**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TYLER SELL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ACER THERAPEUTICS INC., CHRIS SCHELLING, and HARRY PALMIN,<br><br>Defendants. | **CASE No.: 1:19-cv-06137-GHW**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>CLASS ACTION</u>** |

Lead Plaintiff Nicholas Skiadas ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys that included, among other things, reviewing Defendants' public documents, conference calls, and public announcements, the United States Securities and Exchange Commission ("SEC") filings of Acer Therapeutics Inc. ("Acer" or "Company"), wire and press releases, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants[1] and their affiliates, who purchased or otherwise acquired the securities of Acer from September 25, 2017 through June 24, 2019, both dates

[1] The Defendants include: Acer; its president and chief executive officer ("CEO"), Chris Schelling ("Schelling"); and its chief financial officer ("CFO"), Harry Palmin ("Palmin").

inclusive ("Class Period"). Plaintiff pursues remedies against Acer and certain of its officers and directors for violations of federal securities laws.

2. Before the market opened on June 25, 2019, Acer announced that the U.S. Food and Drug Administration ("FDA") had issued a Complete Response Letter ("CRL") denying the Company's New Drug Application ("NDA") for its most advanced product candidate known as "EDSIVO." The CRL, according to Defendants,[2] highlighted the need for Acer "to conduct an adequate and well-controlled trial," necessarily finding that the study upon which the Company relied to support its NDA did not meet that threshold. Later that same day, *Reuters* published an article reporting that "[t]he small group size" of the Company's study had "raised questions among experts about the adequacy of the trial results." The news shocked investors, sending the price of Acer common stock plummeting by $15.16, or over 78%, to close at $4.12 on June 25, 2019.

3. Investors and analysts reacted with such surprise to the FDA's rejection of Acer's NDA because during the Class Period Defendants had touted the positive results from the data they had purchased from a French research hospital to support the Company's NDA for celiprolol. Defendants intended to commercialize celiprolol in the United States under the trademark "EDSIVO" for the treatment of a rare genetic disorder known as vascular Ehlers-Danlos Syndrome ("vEDS").

4. During the Class Period, Defendants stated publicly that the French study had concluded early after having achieved "statistical significance," and that Acer's own analysis of the repackaged trial data had yielded positive results.

[2] Defendants have not made the CRL publicly available.

5. Defendants also reported that, through a series of meetings with FDA representatives, the agency had "agreed" that the Company would not be required to conduct further clinical studies.

6. In light of Defendants' intention to submit its NDA for EDSIVO relying only upon: (i) the "pivotal" data obtained from France, (ii) the Company's own "retrospective" analysis of such data, and (iii) the supplemental patient registry data, Defendants' Class Period statements fostered the impression that FDA approval for EDSIVO was, for all intents and purposes, virtually assured, with only a minimal chance of rejection, since the agency had already deemed the "pivotal" French trial data sufficient. As a result, investors sent the price of Acer common stock soaring from $11.00 per share at the beginning of the Class Period on September 25, 2017 to a Class Period high of $32.83 on August 22, 2018.

7. Acer is a development-stage pharmaceutical company that touts itself as focusing on "the acquisition, development, and commercialization of therapies for serious rare and life-threatening diseases with significant unmet medical needs." Following a reverse merger, Acer needed to raise a significant amount of money to continue as a going concern.

8. During the Class Period, a cash-starved Acer conducted two public offerings to fund its operations for the coming months. In offering documents filed with the SEC in connection with those two public offerings, Defendants represented to investors that they had an "agreement" with the FDA that further clinical development beyond the French study "is not needed" or "is not likely needed." Based on Defendants' representations as to the likelihood of obtaining FDA approval for EDSIVO, the Company raised gross proceeds of $12.56 million from its December 2017 offering and $46.0 million in gross proceeds from its August 2018 offering.

9. Unbeknownst to investors, however, the price of Acer common stock during the Class Period had been artificially inflated. Contrary to Defendants' Class Period statements, the data that Defendants obtained from the French research hospital were fatally flawed, precluding FDA approval. Defendants misrepresented their communications with the FDA regarding the need for additional clinical studies. Contrary to Defendants' public statements during the Class Period, Acer and the FDA did not reach an agreement that Acer would not need to conduct additional clinical studies beyond the already-completed French study. Defendants' mischaracterizations regarding their communications with the FDA misled investors with respect to Acer's prospects for obtaining FDA approval for EDSIVO and the costs and amount of time it would take to secure such approval.

10. In addition, Defendants failed to disclose to the market the FDA's communications that it did not consider the French study an "adequate and well-controlled" trial based on the existence of a severe imbalance between the study's experimental and control arms with respect to the number of patients confirmed as suffering from vEDS. While only 52% of the 25 patients in the experimental arm were confirmed to have vEDS, 71% of the 28 patients in the control group had been confirmed as having the genetic mutation. In addition, a review of the mutation data reveals that the Ong Trial was biased and very underpowered. Each of these flaws would have been recognized in short order by the FDA as a "red flag" or serious impediment to FDA approval.

11. Defendants knew or were reckless in not knowing that their statements touting the French trial data and mischaracterizing their communications with the FDA were materially false and misleading to investors. Obtaining FDA approval for EDSIVO was Acer's paramount objective, as the Company devoted well over 80% of its research and development expenses to EDSIVO. By meeting with FDA representatives several times for the specific purpose of

discussing the French trial data during the period September 2015 to June 2018, Defendants had ready access to the FDA's communications during and after such meetings. In the context of Defendants' other public statements informing the market, among other things, that the Company was: (a) working collaboratively with the FDA, (b) accelerating pre-commercial activities for EDSIVO, (c) hiring a large slate of additional senior-level commercial and medical affairs personnel, and (d) seeking "priority review" of the Company's NDA for EDSIVO, therefore, Defendants knew or recklessly disregarded that in making the challenged statements they had created the false impression in the minds of investors that the French trial data would be sufficient and there were no serious impediments to FDA approval for EDSIVO.

12. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1331.

15. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b). Acer securities trade on the Nasdaq Stock Market ("NASDAQ") located within this District. In addition, substantial acts in furtherance of the alleged fraud or the effect of the fraud have occurred in this District. Many of the acts charged herein, including the

dissemination of materially false and/or misleading information, occurred in substantial part in this District.

16. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17. Plaintiff, as set forth in the Certification submitted in connection with Plaintiff's lead plaintiff motion filed in this action, (ECF No. 14-2), acquired Acer securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

18. Defendant Acer is a Delaware corporation with its principal executive offices located at One Gateway Center, Suite 351, 300 Washington Street, Newton, Massachusetts. Acer's securities trade in an efficient market on the NASDAQ under the symbol "ACER."

19. Defendant Schelling is the founder of Acer and has served as Acer's president and CEO at all relevant times.

20. Defendant Palmin has served as Acer's CFO at all relevant times. He also has served as Acer's chief operating officer ("COO") since September 1, 2018. Defendant Palmin served as president, CEO, and board director at Acer from 2013 until February 2016, as Acting CFO from February 2016 until September 2017, and as CFO until August 2018.

21. Defendants Schelling and Palmin sometimes are referred to herein as the "Individual Defendants."

22. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. certified, pursuant to the Sarbanes-Oxley Act of 2002, as to the Company's compliance with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and to the Company's quarterly and annual reports filed with the Securities and Exchange Commission during the Class Period as having fairly presented, in all material respects, the financial condition and results of operations of the Company;

g. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

h. approved or ratified these statements in violation of the federal securities laws.

23. Acer is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

24. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Acer under *respondeat superior* and agency principles.

25. Acer and the Individual Defendants are collectively referred to herein as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

26. Acer was founded in December 2013 and is headquartered in Newton, Massachusetts. Acer purports to be a development-stage pharmaceutical company focused on the acquisition, development, and commercialization of therapies for serious rare and life-threatening diseases with significant unmet medical needs.

