# EXHIBIT B

424B3 1 d500230d424b3.htm 424B3

**Table of Contents**

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-208314

**The information in this preliminary prospectus supplement and the accompanying prospectus is not complete and may be changed. This preliminary prospectus supplement and the accompanying prospectus are not an offer to sell nor do they seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

SUBJECT TO COMPLETION, DATED DECEMBER 11, 2017

PRELIMINARY PROSPECTUS SUPPLEMENT
(to Prospectus dated November 21, 2017)

## Shares



## Common Stock

Acer Therapeutics Inc. is offering            shares of common stock.

Our common stock is listed on The Nasdaq Capital Market under the symbol "ACER." The last reported sale price of our common stock on The Nasdaq Capital Market on December 8, 2017 was $14.57 per share. The aggregate market value of our outstanding common equity held by non-affiliates on October 16, 2017 was $46,322,604, based on 6,450,766 shares of outstanding common stock, of which 4,056,833 shares are held by affiliates, and a price of $19.35 per share, which was the last reported sale price of our common stock as quoted on The Nasdaq Capital Market on that date. During the 12 calendar months prior to and including the date hereof, we have sold 49,855 shares of our common stock for gross proceeds of $490,098 pursuant to General Instruction I.B.6 of Form S-3.

**Investing in our common stock involves a high degree of risk. See the section entitled "Risk Factors" beginning on page S-13 and in the documents incorporated by reference in this prospectus supplement.**

|  | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discounts and commissions(1) | $ | $ |
| Offering proceeds to us, before expenses | $ | $ |

(1)    We refer you to the section entitled "Underwriting" beginning on page S-20 of this prospectus supplement for additional information regarding total underwriter compensation.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus supplement or the accompanying prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

Funds affiliated with our largest shareholder, TVM Capital Life Science, or TVM Capital, have indicated an interest in purchasing up to an aggregate of $4.0 million in shares of our common stock in this offering on the same terms as those offered to the public. However, indications of interest are not binding agreements or commitments to purchase. TVM Capital may determine to purchase more, fewer or no shares in this offering. In addition, the underwriters could determine to sell fewer or no shares to them.

We have granted the underwriters the right to purchase up to            additional shares of common stock. The underwriters can exercise this right at any time within 30 days after the offering. The underwriters expect to deliver the shares of common stock to investors on or about December    , 2017.

*Sole Book-Running Manager*

Table of Contents

The drug testing and approval process requires substantial time, effort and financial resources, and may take several years to complete. Data obtained from clinical activities are not always conclusive and may be susceptible to varying interpretations, which could delay, limit or prevent marketing approval. The FDA may not grant marketing approval on a timely basis, or at all.

Even if the FDA approves a product, it may limit the approved indications for use for the product. The FDA requires that the approved product labeling include information regarding contraindications, warnings or precautions. It may also, require that post-approval studies, including Phase 4 clinical trials, including a long-term registry, be conducted to further assess a drug's safety after approval, require testing and surveillance programs to monitor the product after commercialization, or impose other conditions, including distribution restrictions or other risk management mechanisms, which can materially affect the potential market and profitability of the product. The FDA may prevent or limit further marketing of a product based on the results of post-marketing studies or surveillance programs. After approval, some types of changes to the approved product, such as adding new indications or labeling claims or manufacturing changes may be subject to further testing requirements and FDA review and approval. Also after approval, the FDA may require labeling changes as new information becomes known, particularly if new risks are identified, such as unexpected adverse events. The FDA has the authority to prevent or limit further marketing of a drug based on the results of these post-marketing studies and programs or other information that may become known after approval.

### Hatch-Waxman Amendments and Exclusivity

The Drug Price Competition and Patent Term Restoration Act of 1984, referred to as the Hatch-Waxman Amendments, amended the FFDCA and established abbreviated pathways to market, as well as incentives for the development of new drug products. The Hatch-Waxman Amendments established section 505(b)(2) of the FFDCA that provides an alternative pathway for submission of an NDA, referred to as the 505(b)(2) application, when some or all of the safety and efficacy investigations relied on for approval were not conducted by or for the applicant and for which the applicant has not obtained a right of reference. The Hatch-Waxman Amendments also established the abbreviated new drug application, or ANDA, approval pathway, which provides an expedient route for generic drugs that have the same active ingredient as a previously approved drug. At the same time, to incentivize continued pharmaceutical innovation, the Hatch-Waxman Amendments authorized periods of market exclusivity to protect certain approved new drugs from competition for five or three year periods.

Under the Hatch-Waxman Amendments, a new drug containing an active ingredient that had never before been approved in any other NDA, ANDA, or 505(b)(2) NDA is provided five years of market exclusivity upon approval. The FDA refers to this exclusivity as NCE Exclusivity. During the NCE Exclusivity period, the FDA cannot approve an ANDA or a 505(b)(2) application for a drug containing the same active ingredient. For NCE Exclusivity, the FDA regulations interpret "active ingredient" to mean "active moiety," which is defined as "the molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt . . . , or other noncovalent derivative . . . of the molecule, responsible for the physiological or pharmacological action of the drug substance." Although the FDA may not approve an ANDA or 505(b)(2) NDA with the same active ingredient during the five-year NCE Exclusivity period, an ANDA or 505(b)(2) NDA may be submitted to the FDA after four years if it contains a certification of patent invalidity or non- infringement.

The Hatch-Waxman Amendments also provide three years of market exclusivity for an NDA, a 505(b)(2) NDA, or a supplement to either of these applications for a drug product containing an active moiety that has been previously approved, if new clinical investigations, other than bioavailability studies, that were conducted or sponsored by the applicant, are deemed by the FDA to be essential to the approval of the application. During this three-year exclusivity period, the FDA will not make effective the approval of any ANDA or 505(b)(2) NDA for the same active moiety for the same conditions of use. Five-year and three-year exclusivity will not delay the submission or approval of a new drug containing the same active moiety if it is the subject of a full NDA for which the applicant conducted, sponsored, or obtained a right of reference to all of the preclinical studies and adequate and well-controlled clinical trials necessary to demonstrate safety and effectiveness.

16