27. On September 19, 2017, the formerly private Acer ("Private Acer") completed a reverse merger with a publicly traded corporation formerly known as Opexa Therapeutics, Inc. ("Opexa"). Companies pursue reverse mergers when they are unable to gain the backing of an underwriter and investors in a conventional initial public offering ("IPO"). In addition, the reverse merger here enabled Private Acer to "go public" quickly and access public capital while avoiding the more in-depth scrutiny of its finances and operations that comes with a traditional IPO.

28. As a result of the September 2017 reverse merger, Private Acer survived as a wholly-owned subsidiary of Opexa, and Opexa changed its name to "Acer Therapeutics Inc." and its trading symbol from "OPXA" to "ACER." The business that Opexa had formerly conducted became primarily the business conducted by Private Acer. Upon the closing of the reverse merger, the directors and the sole executive officer of Opexa resigned from their positions with Opexa, while the surviving company proceeded under the leadership of Private Acer's executive management team. On May 15, 2018, the Company changed its state of incorporation from Texas

to Delaware. Following its reincorporation, the Company eliminated its holding company structure by merging the wholly-owned subsidiary Private Acer with and into the Company.

29. As of December 31, 2018, the Company had twenty-three full-time employees and no part-time employees. In addition, the Company employed a number of consultants or independent contractors.

30. Acer's pipeline includes three clinical-stage candidates, including its most advanced product candidate, EDSIVO, as well as "ACER-001" and "osanetant." The Company has not generated any revenues from commercial sales of any of its current product candidates and has stated that its "ability to generate product revenue depends upon our ability to successfully identify, develop and commercialize these product candidates or other product candidates that we may develop, in-license or acquire in the future."

31. The Company has "not generated any revenue to date" and is "not profitable," having "incurred losses in each year since its inception in 2013." Substantially all of Acer's resources have been dedicated to the clinical development of its product candidates. Since Private Acer's inception in December 2013, the Company has spent approximately $28.5 million in research and development expenses through December 31, 2018. Of that amount, approximately $23.6 million was directly related to EDSIVO, while only approximately $4.2 million was directly related to ACER-001, one of the Company's other clinical-stage candidates.

32. In light of the substantial investment the Company has made in each of its products candidates, particularly EDSIVO, Defendants have informed investors of the importance of obtaining FDA approval for each: "Our business is substantially dependent on our ability to complete the development of, obtain marketing approval for, and successfully commercialize our product candidates in a timely manner. We cannot commercialize our product candidates in the

United States without first obtaining approval from the FDA to market each product candidate." Not surprisingly, therefore, Defendants have warned investors that "our business will be substantially harmed" "if we are ultimately unable to obtain marketing approval for our product candidates."

33. EDSIVO (celiprolol) is, according to the Company, "a repurposing of celiprolol for the treatment of" vEDS, a rare and severe inherited connective tissue disorder caused by mutations in the collagen type III alpha I chain ("COL3A1") gene that affects approximately 2,000 to 5,000 people in the United States. vEDS causes abnormal fragility in blood vessels, which can give rise to aneurysms, abnormal connections between blood vessels known as arteriovenous fistulas, arterial dissections, and spontaneous vascular ruptures, all of which can be potentially life-threatening. Medical intervention for vEDS currently focuses on surgery, symptomatic treatment, genetic counseling and prophylactic measures, such as avoiding intense physical activity, scuba diving, and violent sports. Arterial, digestive or uterine complications in vEDS patients typically require immediate hospitalization, observation in an intensive care unit, and sometimes surgery. Pregnant women with vEDS are considered to be at risk and receive special care.

34. While celiprolol has not been approved for any indication in the United States, it has been approved for the treatment of hypertension in the European Union since 1984 and has been touted by proponents as the "standard of care in France" for patients with vEDS.

**Acer's Acquisition of the Ong Trial Data for the EDSIVO NDA**

35. On December 13, 2016, Private Acer issued a press release announcing that it had signed an agreement with Assistance Publique—Hôpitaux de Paris, Hôpital Européen Georges Pompidou ("AP-HP") in Paris, France granting Private Acer exclusive rights to access and use data from a randomized, controlled clinical study of celiprolol.

36. In 2004, researchers at AP-HP published data on vEDS patients, observing that an abnormally low intima-media thickness generates a higher wall stress than in control subjects at the site of an elastic artery, which may increase the risk of arterial dissection and rupture. Based on this observation, the investigators aimed to assess the preventive effect of celiprolol for major cardiovascular events in patients with vEDS via a multicenter, prospective, randomized, open trial with blinded evaluation of clinical events ("Ong Trial"). Results from the Ong Trial were published on October 30, 2010 in *The Lancet*, a weekly, peer-reviewed medical journal.[3] The Ong Trial was funded by the French Ministry of Health, and the principal investigator for the study was Professor Pierre Boutouyrie.

37. The Ong Trial enrolled 53 participants, who were randomized at eight centers in France and one center in Belgium. The primary endpoint was a composite of cardiac or arterial events (rupture or dissection, fatal or not) during follow-up. Secondary endpoints were gastrointestinal or uterine rupture. According to Acer, the study was ended early "after a consensus decision of the safety monitoring board, the methodologist of AP-HP, and the principal investigator because significant differences were recorded between the treatment group and the control group after 64 months." "[W]ith celiprolol the risk of having a cardiac or arterial event," according to Defendants, "was reduced by 64% compared to [the] control [group]."

38. The Ong Trial data, however, suffered from fatal flaws, aside from the small overall size of its participant pool. During the course of the Ong Trial, researchers learned that more than one-third of the participants did not have a COL3A1 gene mutation, which is the cause of vEDS. Further, the absence of such a genetic mutation was not evenly distributed between the celiprolol arm of the study and the control group. While 12 of the 25 patients in the celiprolol arm did not

[3] A copy of the article appearing in the October 30, 2010 publication of *The Lancet* is attached as Exhibit A.

have a proven COL3A1 mutation, only 8 out of the 28 patients in the control group did not have the proven genetic mutation.

39. Generally, observation of an imbalance between the treatment group and the control group may lead the FDA to conclude that a study was not "well-controlled." Certainly, the severe imbalance observed here, between the experimental and control arms of the Ong Trial with respect to the number of patients with the COL3A1 mutation, prevented the FDA from concluding that the Ong Trial was an "adequate and well-controlled" study[4] and rendered the results insufficient to support FDA approval. Defendants and the FDA almost certainly exchanged communications with each other regarding this subject during the course of their meetings prior to Acer's submission of its NDA for EDSIVO.

40. In addition to the severe imbalance between the experimental and control arms, the Ong Trial presented another major bias. The FDA has a strong preference for prospective studies, which have fewer potential sources of bias and confounding than retrospective studies. Defendants knew, however, that the results of the Ong Trial had already been reported as favorable before they decided to file with the FDA. Since Defendants' claims to statistical significance were not controlled and instead were based on retrospective analysis of historical data, this represents Type 1 error, which the FDA would have recognized as bias upon learning of Defendants' use of the Ong Trial data as the centerpiece of Acer's NDA.

[4] *See* 21 C.F.R. § 314.126(b), which provides that an "adequate and well-controlled study" is characterized by, among other things, the use of "a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect," "the method of selection of subjects provides adequate assurance that they have the disease or condition being studied, or evidence of susceptibility and exposure to the condition against which prophylaxis is directed," "the method of assigning patients to treatment and control groups minimizes bias and is intended to assure comparability of the groups with respect to pertinent variables," and "adequate measures are taken to minimize bias on the part of the subjects, observers, and analysts of the data."

41. The Ong Trial bias can be quantified from the percentages of the study's participants who did not have the genetic mutation, which was 48% (12 out of 25) for the treatment group and 28.6% (8 out of 28) for the control group. From the outset, the treatment group had a 19.4% head start towards event-free survival, which is highly material and equates to a 5-event advantage for the treatment group. Given that an 8-event advantage reaches statistical significance, any scenario among the 13 treatment cases and the 20 control cases with the mutation where there are just 3 fewer events in the mutation present treatment group will result in a statistically significant event-free survival advantage. This is a red flag that the FDA would immediately have recognized as bias upon reviewing the mutation data.

42. Further, with respect to the remaining 33 cases (13+20) with mutations, there was less than 80% power to detect a 50% difference (*i.e.,* 25% vs. 75%), rendering the Ong Trial subgroup very underpowered. In other words, after excluding the ineligible cases, the study lacked an adequate sample size to test for a meaningful difference between the two groups and, therefore, was unlikely to yield any conclusive results. This is another red flag that the FDA would have recognized as soon as the agency learned about the 20 (12+8) ineligible cases.

43. In touting the supposedly positive results of the Ong Trial, Defendants did not mention either the imbalance between the experimental and control arms of the Ong Trial or the biases and underpowering of the Ong Trial.

44. Private Acer's December 13, 2016 press release quoted its chief medical officer, Robert D. Steiner, M.D., as stating: "This pivotal clinical data from AP-HP will represent a critical element of the clinical module in our NDA [New Drug Application], which we are diligently building along with manufacturing, non-clinical and other components of the regulatory package."

From the very moment that the Company acquired the Ong Trial data, therefore, Acer made clear that such data would become the centerpiece for its upcoming NDA.

45. On September 25, 2017, Defendants issued a press release ("September 25, 2017 Press Release") announcing that the Company had obtained "positive results" from Acer's own "retrospective source verified analysis of the [Ong T]rial data, including the primary and secondary endpoints." Defendants touted the Ong Trial data, stating that "[t]he previously completed European study, published on October 30, 2010, in *The Lancet*, was stopped early having achieved statistical significance in its primary endpoints." According to the September 25, 2017 Press Release, "Acer will use this pivotal clinical data to support a New Drug Application (NDA) regulatory filing in the U.S. in the first half of 2018."

**<u>The FDA's Process for Reviewing Acer's NDA for EDSIVO</u>**

46. Every drug that has reached the U.S. market since 1938 has been the subject of an NDA, the vehicle through which drug sponsors formally propose that the FDA approve a new pharmaceutical for sale and marketing in the U.S. According to the FDA website,[5] "[t]he goals of the NDA are to provide enough information to permit FDA reviewer to reach the following key decisions:

a. whether the drug is safe and effective in its proposed use(s), and whether the benefits of the drug outweigh the risks;

b. whether the drug's proposed labeling (package insert) is appropriate, and what it should contain; and

[5] *See* https://www.fda.gov/drugs/types-applications/new-drug-application-nda.

c. whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity.

47. "The documentation required in an NDA," according to the FDA website,[6] "is supposed to tell the drug's whole story, including what happened during the clinical tests, what the ingredients of the drug are, the results of the animal studies, how the drug behaves in the body, and how it is manufactured, processed and packaged."

48. According to Acer:

> The FDA is required to conduct a preliminary review of an NDA within the first 60 days after submission, before accepting it for filing, to determine whether it is sufficiently complete to permit substantive review. The FDA may accept the NDA for filing, potentially refuse to file the NDA due to deficiencies but work with the applicant to rectify the deficiencies (in which case the NDA is filed upon resolution of the deficiencies) or refuse to file the NDA. The FDA must notify the applicant of a refusal to file a decision within 60 days after the original receipt date of the application. … Once an NDA is accepted for filing, the FDA begins an in-depth substantive review. Under the Prescription Drug User Fee Act ("PDUFA") and the FDA's commitments under the current PDUFA Reauthorization Act, the FDA has a goal of reviewing and acting on 90% of standard non-priority NDA applications within ten months from the filing date of the NDA.

49. The PDUFA, however, also provides for a "priority review" designation, which enables applicants that have submitted NDAs meeting certain criteria to receive a decision within 6 months, instead of the 10-month period under standard review. According to the FDA's website:[7]

> A Priority Review designation will direct overall attention and resources to the evaluation of applications for drugs that, if approved, would be significant improvements in the safety or

[6] *See id.*
[7] *See* https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/priority-review.

> effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications.
>
> Significant improvement may be demonstrated by the following examples:
>
> - evidence of increased effectiveness in treatment, prevention, or diagnosis of condition;
> - elimination or substantial reduction of a treatment-limiting drug reaction;
> - documented enhancement of patient compliance that is expected to lead to an improvement in serious outcomes; or
> - evidence of safety and effectiveness in a new subpopulation.
>
> FDA decides on the review designation for every application. However, an applicant may expressly request priority review as described in the Guidance for Industry Expedited Programs for Serious Conditions – Drugs and Biologics. It does not affect the length of the clinical trial period. FDA informs the applicant of a Priority Review designation within 60 days of the receipt of the original BLA, NDA, or efficacy supplement. Designation of a drug as "Priority" does not alter the scientific/medical standard for approval or the quality of evidence necessary.

50. After conducting its review centered on the drug candidate's safety and efficacy, the FDA then issues its decision by letter either approving the NDA or else rejecting or denying the NDA. If the FDA rejects or denies the NDA, it issues a CRL, which must, under 21 C.F.R. § 314.110(a)(1), contain "all of the specific deficiencies that the agency has identified":[8]

> The FDA reviews an NDA to determine, among other things, whether the drug is safe and effective for its intended use and whether the facility in which it is manufactured, processed, packaged or held meets standards designed to assure the product's continued safety, quality and purity. The FDA is required to refer an application for a novel drug to an advisory committee or explain why such referral was not made. An advisory committee is a panel of independent experts, including clinicians and other scientific experts, that reviews, evaluates and provides a recommendation in response to specific questions raised by the FDA, which may

[8] Note, however, that "[i]f FDA determines, after an application is filed or an abbreviated application is received, that the data submitted are inadequate to support approval, the agency might issue a complete response letter without first conducting required inspections and/or reviewing proposed product labeling." *Id.* § 314.110(a)(3).

> include whether the application should be approved and under what conditions. The FDA is not bound by the recommendations of an advisory committee, but it considers such recommendations carefully when making decisions.
>
> * * *
>
> After the FDA evaluates the NDA and conducts its inspections, it may issue an approval letter or a Complete Response Letter. An approval letter authorizes commercial marketing of the drug subject to specific prescribing information for specific indications and, if applicable, specific post-approval requirements. A Complete Response Letter indicates that the review cycle of the application is complete and the application is not ready for approval. After receiving a Complete Response Letter, the applicant must decide within twelve months (subject to extension), if it wants to resubmit the NDA addressing the deficiencies identified by the FDA in the Complete Response Letter, withdraw the NDA, or request an opportunity for a hearing to challenge the FDA's determination. A Complete Response Letter may require additional clinical data and/or an additional pivotal Phase 3 clinical trial(s), and/or other significant, expensive and time-consuming requirements related to clinical trials, nonclinical studies or manufacturing. Even if such data are submitted, the FDA may ultimately decide that the NDA does not satisfy the criteria for approval. Data from clinical trials are not always conclusive and the FDA may interpret data differently than we interpret data.

**<u>Acer Collaborates with the FDA Prior to Filing the NDA for EDSIVO</u>**

51. Defendants repeatedly told investors that the Company was working closely with the FDA in preparing their NDA for the agency's review. In public statements issued during the Class Period, Defendants fostered the impression that through the Company's ongoing collaboration with FDA representatives, Acer would be able to resolve – prior to submission of its NDA – any "gaps" existing between the data package Defendants intended to submit on the one hand, and the FDA's requirements and expectations on the other, thus substantially reducing the risk that its NDA for EDSIVO would receive a CRL.

52. On March 7, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 ("2017 10-K"). In the 2017 10-K, Defendants stated that "[i]n September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO."

53. Also in the 2017 10-K, Defendants reported that "[i]n May 2017, we held a Type C meeting with the FDA to discuss non-clinical and manufacturing data, and proactively identify whether there were any gaps for us to address in advance of a pre-NDA meeting." In addition, Defendants stated that "the FDA provided us with additional guidance on the expected presentation of the existing clinical data for EDSIVO to support the NDA filing." Further, Defendants advised the market that they "plan[ned] to have a pre-NDA meeting, which may consist of one or more consults, with the FDA in the second quarter of 2018," after which they expected "to submit the 505(b)(2) NDA for EDSIVO for the treatment of vEDS at the end of the first half of 2018."

54. Moreover, in a press release issued on March 7, 2018 ("March 7, 2018 Press Release"), Defendants told investors of their "plan to discuss these key data," consisting of the "positive results" obtained from the Company's own "retrospective source-verified analysis of the trial data, including the primary and secondary endpoints, confirm[ing] the data from a previously published randomized controlled clinical study of celiprolol," "during a pre-NDA meeting with the FDA in the second quarter of 2018."

55. Sponsors are represented at meetings with the FDA by multiple members of the sponsor's senior management. Generally, the sponsor's chief medical officer, director of clinical affairs, and director of regulatory affairs attend meetings with the FDA. On some occasions, these senior officers will be accompanied by the sponsor's chief executive officer. Accordingly, at the FDA meetings in question Acer was represented by at least some members of its senior management.

56. Sponsors always maintain written notes and records from such meetings so that they are clear on the FDA's feedback and their path forward. All agreements reached between the FDA and a sponsor during a meeting are recorded, and the minutes of meetings between a sponsor and the FDA are prepared by the FDA and sent to the sponsor. Generally, the sponsor knows well the outcome of a meeting, with the FDA's minutes reflecting the points discussed at the meeting.

57. On August 13, 2018, Defendants issued a press release ("August 13, 2018 Press Release") announcing the Company's financial results for the second quarter of the 2018 fiscal year. In the August 13, 2018 Press Release, Defendants reported that they had "held a Type C clinical meeting and a Type B (pre-NDA) meeting with the FDA in June 2018," and that they had "presented celiprolol vEDS Patient Registry data to the FDA at the Type C meeting." The manuscript of the patient registry data," according to Defendants, was then "currently under peer review" and, "if published, it will be included in support of NDA but is not rate-limiting to submission of NDA." Defendants also stated that they were "targeting NDA submission to the FDA for EDSIVO for the treatment of vEDS in early fourth quarter of 2018."

58. According to Defendants' public statements, therefore, none of the consultations that Defendants held with the FDA had derailed the Company's plan to submit its NDA based on their existing data set, consisting of the Ong Trial data, Acer's own "retrospective source-verified analysis" of the Ong Trial data, and perhaps the patient registry data (if published), all of which had been shared and discussed with the FDA prior to the Company's submission of the NDA for EDSIVO.

**Acer Tells Investors that FDA "Agrees" No Further Studies are Required**

59. Early in the Class Period, Defendants reported that Acer and the FDA had reached an agreement that Acer would not need to conduct any clinical studies beyond the already-

completed Ong Trial. In a Preliminary Prospectus Supplement filed with the SEC on December 11, 2017, and in a Prospectus Supplement filed with the SEC on December 12, 2017, Defendants reported that "[a] that [September 2015] meeting" at which Acer "met with the FDA to discuss the existing clinical data for EDSIVO," "***the FDA agreed that additional clinical development <u>is not needed</u>*** and stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS" (emphasis added). This was significant to Defendants since they "anticipate[d] [that] the use of third-party data will minimize the amount of original data we would be required to generate and shorten the time needed for preparation, submission, and review of the marketing applications."

60. Later in the Class Period, however, Defendants equivocated on the supposed "agreement" which they supposedly had reached at the September 2015 meeting with the FDA regarding the need for additional clinical studies to support Acer's NDA for EDSIVO. In the 2017 10-K, which Defendants filed with the SEC on March 7, 2018, Defendants stated: "In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO. ***At that meeting, the FDA agreed that an additional clinical trial is <u>not likely</u> <u>needed</u>*** and stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS" (emphasis added). Defendants added: "Furthermore, ***the FDA provided us with <u>additional guidance</u>*** on the expected presentation of the existing clinical data for EDSIVO™ to support the NDA filing."

61. Similarly, Defendants backtracked on the supposed September 2015 "agreement" with the FDA in documents they filed in connection with a public offering that closed in August 2018. In a Preliminary Prospectus Supplement filed with the SEC on July 31, 2018, and in a Prospectus Supplement filed with the SEC on August 1, 2018, Defendants stated: "In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO. ***At that meeting, the FDA agreed that an additional clinical trial <u>is not likely needed</u>*** and stated that we may submit a

505(b)(2) NDA for EDSIVO™ for the treatment of vEDS" (emphasis added). Defendants also added: "Furthermore, ***the FDA provided us with <u>additional guidance</u>*** on the expected presentation of the existing clinical data for EDSIVO to support the NDA filing" (emphasis added).

62. By thus characterizing their communications with the FDA as constituting an "agreement" that did not require, or likely would not require, further clinical development for the agency to approve Acer's NDA for EDSIVO, Defendants misled investors regarding the likelihood of and timeline for EDSIVO's approval.

63. The FDA did not enter into any such agreement with Defendants that no further clinical development would be required for Acer to obtain FDA approval for EDSIVO. The FDA would not "agree" that Acer's Ong Trial data were sufficient to support approval for EDSIVO, only to later deny the Company's NDA on the ground that such data are insufficient. Rather, Defendants determined to negotiate the sufficiency of the existing clinical data with the FDA, but did not reveal the extent to which the FDA pushed back against Defendants' position regarding the use of retrospective data and the sufficiency of such data.

64. Based on Defendants' later admission that "[t]he CRL states that it will be necessary to conduct ***an adequate and well-controlled trial*** to determine whether celiprolol reduces the risk of clinical events ***in patients with vEDS***" (emphasis added), the FDA had previously communicated to Defendants that the agency did not consider the Ong Trial an "adequate and well-controlled trial" as a result of the imbalance between the experimental and control arms of the Ong Trial. The FDA would not – over the course of multiple meetings with Acer dating back to September 2015, in which Defendants reported that the "existing clinical data for EDSIVO" was the primary, if not exclusive, subject – lead Defendants to believe that the agency considered the Ong Trial an "adequate and well-controlled trial," and then later deny the

Company's NDA on the ground that the Ong Trial did not constitute an "adequate and well-controlled trial."

65. In their Class Period statements, Defendants led investors to believe that there were no serious impediments to FDA approval. Defendants made such statements while knowing or recklessly disregarding that: (i) the FDA's view that the Ong Trial data were flawed, and (ii) they did not have an agreement with the FDA that no further clinical development would be required to support approval.

**The FDA Issues a CRL to Acer for EDSIVO**

66. In the months leading up to Acer's submission of its NDA for EDSIVO, Defendants continued to send signals to the market that there were no serious impediments to FDA approval. Although Defendants' public statements led investors to believe that FDA approval was virtually certain, they did not disclose that the FDA had requested new prospective data and advised Defendants to address certain other flaws in the data.

67. On February 5, 2018, Acer issued a press release ("February 5, 2018 Press Release") announcing the expansion of its management team. Defendants stated that they had hired three new executives and "one new key hire." The February 5, 2018 Press Release reported that the Company had "appointed Terrie Kellmeyer, Ph.D., as Vice President, Clinical Science; John Klopp as Vice President, Manufacturing; and Jason Kneeland, CPA, as Vice President Finance, Controller. Also, the Company hired Kim Tharaldsen, MBA, as Senior Director, Marketing."

68. In the March 7, 2018 Press Release, Defendants stated that they planned to make "additional senior-level commercial and medical affairs hires this year, as well as continuing to build out the commercial team and add other core personnel later this year."

69. On May 14, 2018, Defendants issued a press release ("May 14, 2018 Press Release") announcing that it had "appointed Don Joseph, as Chief Legal Officer; Stacey Bain, Ph.D., as Vice President, Clinical Operations; Kristin Mulready, as Vice President, Program and Alliance Management; and Matt Seibt, as Vice President, Market Access and Reimbursement." The May 14, 2018 Press Release also noted the February 2018 appointments of Terrie Kellmeyer, Ph.D., as Vice President, Clinical Science; John Klopp as Vice President, Manufacturing; and Jason Kneeland, CPA, as Vice President Finance, Controller. All told, Defendants had "expanded [the Company's] management team by hiring a Chief Legal Officer and six Vice Presidents." These "additional senior-level hires," according to the May 14, 2018 Press Release, "bring deep industry knowledge and experience with them, which will be invaluable as we move forward." Defendants also reported that they were "continuing pre-commercial activities for EDSIVO" and would be "making additional senior-level commercial and medical affairs hires this year, as well as continuing to build out the commercial team and add other core personnel later this year."

70. In the August 13, 2018 Press Release, Defendants announced that it had made "two important senior-level hires," Dr. Usman Iqbal as Vice President, Medical Affairs and Ms. Nancy Duarte-Lonnroth as Vice President, Quality, "[a]s part of the pre-commercial preparation." Like the new hires announced in May 2018, Iqbal and Duarte-Lonnroth "bring deep industry knowledge and experience across medical affairs and quality, which will be invaluable as we move forward," according to Defendants. The August 13, 2018 Press Release also noted that Acer planned on "making additional senior-level commercial hires this year, as well as continuing to build out the commercial team and add other core personnel later this year."

71. On October 29, 2018, Defendants issued a press release ("October 29, 2018 Press Release") announcing that Acer had submitted its NDA for EDSIVO. Defendants also reported in

the October 29, 2018 Press Release that the Company had "requested Priority Review, which if granted, could result in a six-month review period," while noting that "Priority Review is a designation given to drugs that offer a significant improvement in treatment or provide treatment where no satisfactory alternative therapy exists." The October 29, 2018 Press Release quoted Dr. William Andrews, Acer's chief medical officer, as stating: "We now look forward to continuing to work with the FDA as they review our NDA, with hopes to make EDSIVO available as quickly as possible in the U.S."

72. On December 26, 2018, Defendants issued a press release ("December 26, 2018 Press Release") announcing that the FDA had accepted for review the Company's NDA for EDSIVO. The December 26, 2018 Press Release also noted that "[t]he FDA also granted a priority review of the NDA and assigned a Prescription Drug User Fee Act (PDUFA) target action date of June 25, 2019. Priority review is a designation granted by the FDA to accelerate the review process for drugs that offer a significant improvement in treatment or provide treatment where no satisfactory alternative therapy exists." In addition, in the December 26, 2018 Press Release Defendants stated that "[w]e continue to accelerate our pre-commercial activities supporting the potential U.S. launch of EDSIVO for the treatment of vEDS if it is approved by the FDA."

73. On April 16, 2019, Defendants issued a press release ("April 16, 2019 Press Release") announcing the publication of "long-term data from a cohort of COL3A1-positive vEDS patients in the *Journal of the American College of Cardiology*" ("Long-Term Observational Study") According to the April 16, 2019 Press Release, the Long-Term Observational Study, entitled "Vascular Ehlers-Danlos Syndrome: Long-Term Observational Study," and authored by Michael Frank, MD, Xavier Jeunemaitre, MD, PhD, and Pierre Boutouyrie, MD, PhD, et al., "describes outcomes in 144 COL3A1-positive vEDS patients clinically monitored and treated at

the French National Referral Center for Rare Vascular Diseases (Paris, France) between the years 2000 and 2017." The April 16, 2019 Press Release quotes Dr. Michael Frank, a clinical investigator from the Paris Group and one of the co-authors of the Long-Term Observational Study, as stating, "The higher overall survival in patients treated with celiprolol in this long-term study in COL3A1-positive vEDS patients appears to correlate with the significant event-free survival advantage that was reported in the [Ong Trial] of celiprolol treatment in vEDS patients."

74. While touting the supposedly "positive impact of celiprolol" supposedly observed in the Long-Term Observational Study, the April 16, 2019 Press Release, did not disclose the significant limitation of the Long-Term Observational Study. According to the researchers of the Long-Term Observational Study themselves, "[i]t is difficult to formally assess this beneficial effect (the benefit of celiprolol on survival) in the absence of a placebo-controlled prospective trial, because other confounders might have influenced this observation." As Dr. Julie De Backer and Dr. Tine De Backer, vEDS researchers not affiliated with the Long-Term Observational Study, stated:

> Whether the systematic treatment with celiprolol has an additional genuine pharmacological beneficial effect or helps ensure better follow up cannot be answered with this study. The only way to determine if it is celiprolol contributing to the better outcome is to conduct a randomized prospective trial comparing celiprolol to another beta-blocker in patients with molecularly confirmed vEDS.[9]

75. On June 25, 2019, Defendants issued a press release ("June 25, 2019 Press Release") disclosing that the FDA had rejected Acer's NDA for EDSIVO. Although Defendants did not make the CRL available to the public, the June 25, 2019 Press Release reported that the CRL had cited the need for an "adequate and well-controlled trial" evaluating EDSIVO's

[9] De Backer, Julie and Tine De Backer, "Vascular Ehlers-Danlos Syndrome Management: The Paris Way, A Step Forward on a Long Road," *Journal of the American College of Cardiology*, Vol. 73, Issue 15 (April 2019).

effectiveness in reducing the risk of clinical events in patients with vEDS. The June 25, 2019 Press Release also quoted Defendant Schelling as stating the following: "We remain committed to working closely with the FDA to fully understand its response. We expect to respond to the FDA in the third quarter of this year."

76. In the June 25, 2019 Press Release, Defendants made no mention of the supposed "agreement" they had reached with the FDA regarding the sufficiency of the Ong Trial data to support approval for EDSIVO.

77. On July 5, 2019, Defendants issued a press release ("July 5, 2019 Press Release") announcing that, in light of the FDA's issuance of the CRL to Acer regarding its NDA for EDSIVO, the Company was undergoing a "corporate restructuring," as a result of which "Acer's headcount has been reduced from 48 to 19 employees and pre-commercial activities of EDSIVO (celiprolol) have been halted. The restructuring is expected to provide the resources needed for Acer to conduct its planned business operations through 2020." The July 5, 2019 Press Release also noted that Defendants "intend to continue our dialogue with the FDA to fully understand its response and work toward our goal of approval of EDSIVO." Defendants added that "[i]n light of the CRL it was necessary to reduce our expenses, extend our cash runway, and focus our resources on a potential path forward for EDSIVO as well as continued development of our other pipeline opportunities."

**MATERIALLY FALSE AND MISLEADING STATEMENTS**
**<u>ISSUED DURING THE CLASS PERIOD</u>**

78. The Class Period begins on September 25, 2017, when Defendants issued the September 25, 2017 Press Release touting the "positive results" Acer had obtained from its "pivotal clinical trial of EDSIVO." In the September 25, 2017 Press Release, Defendants stated that the Company:

> today announced ***positive results from the pivotal clinical trial of EDSIVO (celiprolol)*** for the treatment of vascular Ehlers-Danlos Syndrome (vEDS). ***Acer's retrospective source verified analysis of the trial data, including the primary and secondary endpoints, confirmed the data from a previously published randomized controlled clinical study of celiprolol***. ***Acer will use this pivotal clinical data to support a New Drug Application (NDA) regulatory filing in the U.S. in the first half of 2018***. … "We are committed to bringing EDSIVO to vEDS patients who currently do not have access to this treatment," said Robert D. Steiner, M.D., Chief Medical Officer of Acer. "***Our confirmation of the published celiprolol clinical data with an Acer-sponsored retrospective source verified analysis of the trial data represents a critical element of the clinical module in our NDA,*** which we are diligently building, along with current manufacturing, non-clinical and other components of the regulatory package." (Emphasis added).

79. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study. By touting the supposedly positive results of the Ong Trial, Defendants were duty bound to disclose potentially adverse information within their possession, including communications from the FDA that the Ong Trial data were flawed. In failing to disclose such potentially adverse information, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

80. Also in the September 25, 2017 Press Release, Defendants stated: "The previously completed European study, published on October 30, 2010, in *The Lancet*, was stopped early ***having achieved statistical significance*** in its primary endpoints…." (emphasis added).

81. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study. By touting the supposedly positive results of the Ong Trial,

Defendants were duty bound to disclose potentially adverse information within their possession, including communications from the FDA that the Ong Trial data were flawed. In failing to disclose such potentially adverse information, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

82. In addition, Defendants stated in the September 25, 2017 Press Release the following: "In addition to source verifying a definitive Event-Free Survival endpoint from ***a previously completed robust clinical study***, modernizing manufacturing and assembling other components of the regulatory package, we are executing on a number of key medical affairs focused initiatives for vEDS patients" (emphasis added).

83. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study. By touting the supposedly positive results of the Ong Trial, Defendants were duty bound to disclose potentially adverse information within their possession, including communications from the FDA that the Ong Trial data were flawed. In failing to disclose such potentially adverse information, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

84. On November 13, 2017, Acer issued a press release ("November 13, 2017 Press Release") in which the Company reported its financial results for the third quarter of fiscal 2017. In the November 13, 2017 Press Release, Defendants stated:

> We … announced ***positive results from our pivotal clinical trial of EDSIVO, each a critical step in bringing us closer to our goal of becoming a leading pharmaceutical company that acquires, develops and commercializes therapies for the treatment of patients with serious rare and ultra-rare diseases with critical unmet medical need***," said Chris Schelling, CEO and Founder of

> Acer. "***We continue to successfully advance our lead product candidate, EDSIVO***, a potential life-saving therapy for patients with vEDS." (Emphasis added).

85. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study. By touting the supposedly positive results of the Ong Trial, Defendants were duty bound to disclose potentially adverse information within their possession, including communications from the FDA that the Ong Trial data were flawed. In failing to disclose such potentially adverse information, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

86. On December 11, 2017, Acer filed with the SEC its Preliminary Prospectus Supplement in connection with its public offering of common stock ("December 11, 2017 Preliminary Prospectus Supplement").[10] In the December 11, 2017 Preliminary Prospectus Supplement, Defendants stated:

> ***In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO. At that meeting, the FDA agreed that additional clinical development is not needed and stated that we may submit a 505(b)(2) NDA for EDSIVO for the treatment of vEDS.*** In addition, the FDA advised us that no significant additional work would be required for the chemistry, manufacturing and controls, nonclinical or pharmacology sections of the NDA. The FDA also indicated to us at that time that it expected that the 505(b)(2) NDA for EDSIVO would qualify for priority review, which provides an expedited six-month review cycle, instead of the traditional ten-month cycle, for a drug that treats a serious condition and demonstrates the potential to be a significant improvement in safety or effectiveness of the treatment, prevention, or diagnosis of the condition. The FDA determines whether an application will receive priority review at the time the application is submitted. We

[10] On December 12, 2017, Acer filed with the SEC its Prospectus Supplement, which is at least substantially similar, if not virtually identical, to the December 11, 2017 Preliminary Prospectus Supplement. The language quoted immediately below is identical.

> expect to submit to the FDA the 505(b)(2) NDA for EDSIVO for the treatment of vEDS in the first half of 2018. (Emphasis added).

87. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the FDA did not enter into any such agreement with Defendants that no further clinical development would be required for Acer to obtain FDA approval for EDSIVO. By misrepresenting to the market the FDA's communications to Acer regarding the need for further clinical development to obtain approval, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

88. In the March 7, 2018 Press Release, Defendants stated that they had previously "announced positive results from the pivotal clinical trial of EDSIVO (celiprolol) for the treatment of vEDS. Our retrospective source-verified analysis of the trial data, including the primary and secondary endpoints, confirmed the data from a previously published randomized controlled clinical study of celiprolol." Defendants added: "We plan to discuss these key data during a pre-NDA meeting with the FDA in the second quarter of 2018."

89. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study. By touting the supposedly positive results of the Ong Trial, Defendants were duty bound to disclose potentially adverse information within their possession, including communications from the FDA that the Ong Trial data were flawed. In failing to disclose such potentially adverse information, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

90. Also on March 7, 2018, in the 2017 10-K, Defendants stated:

> ***In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO. At that meeting, the FDA agreed that***

> ***an additional clinical trial is not likely needed*** and stated that we may submit a 505(b)(2) NDA for EDSIVO for the treatment of vEDS. The FDA indicated to us at that time that it expected that the 505(b)(2) NDA for EDSIVO is likely to qualify for priority review. Priority review provides an expedited six-month review cycle after acceptance of the NDA for filing, instead of the traditional ten-month review cycle, for drugs that treat a serious condition and demonstrate the potential to be a significant improvement in safety or effectiveness of the treatment, prevention, or diagnosis of the condition. The FDA determines whether an application will receive priority review at the time the application is accepted for filing. (Emphasis added).

91. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the FDA did not enter into any such agreement with Defendants that no further clinical development would be required for Acer to obtain FDA approval for EDSIVO. By misrepresenting to the market the FDA's communications to Acer regarding the need for further clinical development to obtain approval, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

92. Defendants also stated in the 2017 10-K:

> In May 2017, we held a Type C meeting with the FDA to discuss non-clinical and manufacturing data, and proactively identify whether there were any gaps for us to address in advance of a pre-NDA meeting. In our non-clinical data package, we are addressing a potential preclinical gap by conducting in vitro drug-drug interaction studies, which were missing from the Aventis MHRA dossier. We also reached agreement with the FDA regarding Chemistry, Manufacturing and Controls (CMC) specifications. Furthermore, ***the FDA provided us with additional guidance on the expected presentation of the existing clinical data for EDSIVO™ to support the NDA filing***. (Emphasis added).

93. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study. By reporting to investors that the FDA had provided "guidance"

as to how Defendants should "present[ ]" the "existing clinical data for EDSIVO," Defendants led investors to believe that the Ong Trial data were sufficient to support FDA approval and that no further clinical development would be required. By misrepresenting to the market the FDA's communications to Acer regarding the need for further clinical development to obtain approval, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

94. On July 31, 2018, Acer filed with the SEC its Preliminary Prospectus Supplement in connection with its public offering of common stock ("July 31, 2018 Preliminary Prospectus Supplement").[11] In the July 31, 2018 Preliminary Prospectus Supplement, Defendants stated:

> ***In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO™. At that meeting, the FDA agreed that an additional clinical trial is not likely needed*** and stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS. The FDA indicated to us at that time that it expected that the 505(b)(2) NDA for EDSIVO™ is likely to qualify for priority review. Priority review provides an expedited six-month review cycle after acceptance of the NDA for filing, instead of the traditional ten-month review cycle, for drugs that treat a serious condition and demonstrate the potential to be a significant improvement in safety or effectiveness of the treatment, prevention, or diagnosis of the condition. The FDA determines whether an application will receive priority review at the time the application is accepted for filing. (Emphasis added).

95. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the FDA did not enter into any such agreement with Defendants that no further clinical development would be required for Acer to obtain FDA approval for EDSIVO. By misrepresenting to the market the FDA's communications to Acer

[11] On August 1, 2018, Acer filed with the SEC its Prospectus Supplement, which is at least substantially similar, if not virtually identical, to the July 31, 2018 Preliminary Prospectus Supplement. The language quoted immediately below is identical.

regarding the need for further clinical development to obtain approval, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

96. In the July 31, 2018 Preliminary Prospectus Supplement, Defendants also stated:

> In May 2017, we held a Type C meeting with the FDA to discuss non-clinical and manufacturing data, and proactively identify whether there were any gaps for us to address in advance of a pre-NDA meeting. In our non-clinical data package, we are addressing a potential preclinical gap by conducting in vitro drug-drug interaction studies, which were missing from the Aventis MHRA dossier. We also reached agreement with the FDA regarding Chemistry, Manufacturing and Controls (CMC) specifications. Furthermore, ***the FDA provided us with additional guidance on the expected presentation of the existing clinical data for EDSIVO™ to support the NDA filing.*** (Emphasis added).

97. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study. By reporting to investors that the FDA had provided "guidance" as to how Defendants should "present[ ]" the "existing clinical data for EDSIVO," Defendants led investors to believe that the Ong Trial data were sufficient to support FDA approval and that no further clinical development would be required. By misrepresenting to the market the FDA's communications to Acer regarding the need for further clinical development to obtain approval, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

98. In the April 16, 2019 Press Release, Defendants stated: "[I]n this large, long-term cohort study, vEDS patients had a higher survival rate than expected relative to the known natural history of the disease and a lower annual occurrence of arterial complications, and that celiprolol use was potentially associated with these significant improvements in clinical outcomes."

99. Also in the April 16, 2019 Press Release, Defendants quoted the clinical investigator from the Paris group, Dr. Michael Frank, as stating: "The higher overall survival in patients treated with celiprolol in this long-term study in COL3A1-positive vEDS patients appears to correlate with the significant event-free survival advantage that was reported in the Ong, et al. study of celiprolol treatment in vEDS patients."

100. In addition, the April 16, 2019 Press Release quoted Acer's chief medical officer as stating: "We are pleased to see this publication from the vEDS clinical investigator group in Paris which provides patients and physicians with a greater understanding of this chronic disease, including data suggesting a positive impact of celiprolol, which has a unique pharmacological profile."

101. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that: (i) the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study, and (ii) the significant limitation of the Long-Term Observational Study in that it could not answer "whether the systematic treatment with celiprolol has an additional genuine pharmacological beneficial effect." By touting the supposedly positive results of the Ong Trial and the Company's "retrospective source verified analysis" to the market, Defendants were duty bound to disclose potentially adverse information within their possession, including communications from the FDA that the Ong Trial data were flawed and the limited value of the Long-Term Observational Study. In failing to disclose such potentially adverse information, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

102. In the May 14, 2019 Press Release, Defendants stated: "[I]n April 2019, we announced the publication of the Paris registry data in JACC that supplements the previously-reported safety and efficacy of celiprolol in vEDS patients with a confirmed type III collagen (COL3A1) mutation."

103. Also in the May 14, 2019 Press Release, Defendants stated that during the first quarter of fiscal year 2019, the Company had:

> announced the publication of long-term data from a cohort of COL3A1-positive vascular Ehlers-Danlos syndrome (vEDS) patients in the Journal of the American College of Cardiology (JACC). The published data includes up to 17 years of safety data in this population, and the survival curve analysis shows that those patients not treated with celiprolol had a significantly worse outcome than celiprolol-treated patients. The authors also observed a relative decrease in hospitalization rates for acute arterial events during the time period in which the majority of patients were on celiprolol, suggesting a positive effect of celiprolol on the incidence and/or severity of new arterial events.

104. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that: (i) the Ong Trial data were insufficient to support FDA approval based on the imbalance between the study's experimental and control arms, and the severe bias and underpowering of the study, and (ii) the significant limitation of the Long-Term Observational Study in that it could not answer "whether the systematic treatment with celiprolol has an additional genuine pharmacological beneficial effect." By touting the supposedly positive results of the Ong Trial and the Company's "retrospective source verified analysis" to the market, Defendants were duty bound to disclose potentially adverse information within their possession, including communications from the FDA that the Ong Trial data were flawed and the limited value of the Long-Term Observational Study. In failing to disclose such potentially adverse information, Defendants disabled investors from properly assessing the likelihood of and timeline for FDA approval of EDSIVO.

**THE TRUTH EMERGES**

105. On June 25, 2019, Defendants issued the June 25, 2019 Press Release, which revealed that the FDA had rejected Acer's NDA for EDSIVO. According to the June 25, 2019 Press Release, in the CRL the FDA cited the need for an "adequate and well-controlled trial" evaluating EDSIVO's effectiveness in reducing the risk of clinical events in patients with vEDS. Specifically, the June 25, 2019 Press Release stated, in pertinent part, the following:

> Acer Therapeutics Inc. (Nasdaq: ACER), a pharmaceutical company focused on the acquisition, development and commercialization of therapies for serious rare and life-threatening diseases with significant unmet medical needs, today announced it has received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding its New Drug Application (NDA) for EDSIVO™ for the treatment of vascular Ehlers-Danlos syndrome (vEDS). The CRL states that it will be necessary to conduct an adequate and well-controlled trial to determine whether celiprolol reduces the risk of clinical events in patients with vEDS. Acer plans to request a meeting to discuss the FDA's response.
>
> "We remain committed to working closely with the FDA to fully understand its response," said Chris Schelling, CEO and Founder of Acer. "We expect to respond to the FDA in the third quarter of this year."

106. Also on June 25, 2019, *Reuters* published an article entitled, "FDA declines to approve Acer Therapeutics' rare genetic disorder treatment" ("June 25, 2019 *Reuters* Article"). The June 25, 2019 *Reuters* Article noted, among other things, how "[t]he small group size" of the Ong Trial had "raised questions among experts about the adequacy of the trial results."

107. On the above news, the per-share price of Acer common stock fell $15.16, or 78.63%, to close at $4.12 per share on June 25, 2019.

108. On July 5, 2019, Defendants issued a press release ("July 5, 2019 Press Release") announcing the restructuring of the corporation. The July 5, 2019 Press Release stated that the Company's "headcount has been reduced from 48 to 19 employees and pre-commercial activities

of EDSIVO (celiprolol) have been halted. The restructuring is expected to provide the resources needed for Acer to conduct its planned business operations through 2020." Defendants also stated in the July 5, 2019 Press Release that they "intend to continue our dialogue with the FDA to fully understand its response and work toward our goal of approval of EDSIVO," and that "in light of the CRL it was necessary to reduce our expenses, extend our cash runway, and focus our resources on a potential path forward for EDSIVO as well as continued development of our other pipeline opportunities."

109. As a result of Defendants' wrongful acts and omission, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**ADDITIONAL SCIENTER ALLEGATIONS**

110. By late 2017, Acer had substantial concerns about its ability to continue operations, including its funding of the development of EDSIVO. On November 13, 2017, the Company filed its quarterly report on Form 10-Q for the third quarter of fiscal 2017 ("3Q2017 10-Q"). In the 3Q2017 10-Q, Defendants stated:

> There is substantial doubt about the Company's ability to continue as a going concern within one year after the date that the accompanying financial statements are available to be issued and these financial statements do not include any adjustments relating to the recoverability of recorded asset amounts that might be necessary as a result of the above uncertainty. Based on available resources, the Company believes that its cash and cash equivalents currently on hand are sufficient to fund its anticipated operating and capital requirements through the first half of 2018.

111. Also in the 3Q2017 10-Q, Defendants stated:

> Our current capital resources are not sufficient to fund our planned operations for the next 12 months. We will continue to require substantial additional capital to continue our clinical development and pursuit of regulatory approval activities. Accordingly, we will need to raise substantial additional capital to continue to fund our

> operations. The amount and timing of our future funding requirements will depend on many factors, including the pace and results of our development, regulatory and commercialization efforts. Failure to raise capital as and when needed, on favorable terms or at all, would have a negative impact on our financial condition and our ability to develop and potentially commercialize (if approved) our product candidates. Based on available resources, we believe that our cash and cash equivalents currently on hand are sufficient to fund our anticipated operating and capital requirements through the first half of 2018.

112. In addition, Defendants stated in the 3Q2017 10-Q the following:

> We expect to incur significant expenses and increasing operating losses for at least the next two years as we initiate and continue the clinical development of, seek regulatory approval for, and potentially commercialize (if approved) our product candidates and add personnel necessary to operate as a public company with an advanced clinical pipeline of product candidates. In addition, operating as a publicly-traded company involves the hiring of additional financial and other personnel, upgrading financial information systems, and incurring costs associated with operating as a public company. We expect that our operating losses will fluctuate significantly from quarter-to-quarter and year-to-year due to the timing of clinical development programs, efforts to achieve regulatory approval and planning for potential commercialization (if approved) of our product candidates.

113. Further, the 3Q2017 10-Q stated that "[a]s of September 30, 2017, we had approximately $8.4 million in cash and cash equivalents."

114. On December 11, 2017, Acer issued a press release ("December 11, 2017 Press Release") announcing the proposed underwritten public offering of common stock. In the December 11, 2017 Press Release, Defendants stated that the Company "intends to use the net proceeds from this offering to fund its research and development efforts, to seek regulatory approval for EDSIVO™, to invest in pre-commercial activities for EDSIVO™ and for general corporate purposes, including working capital and other general and administrative purposes."

115. On December 14, 2017, Acer issued a press release ("December 14, 2017 Press Release") announcing the pricing of its underwritten public offering of common stock. In the

December 14, 2017 Press Release, Defendants reported "the closing of the previously announced underwritten public offering of 916,667 shares of its common stock at a price to the public of $12.00 per share." Defendants also stated in the December 14, 2017 Press Release that "[t]he gross proceeds to Acer from this offering were $11.0 million, before deducting the underwriting discount and other estimated offering expenses," and that "Acer intends to use the net proceeds from this offering to fund its research and development efforts, to seek regulatory approval for EDSIVO™, to invest in pre-commercial activities for EDSIVO and for general corporate purposes, including working capital and other general and administrative purposes."

116. On December 27, 2017, Acer issued a press release ("December 27, 2017 Press Release") announcing that the underwriters had "partially exercised their over-allotment option by the purchase of an additional 130,000 shares at a price to the public of $12.00 per share, resulting in additional gross proceeds of $1.56 million, before deducting underwriting discounts and commissions and other offering expenses payable by Acer." "After giving effect to the partial exercise of the over-allotment option," according to the December 27, 2017 Press Release, "the total number of shares sold by Acer in the offering increased to 1,046,667 shares and the total gross proceeds increased to $12.56 million." Defendants added: "Acer intends to use the net proceeds from this offering to fund its research and development efforts, to seek regulatory approval for EDSIVO, to invest in pre-commercial activities for EDSIVO and for general corporate purposes, including working capital and other general and administrative purposes."

117. In the 2017 10-K, Defendants stated:

> On December 14, 2017, the Company closed on an underwritten public offering of its common stock of 916,667 shares at a price of $12.00 per share. The gross proceeds were $11.0 million, before deducting the underwriting discount and other estimated offering expenses. Subsequently, on December 27, 2017, the Company sold an additional 130,000 shares in connection with the over-allotment

> option granted to the underwriters, for an additional $1.6 million of gross proceeds, before deducting the underwriting discount. The total amount of underwriting discount and other offering costs deducted from gross proceeds was $1.1 million.

118. In addition, the 2017 10-K stated that "[a]s of December 31, 2017, we had approximately $15.6 million in cash and cash equivalents."

119. On May 31, 2018 Acer issued a press release ("May 31, 2018 Press Release") announcing its intention to offer and sell shares of its common stock in an underwritten public offering. According to the May 31, 2018 Press Release:

> Acer intends to use the net proceeds from this offering to fund its research and development efforts, to seek regulatory approval for EDSIVO, to invest in pre-commercial activities for EDSIVO, to advance development of ACER-001, to acquire or in-license product candidates, and for general corporate purposes, including working capital and other general and administrative purposes.

120. On August 1, 2018, Acer issued a press release ("August 1, 2018 Press Release") announcing the pricing of its underwritten public offering. In the August 1, 2018 Press Release, Defendants announced "the pricing of its underwritten public offering of 2,222,222 shares of its common stock at a public offering price of $18.00 per share." "The gross proceeds from the offering, before deducting underwriting discounts and commissions and estimated offering expenses payable by Acer," according to the August 1, 2018 Press Release, "are expected to be approximately $40.0 million." "In addition," Defendants stated, "Acer granted the underwriters in the offering a 30-day option to purchase up to 333,333 additional shares of common stock at the public offering price, less the underwriting discounts and commissions." The August 1, 2018 Press Release further stated:

> Acer intends to use the net proceeds from this offering to fund its research and development efforts, to seek regulatory approval for EDSIVO, to invest in pre-commercial activities for EDSIVO, to advance development of ACER-001, to acquire or in-license

> product candidates, and for general corporate purposes, including working capital and other general and administrative purposes.

121. On August 3, 2018, the Company issued a press release ("August 3, 2018 Press Release") announcing the closing of its underwritten public offering. The August 3, 2018 Press Release reported that "[t]he gross proceeds to Acer from this offering are approximately $46.0 million, before deducting underwriting discounts and commissions and estimated offering expenses." The offering consisted of "2,555,555 shares of its common stock, including 333,333 shares sold pursuant to the underwriters' full exercise of their option to purchase additional shares to cover over-allotments, at a public offering price of $18.00 per share." Defendants stated that the Company:

> intends to use the net proceeds from this offering to fund its research and development efforts, to seek regulatory approval for EDSIVO, to invest in pre-commercial activities for EDSIVO, to advance development of ACER-001, to acquire or in-license product candidates, and for general corporate purposes, including working capital and other general and administrative purposes.

122. On March 7, 2019, Acer filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K"). In the 2018 10-K, Defendants stated:

> On August 3, 2018, we completed an underwritten public offering of 2,555,555 shares of common stock at a public offering price of $18.00 per share. We received aggregate net proceeds of approximately $42.7 million, after deducting underwriting discounts, commissions and offering-related expenses of approximately $3.3 million. As of December 31, 2018, we had approximately $41.7 million in cash and cash equivalents.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

123. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Acer securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants, the

officers and directors of Acer, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

124. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Acer securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

125. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

126. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

127. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Acer;

c. whether the Individual Defendants caused Acer to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of Acer securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

128. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

129. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. the Company's securities are traded in efficient markets;

d. the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ, and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

g. unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

130. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

131. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

132. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

133. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

134. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

136. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

137. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the

Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

138. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

139. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

140. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

141. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

143. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

144. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

145. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

146. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 3, 2019

**THE ROSEN LAW FIRM, P.A.**

/s/ *Keith R. Lorenze*
Keith R. Lorenze
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: klorenze@rosenlegal.com

and

Laurence Rosen
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

***Lead Counsel for Plaintiff and the Putative Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2019, I electronically filed the foregoing ***Amended Class Action Complaint for Violation of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Keith R. Lorenze*
Keith R. Lorenze
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
E-M: klorenze@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***