**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
Brian B. Alexander
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
balexander@rosenlegal.com

*Counsel for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICHOLAS SKIADAS, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>ACER THERAPEUTICS INC., CHRIS SCHELLING, and HARRY PALMIN,<br><br>    Defendants. | No.: 1:19-cv-06137-GHW<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Case 1:19-cv-06137-GHW    Document 52    Filed 05/22/20    Page 2 of 32

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

    A.    Acer Therapeutics. ............................................................................................. 3

    B.    Acer's Plan to Commercialize Celiprolol in the United States Under the Name EDSIVO Without Conducting Any New Research. ..................................... 4

    C.    Acer Raises Money by Claiming that the FDA "Agreed" that "Additional Clinical Development" was "Not Needed" for EDSIVO. ........................................ 5

    D.    Acer's Statements that the "FDA Agreed" Were Highly Material Because the Ong Trial was Deeply Flawed. ................................................................... 6

    E.    Acer Discusses the Ong Trial Data with the FDA Repeatedly Prior to Filing its NDA. .......................................................................................................... 8

    F.    After Submitting Acer's NDA for EDSIVO, Defendants Continue to Promote the Efficacy of EDVISO and Signal to the Market that the FDA Will Approve it. ........................................................................................................ 9

    G.    The FDA Issues a CRL to Acer for EDSIVO, Revealing that it had Never "Agreed" that Additional Clinical Development was not Needed for EDSIVO. ........................................................................................................... 9

ARGUMENT ......................................................................................................................... 10

    I.    PLAINTIFF ALLEGES MISREPRESENTATIONS AND OMISSIONS ................... 10

    A.    Defendants' Statements Would Have Led a Reasonable Investor to Believe that the "FDA Agreed" That no Additional Clinical Development or Trials Were Needed for Approval of EDSIVO. ..................................................... 11

    B.    Plaintiff Alleges that Defendants' Statements Were False and Misleading. .............. 13

    II.    PLAINTIFF ALLEGES SCIENTER. ............................................................... 18

    A.    Plaintiff Alleges Conscious Misbehavior or Recklessness. ...................................... 19

i

B.    Plaintiff Alleges Motive to Commit Fraud. ................................................................. 22

C.    It Does not Matter if Defendants Believed EDSIVO Would be Approved. ............... 24

CONCLUSION.................................................................................................................................. 25

**Table of Authorities**

**Pages**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)............................................................................................... 18

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)............................................................................................. 25

*City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
    *No. 10 CIV. 2835 NRB, 2011 WL 4357368 (S*.D.N.Y. Sept. 19, 2011)................................... 20

*Cozzarelli v. Inspire Pharm. Inc.*,
    549 F.3d 618 (4th Cir. 2008) ........................................................................................... 25

*DeMarco v. DepoTech Corp.*,
    149 F.Supp.2d 1212 (S.D. Cal. 2001)............................................................................... 15

*Frater v. Hemispherx Biopharma, Inc.*,
    996 F. Supp. 2d 335 (E.D. Pa. 2014) ............................................................................... 22

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016)............................................................................... 25

*In re Amylin Pharm., Inc. Sec. Litig.*,
    No. 01CV1455 BTM (NLS), 2003 WL 21500525 (S.D. Cal. May 1, 2003) .......................... 25

*In re Avon Sec. Litig.*,
    No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .............................. 19

*In re Ibis Tech. Sec. Litig.*,
    422 F. Supp. 2d 294 (D. Mass. 2006) ............................................................................... 23

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
    No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)............................... 11, 13, 16, 20

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) ....................................................................... passim

*In re OmniVision Techs., Inc. Sec. Litig.*,
    937 F. Supp. 2d 1090 (N.D. Cal. 2013) ............................................................................ 17

*In re Pall Corp.*,
    No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009) ........................ 18

iii

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..................................................................................... 10

*In re Vale S.A. Sec. Litig.*
  No. 1:15-CV-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ............................... 20

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)........................................................................ 20

*In re: Enzymotec Sec. Litig.*,
  No. CV145556JLLMAH, 2015 WL 8784065 (D.N.J. Dec. 15, 2015).................................... 15

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013)..................................................................................... 18

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)........................................................................ 16

*Mazzeo v. Nature's Bounty, Inc.*,
  No. 14-60580-CIV, 2015 WL 1268271 (S.D. Fla. Mar. 19, 2015) ........................................ 15

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990)..................................................................................... 11

*Nguyen v. Radient Pharm. Corp.*,
  No. SA CV 11-0406 DOC, 2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ............................. 22

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..................................................................................... 10

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)........................................................................ 15

*Rescuecom Corp. v. Google Inc.*,
  562 F.3d 123 (2d Cir. 2009)..................................................................................... 10

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ................................................................................... 22

*Sgarlata v. PayPal Holdings, Inc.*,
  409 F. Supp. 3d 846 (N.D. Cal. 2019) ........................................................................ 17

*Tabak v. Canadian Solar Inc.*,
  549 F. App'x 24 (2d Cir. 2013) ................................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................... 10, 14, 18

iv

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)........................................................................................ 16

*Yanek v. Staar Surgical Co.*,
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..................................................................... 24

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ..................................................................................... 12

<u>**Statutes**</u>

15 U.S.C. § 78u - 4(b)(1)(B).......................................................................................... 10

15 U.S.C. § 78u-4 .......................................................................................................... 10

<u>**Rules**</u>

Fed R. Civ. P. 12(b)(6)................................................................................................... 10

Fed. R. Civ. P. 9(b) ........................................................................................................ 10

<u>**Regulations**</u>

21 C.F.R. 312 .................................................................................................................. 7

Lead Plaintiff Nicholas Skiadas ("Plaintiff") respectfully submits this Memorandum of Law in opposition to Defendants' Motion to Dismiss the Second Amended Complaint.

**PRELIMINARY STATEMENT**

Acer Therapeutics Inc. ("Acer" or the "Company") is a development-stage pharmaceutical company. This case concerns Acer's effort to use the Food and Drug Administration's ("FDA") orphan drug designation to commercialize celiprolol, a betablocker, in the United States under the trademark "EDSIVO" for the treatment of the rare disorder vascular Ehlers-Danlos Syndrome ("vEDS"). Acer has devoted more than 80% of its research and development expenses to EDSIVO since its founding. Even though celiprolol has never been approved in the United States, it has been approved for hypertension in the European Union since 1984 and is available as a low-cost generic drug and prescribed off-label to vEDS patients there. Doctors use other, similar, beta-blockers, that are available as low cost generics, to treat vEDS patients in the United States.

The purpose of the FDA's orphan drug designation is to encourage research into treatments for rare diseases, but Acer never intended to generate any new clinical data for its New Drug Application ("NDA") for EDSIVO. Instead, Acer acquired an old study from France, which consisted of only 53 patients (the "Ong Trial"). Nevertheless, Acer reportedly intended to use FDA rules to gain market exclusivity that would allow Acer to charge vEDS patients more than $100,000 a year. Because of the expected cost of EDSIVO and the limited evidence that it was an improvement over other, low-cost, drugs, the Ehlers-Danlos Society and Marfan Foundation, who are advocacy groups for vEDS, opposed approval of EDSIVO.

Less than a year after acquiring the Ong Trial data rights, Acer became a public company through a reverse merger in September 2017 and needed to raise a significant amount of money to continue as a going concern. In the prospectus for its December 2017 secondary offering, Acer

1

claimed that "***the FDA agreed that additional clinical development is not needed***" for EDSIVO (emphasis added). Acer made similar statements about the FDA's view of the Ong Trial in its 2017 Form 10-K and its prospectus for another secondary offering, completed in August 2018. In total Acer used this claim to raise almost $60 million dollars from investors.

On June 25, 2019, Acer announced that the FDA had issued a Complete Response Letter ("CRL") denying EDSIVO's NDA. Acer admitted that the CRL stated that it needed "to conduct an adequate and well controlled trial" to show the effectiveness of EDSIVO. Accordingly, it was clear that the FDA had never agreed that additional clinical development was not needed for EDSIVO. This news shocked investors, causing Acer's stock to fall 78% that day.

Acer has not released the CRL publicly and had only 23 full time employees at the end of 2018, which made securing a confidential witness unlikely. In their Motion, Defendants try to use this informational advantage to persuade the Court to dismiss an obvious fraud. The available facts, however, create the clear inference that Acer knowingly or recklessly misrepresented to investors that the FDA had agreed that additional clinical development was not needed for EDSIVO.

*First*, Defendants try to avoid their own words by claiming that they meant that the FDA agreed that no additional clinical development was needed to merely submit the NDA (without receiving a refuse to file letter), not for its approval. The term "submit" is, however, in a different clause of the statements and is not the object of "agreed." Their argument also makes little sense given that approval is what matters to investors. Even though Acer submitted its NDA, its rejection was a calamity for investors. At minimum, where all inferences are taken in the light most favorable to Plaintiff, the Court should not grant a motion to dismiss based on Defendants' questionable interpretation of their statements.

*Second,* Defendants contend that Plaintiff does not adequately plead that the statements

were false or misleading, but they do not even try to claim that the FDA agreed that no more clinical development was needed for EDSIVO's approval, nor can they, given that they admit the CRL called for "an adequate and well controlled trial." Also, the flaws in the Ong Trial, including its size, the fact that 20 of the 53 participants were not even confirmed as having vEDS, and the treatment and control groups had an unbalanced of number of unconfirmed patients, made it very unlikely that the FDA would have agreed that the Ong Trial was sufficient for approval.

*Third*, Plaintiff has pled scienter. Given Acer's size and EDSIVO's importance to it, Acer's management certainly would have known that the FDA had not agreed that no more clinical development was needed. The Court should also infer scienter from the facts that Defendants later edited their statement to make the agreement with the FDA less definitive and that they made misstatements about FDA approval — which is very important to investors — even though others publicly criticized their use of the Ong Trial. Defendants also had a strong motive to make misrepresentations — they needed to raise money for Acer to continue as a going concern.

*Finally,* Defendants state repeatedly in their brief that the Court must dismiss this case because they *believed* that the FDA would approve EDSIVO, but that is irrelevant. Instead, the question is whether Defendants misled investors about what the FDA told Acer about their data. They clearly did so because, contrary to what they told investors, the FDA never agreed that no more clinical development was needed for EDSIVO. Defendants were certainly entitled to engage in and raise money for a risky venture with a potentially large payoff, but they could not mislead investors about the risk by telling them the FDA had agreed to something it had not.

## STATEMENT OF FACTS

### A. Acer Therapeutics.

Acer purports to be a development-stage pharmaceutical company focused on therapies for rare diseases. (Second Amended Complaint ("SAC") ¶ 32.) Acer was founded in 2013 and was a

private company until September 19, 2017 when it completed a reverse merger with Opexa Therapeutics, a publicly traded company on the NASDAQ. (*Id.* ¶¶ 18, 32-33.) Reverse mergers allow access to public capital while avoiding the in-depth scrutiny of a traditional IPO. (*Id.* ¶ 33.) Right after the reverse merger closed, in December 2017, Acer raised $12.56 million in a secondary stock offering. (*Id.* ¶ 127.) In August 2018, the Company raised $46.0 million from investors in another secondary offering. (*Id.* ¶ 134.)

As of December 31, 2018, Acer had 23 employees and had spent over 80% of its research and development budget on EDSIVO since the Company's inception. (*Id.* ¶¶ 35, 37.) Defendant Schelling is the founder of Acer and served as its President and CEO at all relevant times. (*Id.* ¶ 19.) Defendant Palmin served as Acer's CFO at all relevant times. (*Id.* ¶ 20.)

### B. Acer's Plan to Commercialize Celiprolol in the United States Under the Name EDSIVO Without Conducting Any New Research.

There are no drugs approved for the treatment of vEDS in the United States or internationally. (*Id.* ¶ 40.) Doctors, however, prescribe members of the beta-blocker class of drugs, which are used to treat high blood pressure, off-label[1] as part of the treatment of the disease. (*Id.*) One such beta-blocker is celiprolol, which the European Union ("EU") approved to treat hypertension in 1984, and is now available there as a cheap generic drug. (*Id.*) Celiprolol has never been approved by the FDA for any indications, but patients can import it for personal use, including through online pharmacies. (*Id.*) According to the Ehlers-Danlos Society and the Marfan Foundation, two advocacy groups for vEDS patients, doctors in the United States prescribe other low-cost beta-blockers that are similar to celiprolol to vEDS patients and there is not sufficient evidence to know whether celiprolol is more effective than those medications. (*Id.* ¶ 41-42.)

---

[1]A drug is prescribed off-label when a doctor prescribes it for a condition that a government drug regulatory agency did not approve it for. (*Id.* ¶ 4 n.2.)

4

That the FDA had never approved celiprolol presented Acer with a significant financial opportunity. Since the only drugs used to treat vEDS are prescribed off-label, if Acer could get FDA approval for celiprolol (under the name EDSIVO) for the treatment of vEDS, it would qualify for Orphan Drug Exclusivity. (*Id.* ¶ 43.) According to analysts, this would allow Acer to charge each patient more than $100,000 per year for EDSIVO. (*Id.* ¶ 47.) Although the purpose of Orphan Drug Exclusivity is to promote investment into the research and development of new drugs, Acer never intended to conduct an additional clinical study of EDSIVO. (*Id.* ¶ 44.) Instead, after the FDA approved Orphan Drug Exclusivity for EDSIVO in 2015, Acer licensed the data from the Ong Trial, a previously published French study. (*Id.* ¶¶ 43-45.) The Ong trial was not used to gain approval for celliprolol in the EU since the drug was already approved for hypertension there. Acer conducted a "retrospective source verified analysis" of the old data from Ong Trial instead of conducting a new study. (*Id.* ¶ 46.) Acer announced the completion of its analysis of the Ong Trial data in a September 25, 2017 press release that said the Trial "achieved statistical significance" and quoted Defendant Schelling as saying it was a "robust clinical study" (*Id.* ¶ 54.)

## C. Acer Raises Money by Claiming that the FDA "Agreed" that "Additional Clinical Development" was "Not Needed" for EDSIVO.

Shortly after its reverse merger allowed Acer access to public markets, Acer filed its Form 10-Q for the third quarter of fiscal 2017 on November 13, 2017 ("3Q2017 10-Q"). *(Id.* ¶ 119.)* In that filing, the Company admitted that "[t]here is substantial doubt about the Company's ability to continue as a going concern within one year." (*See id* ¶¶ 119-123.) A month later, on December 11 and 12, 2017, respectively, Acer filed a Preliminary Prospectus Supplement and Prospectus Supplement with the SEC for a secondary offering (the "December 2017 Offering Documents"), misrepresenting that FDA had agreed that Acer would not need to conduct any clinical development beyond the already-completed Ong Trial for approval of EDSIVO. Defendants stated

that at a September 2015 meeting at which Acer "met with the FDA to discuss the existing clinical data for EDSIVO," "*the FDA agreed that additional clinical development is not needed* and stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS." (*Id.* ¶¶ 49, 125. (emphasis added).) Defendants further stated in a December 14, 2017 press release that Acer would use the money raised in the offering for EDSIVO. (*Id.* ¶ 126.)

In Acer's Form 10-K for the fiscal year ended December 31, 2017 ("2017 10-K"), filed on March 7, 2018, Defendants continued to assure investors that the FDA would approve EDSIVO based on the Ong Trial: "In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO. *At that meeting, the FDA agreed that an additional clinical trial is not likely needed* and stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS." (*Id.* ¶ 50. (emphasis added)). Notably, Acer modified the statement to make it less definitive: Instead of unambiguously stating that "additional clinical development" was "not needed," Acer limited the statement in the 2017 10-K to an "an additional clinical *trial*" instead of the more general term "development" and stated that it was "not *likely* needed." (*Id.* ¶ 51.)

In the Company's Form 10-Q for the First Quarter of 2017 ("3Q2017 10-Q"), filed on May 14, 2018, Acer again stated that there was substantial doubt about its ability to continue as a going concern. (*Id.* ¶ 130.) On July 31 and August 1, 2018, Acer filed a Preliminary Prospectus Supplement and Prospectus Supplement for another secondary offering (the "August 2018 Offering Documents"). (*Id.* ¶ 52.) Defendants repeated their revised description of the September 2015 meeting claiming the FDA agreed an additional clinical trial is not likely needed. (*Id.*)

   **D.  Acer's Statements that the "FDA Agreed" Were Highly Material Because the Ong Trial was Deeply Flawed.**

The Ong Trial enrolled only 53 participants. (*Id.* ¶ 54.) Additionally, during the Trial, researchers discover that *20 of the 53* participants did not have the COL3A1 gene mutation that

6

causes vEDS. (*Id.* ¶ 55.) The absence of the genetic mutation was also not evenly distributed between the patients who were treated with celiprolol and the control group. (*Id.*) Of the 25 patients treated with celiprolol **almost half** (12) did not have a proven COL3A1 mutation. (*Id.*) Out of the 28 patients in the control group, **only 8** did not have a proven COL3A1 mutation. (*Id.*)

Plaintiff retained an expert in biostatistics and the FDA approval process, Dr. Phillip Lavin, to review the published Ong Trial data. (*Id.* ¶ 56.) Dr. Lavin is eminently qualified to evaluate the Ong Trial based on FDA standards because, *inter alia*, he has been an FDA advisory panel member and special government employee for 33 years and contributed to the approval of 64 FDA-regulated products (*See id.* ¶¶ 24-30.) Dr. Lavin identified four red flags in the Ong Trial that would concern the FDA. First, the genetic mutation imbalance between the group taking celiprolol and the control group created a clear cut bias in favor of the group taking celiprolol. (*Id.* ¶¶ 57-59.) Second, the small sample of patients (53 total and only 33 had the COL3A1 mutation) left the study unpowered and therefore unable to test a clinically realistic advantage for the patients taking celiprolol. (*Id.* ¶ 60.) Third, the FDA expects researchers to conduct trials in accordance with 21 C.F.R. 312 (concerning drugs for human use) and the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use Standards, but, because of the high percentage of ineligible subjects in the study (20 of 53 did not have the mutation), the Ong Trial did not comply with those standards. (SAC ¶ 61.) Fourth, the FDA would consider the Ong Trial a retrospective[2] study because Acer knew the results of the study prior to deciding to file with the FDA. Using a previously published study for an NDA introduces bias because the drug's sponsor

---

[2] Defendants misunderstand why the FDA would consider the Ong Trial a retrospective study when evaluating EDSIVO's NDA. (Memorandum of Law in Support of Defendants' Motion to Dismiss ("Mot.") at 4 n.3.) The Ong Trial *was prospective when it was conducted*, but the FDA would have considered it retrospective when evaluating EDSIVO's NDA because Acer already knew the result of the study when they purchased it. This introduces bias because it allows a drug sponsor to selectively bring positive results to the FDA's attention.

can shop around for a study with a positive result. (*Id.* ¶ 62.)

Other independent sources agree with Dr. Lavin's assessment of the Ong Trial. On January 28, 2019, six months before the FDA issued its CRL for EDSIVO, *Pharmaceutical Technology* published an article on its website entitled "Why the experts say Acer is unlikely to get FDA nod for vEDS drug." (*Id.* ¶ 64.) The authors of the article interviewed experts from Johns Hopkins Hospital and Rady Children's Hospital in San Diego who told them that the Ong Trial was too small, not well-controlled, and not sufficient for FDA approval. (*Id.*) The authors of the article contacted Acer about the article, but it declined to comment. (*Id.*)

Additionally, after the FDA issued the CRL for EDSIVO, both the Ehlers-Danlos Society and the Marfan Foundation issued statements supporting the FDA's decision because the Ong Trial was not sufficient to show that celiprolol was effective against vEDS. (*Id.* ¶¶ 66-67.) The Marfan Foundation issued its statement the same day that Acer announced the CRL. (*Id.* ¶ 67.) Plaintiff's investigator spoke with a senior officer at the Marfan Foundation (the "Marfan Senior Officer"). The Marfan Senior Officer said that all 18 members of the Marfan Foundation's Profession Advisory Board approved the Foundation's statement supporting the FDA's decision because the Advisory Board did not want to support approval for a very expensive drug when its efficacy was "not even marginal." (*Id.* ¶ 68.) The Marfan Senior Officer further stated that the Professional Advisory Board met with Acer employees about EDSIVO prior to the FDA's decision and several board members told them they did not support approval. (*Id.* ¶ 70.) The Marfan Senior Officer also stated that she attended a symposium on vEDS in May 2018 that was also attended by an executive from Acer where some of the attendees questioned the size and results of the Ong Trial. (*Id.* ¶ 69.)

**E. Acer Discusses the Ong Trial Data with the FDA Repeatedly Prior to Filing its NDA.**

It is standard practice for sponsors of a drug to have several meetings with the FDA prior to filing an NDA. (*Id.* ¶ 80.) The sponsors are usually represented at meetings by at least five

members of the sponsor's senior management team (*Id.* ¶ 81.) Minutes of the meetings between the sponsor and the FDA are prepared by the FDA and sent to the sponsor. (*Id.* ¶ 82.) Acer's SEC filings describe three meetings in September 2015, May 2017, and June 2018 in which Acer officials met with FDA officials about the clinical data for EDSIVO. (*Id* ¶¶ 84-87.)

**F.  After Submitting Acer's NDA for EDSIVO, Defendants Continue to Promote the Efficacy of EDVISO and Signal to the Market that the FDA Will Approve it.**

Acer submitted its NDA for EDSIVO on October 29, 2018. (*Id.* ¶ 99.) On April 16, 2019, Defendants issued a press release announcing the publication of a non-randomized study of vEDS patients in France (the "Long-Term Observational Study") which stated that the study showed the "positive impact of celiprolol, which has a unique pharmacological profile." (*Id.* ¶¶ 10, 101.) On May 14, 2019, Acer issued another press release stating that the Long-Term Observational Study data "supplements the previously-reported safety and efficacy of celiprolol in vEDS patients with a confirmed type III collagen (COL3A1) mutation." (*Id.* ¶ 102.)

Those press releases did not mention that the researchers who conducted the Long-Term Observational Study stated that it was difficult to assess the beneficial effect of celiprolol "in the absence of a placebo-controlled prospective trial, because other confounders might have influenced this observation." (*Id.* ¶ 103.)  Other vEDS researchers published an article that stated that the Long-Term Observation Study was of limited utility because "[t]he only way to determine if it is celiprolol contributing to the better outcome is to conduct a randomized prospective trial comparing celiprolol to another beta-blocker in patients with molecularly confirmed vEDS." (*Id.*)

**G.  The FDA Issues a CRL to Acer for EDSIVO, Revealing that it had Never "Agreed" that Additional Clinical Development was not Needed for EDSIVO.**

On June 25, 2019, Acer issued a press release (the "June 25, 2019 Press Release') disclosing that the FDA had issued Acer a CRL rejecting its NDA for EDSIVO. (*Id.* ¶ 116.) Acer declined to publicly release the CRL, but admitted that the CRL said that the Ong Trial was not

9

sufficient for the approval of EDSIVO: "***The CRL states that it will be necessary to conduct an adequate and well-controlled trial to determine whether celiprolol reduces the risk of clinical events in patients with vEDS***." (*Id.* (emphasis added).) On that day, the per-share price of Acer common stock fell $15.16, or 78.63%, to close at $4.12 per share. (*Id.* ¶ 117.)

## ARGUMENT

When deciding a motion under Federal Rule of Civil Procedure 12(b)(6), "a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009). Furthermore, "[t]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007).

The PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure require that allegations of fraud be pled with particularity. 15 U.S.C. § 78u-4; Fed. R. Civ. P. 9(b). However, the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). "Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Id.* at 313-14. Similarly, Rule 9(b) does "not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

## I. PLAINTIFF ALLEGES MISREPRESENTATIONS AND OMISSIONS.

A securities fraud complaint adequately pleads a false or misleading statement by "specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u - 4(b)(1)(B). Here, Defendants' statements were false and misleading because the FDA never "agreed" that additional "clinical development" or "clinical trial" was "not needed" or "likely not needed" for the approval of EDSIVO.

**A. Defendants' Statements Would Have Led a Reasonable Investor to Believe that the "FDA Agreed" That no Additional Clinical Development or Trials Were Needed for Approval of EDSIVO.**

Defendants first argue that they did not make any misstatements because their statements only concerned what the FDA required for submission, not what it required for approval. (Mot. at 10.) Defendants focus on the fact that the statements in question contain the word "submit," but do not address that "submit" appears in a separate clause, separated by an "and." Acer's December 11, 2017 statement says: "In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO. At that meeting, the FDA agreed that additional clinical development is not needed **and** stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS." (SAC ¶ 106 (emphasis added).) The phrase "that we may submit" is part of a separate clause and not the object of "agreed." Furthermore, this sentence could easily have been drafted to say what Defendants claim it says. For example, Defendants could have written: "the FDA agreed that additional clinical development is not needed *to* submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS." These same points equally apply to Defendants' two statements that the "FDA agreed that an additional clinical trial is not likely needed." (*Id.* ¶¶ 108, 112.)

At minimum, the way that Defendants wrote these statements would have easily mislead investors, which is all that is necessary for them to be actionable. *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (disclosures required under the securities laws are "measured not by literal truth," but based on whether they "would have mislead a reasonable investor"); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128, at *16 (E.D. Pa. Mar. 25, 2020) ("Defendants inappropriately focus on the literal accuracy of the statements instead of whether the statements accurately informed rather than misled prospective buyers.").

In addition to the wording of Defendants' statements, there are other reasons why a

11

reasonable investor would have believed that they applied to approval instead of submission. To start with, *approval of an NDA is what matters*. The FDA accepted Acer's NDA of EDSIVO for review, but later rejected the NDA and the stock lost more than 78% of its value. It made little sense for Acer to brag to investors that the "FDA agreed" that "additional clinical development is not needed" unless it was not needed for approval. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 609 (4th Cir. 2015) (statement that "FDA had 'agreed' that [defendant] could submit its new drug application…'without the need for any further efficacy studies'" was actionable even if literally true where company did not disclose that another study was required for approval). [3]

The Court should also read Acer's statements about its agreement with the FDA in the context of other statements that Acer made about the Ong Trial. On September 25, 2017, shortly before Acer made its first statement that the "FDA agreed," Acer issued a press release in which Defendant Schelling called the Ong Trial a "robust clinical study" and also said that it had "achieved statistical significance." (SAC ¶ 54.) Given the use of this language by Defendants, it would be reasonable for investors to believe that Acer meant that the FDA had agreed that no additional clinical development was needed for approval of EDSIVO. Furthermore, the enormous stock drop that occurred when the FDA rejected EDSIVO indicated that Acer's statement that FDA agreed that no additional clinical development was needed actually led investors to believe that the FDA was going to approve EDSIVO.

Defendants argue investors could not have interpreted their statements to mean that the FDA agreed that the Ong Trial was sufficient for approval because of a generic risk disclosure that FDA approval "cannot be certain" and that "approval is never guaranteed." (Mot. at 11.) The Court

---

[3] Accordingly, any failure by Acer to disclose negative feedback from the FDA concerning approval of EDSIVO would render its statements that "the FDA provided us with additional guidance on the expected presentation of the existing clinical data for EDSIVO™ to support the NDA filing" misleading. (SAC ¶¶ 110, 114.)

12

should disregard this risk disclosure because it is completely generic. *Innocoll*, 2020 WL 1479128, at \*17-\*18, a securities class action case concerning the FDA approval process decided this year, addressed cautionary language virtually identical to what Defendants cite here. That court held that the disclosure was insufficient because "such a generic warning, however, is inherently true of any and every New Drug Application." *Id.* at \*18. Instead, the court agreed with the plaintiffs' contention that the cautionary language should have included the specific warning that defendant assumed that the product at issue in the case was a drug instead of a device. *Id.* Here a meaningful risk disclosure would have stated it was risky for Acer to base its NDA for EDSIVO on one small clinical trial. But Defendants instead stated about the Ong Trial that "FDA agreed that additional clinical development is not needed." Moreover, risk warnings to do not immunize the Company against misstatements about past interactions with the FDA. *See In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 816-817 (C.D. Cal. 2011).

Based on both their wording and their context, Defendants' statements would have misled a reasonable investor.  Here the Court must consider all inferences from the allegations in the light most favorable to Plaintiff.  At minimum, the Court should not grant a motion to dismiss based on Defendants' self-serving interpretation of their statements.

### B.  Plaintiff Alleges that Defendants' Statements Were False and Misleading.

Defendants make a general argument that Plaintiff did not plead falsity because they did not plead internal documents, communications, and confidential witness statements. (Mot. at 11.) Those are, however, unnecessary in this case since Defendants concede that FDA never agreed that "no additional clinical development" or trials were needed for approval of EDSIVO – only that none were needed to submit an NDA.

Acer's June 25, 2019 Press Release dispositively shows that Acer and the FDA did not have any such agreement. In *MannKind*, 835 F.Supp.2d at 809-811, the court addressed precisely

13

this issue. There, the defendants argued that plaintiff's use of the CRL to show falsity was "fraud-by-hindsight pleading." *Id.* at 809.  The court rejected that argument, explaining that "[f]raud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements" and that "[t]he statements that the FDA had…agreed to the Defendants' bioequivalency methodology—which are shown to be false by a later revelation demonstrating that the FDA had not, in fact, done any such thing—do not constitute 'fraud-by-hindsight.'" *Id.* at 809-810. The court further held that "***[b]ased on the FDA's subsequent ordering of further studies,…the most plausible inference to draw is that Defendants' showing of bioequivalence had failed, and that no 'agreement'…had ever been secured***." *Id.* at 810 (emphasis added).

The situation here is identical to *MannKind*. Acer's June 25, 2019 Press Release admitted that the FDA stated in the CRL that it had rejected EDSIVO because it was "necessary to conduct an adequate and well-controlled trial to determine whether celiprolol reduces the risk of clinical events in patients with vEDS." (SAC ¶ 116.) Accordingly, it is highly implausible that the FDA had previously agreed that no more clinical development was needed for EDSIVO.

*MannKind*, 835 F.Supp.2d at 811, further held that the plaintiffs' reading of the CRL was buttressed by evidence that defendants' studies were inadequate. There is similar evidence here both from independent third parties and an FDA clinical trial expert. Defendants criticize the expert allegations in the SAC, but the expert is not even necessary since on a motion to dismiss the Court must accept the  Plaintiff's allegations as true. *Tellabs,* 551 U.S. at 322 (holding that when considering a motion to dismiss a § 10(b) action, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"). By pleading his consultation with an expert, the Plaintiff was just informing

14

the Court of the basis for his allegations. Accordingly, the court in the case that Defendants rely on, *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 224 (S.D.N.Y. 2018), did not strike any paragraphs from the complaint that relied on an expert declaration and instead stated only that it would not consider any "conclusory allegations." *See also DeMarco v. DepoTech Corp.*, 149 F.Supp.2d 1212, 1222 (S.D. Cal. 2001) (considering portions of complaint that were derived from expert affidavit); *Mazzeo v. Nature's Bounty, Inc.*, No. 14-60580-CIV, 2015 WL 1268271, at \*3 (S.D. Fla. Mar. 19, 2015) (considering the expert's factual statements that were incorporated in the complaint). Additionally, the Court should consider expert allegations here because Defendants have refused to release the CRL. *See In re: Enzymotec Sec. Litig.*, No. CV145556JLLMAH, 2015 WL 8784065, at \*19 (D.N.J. Dec. 15, 2015) (allowing use of expert allegations to "support [plaintiffs'] contentions that Defendants should have known of, and anticipated, the true impact of the regulatory changes" because factual information was peculiarly within the defendant's knowledge or control"); *MannKind*, 835 F.Supp.2d at 814 ("Plaintiffs have relied partly on inference in order to demonstrate that Defendants' statements were known to be false when made" because "Defendants have not made available the FDA's 2011 CRL.").

Furthermore, Defendants' contention that Dr. Lavin's statements are speculative is wrong. Dr. Lavin's statements establish two points about FDA procedure that are well within the knowledge of someone who has decades of experience working for FDA and presenting products to the Agency (SAC ¶¶ 24-31) and they are corroborated by other allegations in the SAC: (1) the Ong Trial had flaws that would have concerned the FDA and (2) the FDA discusses its concerns about clinical trials with drug sponsors before they file NDAs. *See MannKind*, 835 F.Supp.2d at 821 (considering expert allegations about the inadequacy of Defendants' bioequivalency studies and FDA's standard procedures). The allegations in the SAC laying out the concerns the FDA

15

would have had about the Ong Trial are the opposite of conclusory — it pleads four detailed reasons. (SAC ¶¶ 56-62.) The experts interviewed by *Pharmaceutical Technology* and at the Marfan Foundation and Ehlers-Danlos corroborated that opinion of the Ong Trial. (*Id.* ¶¶ 63-70.)[4] Furthermore, all of those allegations just serve to corroborate Acer's admission that the FDA stated in the CRL that it was necessary to "conduct an adequate and well-controlled trial." (*Id.* ¶ 116.)

The second point — that the FDA and a drug's sponsor communicate about the sponsor's NDA, including the sufficiency of clinical trials — is so uncontroversial that multiple courts have accepted it as true when evaluating motions to dismiss. *See, e.g. Tongue*, 816 F.3d at 211 ("These investors are similarly aware, as the district court recognized, that [c]ontinuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process.…These sophisticated investors, well accustomed to the customs and practices of the relevant industry, would fully expect that Defendants and the FDA were engaged in a dialogue, as they were here, about the sufficiency of various aspects of the clinical trials…." (internal quotations marks and citations omitted)); *Innocoll*, 2020 WL 1479128, at *16 (E.D. Pa. Mar. 25, 2020) (same). Moreover, Acer's SEC filings establish that the Company discussed the Ong Trial data with the FDA several times in pre-NDA meetings. (SAC ¶¶ 84-87.)

Given the well-established flaws with the Ong Trial, the fact that Acer went over the data with the FDA, and that the FDA rejected EDSIVO's application because an adequate and well-controlled trial was necessary, it is a commonsense and inescapable inference that the FDA never

---

[4] In a footnote, Defendants argue that the Court should not consider statements from the Ehlers-Danlos Society and Marfan Foundation that are from after the class period. (Mot. at 13 n. 7.) The Second Circuit has rejected that position, however. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("[t]he Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period." (internal quotation marks omitted)). Additionally, Defendants' citation to *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) is misplaced. *Tongue*, 816 F.3d at 214, held that Defendants' statement about of the effectiveness of a drug were not actionably false because of a methodological disagreement. Here, Plaintiff is using them as evidence supporting allegations that Defendants' statements concerning what the "FDA agreed" to were false. *See MannKind*, 835 F.Supp.2d at 811.

agreed that additional clinical development was not needed for approval of EDSIVO.[5]

Defendants attempt to negate Plaintiff's position with an FDA *Draft* Guidance, that states only that the FDA "*may*" issue a refuse to file decision on an NDA if:

> An application that relies on a single adequate and well-controlled trial for a demonstration of effectiveness if prior communication between the FDA and the applicant…determined the need for more than one trial…and if the submitted justification for reliance on a single trial is inadequate.

(Mot. at 16; Defs. Ex. D (Dkt. No. 51-4) at 4-5.) Defendants claim the fact that the FDA did not issue a refuse to file decision means that they did not make misstatements, but there are several problems with that argument. First, it would be completely inappropriate for the Court to dismiss the SAC based on a draft guidance that gave the FDA discretion to do something. Whether this guidance was even effective and whether the FDA would have used its discretion to issue a refuse to file decision is a question of fact. Furthermore, dismissal would necessitate the Court *assume both* (1) FDA specifically told Acer in a pre-NDA meeting that it definitely needed an additional clinical trial for FDA approval, and (2) FDA *would have* exercised its discretion to issue an RTF, when there is no evidence FDA even flagged the issue during the initial 60 day filing review period. Neither Plaintiff, nor Defendants, contend that FDA told Acer that it definitely needed an additional clinical trial for approval. Plaintiff only alleges that FDA would have discussed its concerns about the EDSIVO data with Acer and FDA would not have "agreed that no additional clinical development is needed" given the study's myriad deficiencies. (SAC ¶¶ 88-90.) Whether

---

[5] In the cases Defendants cite, the plaintiffs made far more speculative inferences. *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1107-08 (N.D. Cal. 2013) (expert's allegations concerned what Apple would have done even though he had never worked at Apple); *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 860 (N.D. Cal. 2019) ("There is also no allegation that Mr. Yeung was familiar with, much less had knowledge of, the specific security architecture of Defendants' privacy network.") This is in stark contrast to Dr. Lavin's decades of experience with the FDA. (SAC ¶¶ 24-31.)

the EDSIVO trial was sufficient for FDA approval would have been a substantive review decision – which is exactly how the FDA addressed it.  This draft guidance is irrelevant.

The Defendants in *MannKind* also claimed that they did not make misstatements because the FDA did not issue a refuse to file, but the court rejected that argument. 835 F. Supp. 2d at 809 (defendants "contend that the FDA technically 'accepted' the NDA submission, and thus could not have viewed the studies as glaringly insufficient.")  Furthermore, even if Defendants offer a plausible reading of the alleged facts, that is not "a mandate for *dismissal of the complaint*. No such mandate exists in controlling case law." *Id.* at 824 (emphasis in original).[6]

## II.  PLAINTIFF ALLEGES SCIENTER.

A complaint may plead scienter by "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting **strong circumstantial evidence** of conscious misbehavior." *ATSI Commc'ns.*, 493 F.3d at 98 (emphasis added)). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs,* 551 U.S. at 324 (internal quotation marks omitted). The proper inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). Recklessness can suffice to meet pleading requirements for scienter where the complaint sufficiently alleges that the Defendants "knew facts or had access to information suggesting that their public statements were not accurate;" or "failed to check information that they had a duty to monitor." *In re Pall Corp.*, No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777, at *6 (E.D.N.Y. Sept. 21, 2009).

---

[6] The factual situations in *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) and *Kleinman v. Elan Corp., plc*, 706 F.3d 145 (2d Cir. 2013) were completely different from this case. *See ATSI*, 493 F.3d at 102-103 (complaint could not even definitely allege that defendant sold shares in question in market manipulation claim); *Kleinman*, 706 F.3d at 153-55 (plaintiffs' complaints about defendants' methodology did not establish falsity).

18

Even though only one is necessary, Plaintiff properly alleges both that there was strong circumstantial evidence of conscious misbehavior or recklessness and motive.

### A. Plaintiff Alleges Conscious Misbehavior or Recklessness.

Defendants concede that if the Court finds Plaintiff has pled that the FDA never agreed with Acer that additional clinical development was needed for EDSIVO's approval, Plaintiff has pled that Defendants engaged in conscious misbehavior or recklessness. (Mot. at 21 ("This theory of scienter fails for the same reason that Plaintiff's falsity allegations fail.").) Defendants must concede this because only 23 employees worked at Acer during the relevant time period and EDSIVO was Acer's most important drug by far. (SAC ¶¶ 3, 35.) The SAC further alleges that at least 5 members of Acer's senior management would have attended each meeting with the FDA, and it is standard practice for the FDA to prepare minutes of each meeting and send them to the sponsor of the drug. (*Id.* ¶¶ 81-82.) Accordingly, given that they were the CEO and CFO of the Company, each Individual Defendant must have known that the FDA had not agreed that no more clinical development or trials were needed for EDSIVO and about any significant feedback that the FDA gave Acer about the Ong Trial. *See MannKind*, 835 F. Supp. 2d at 815 (holding that because the drug in question was MannKind's only advanced-stage product, "[d]efendants' positions within MannKind raise an inference of scienter based on the falsity of the statements and Defendants' access to information contradicting those statements. Moreover, the company's interactions with the FDA regarding… approval were absolutely integral to the company's success, and it would therefore be absurd to suggest that management was without knowledge of the matter." (internal quotation marks omitted)); *In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("[I]t would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market."); (SAC ¶ 137.) If Defendants claim they failed to review such important

19

information, it just means they were reckless and still had scienter. See *Innocoll*, 2020 WL 1479128, at *13 ("Suggesting that Plaintiffs failed to plead recklessness because Defendants possibly failed to review important information accessible to them equally runs afoul of the policy objective to discourage deliberate ignorance.").[7]

The SAC also alleges that each Individual Defendant was provided with copies of the Company's SEC filings that contained the misleading statements and had the opportunity to prevent their issuance or cause them to be corrected. (SAC ¶ 138.) The December 2017 and August 2018 Offering Documents form parts of a registration statement that each of the Individual Defendants signed. (*Id.*) Additionally, each Individual Defendant signed the 2017 10-K and the certifications required by Sarbanes Oxley that accompanied them. (*Id.*); *see In re Vale S.A. Sec. Litig.*, No. 1:15-CV-9539-GHW, 2017 WL 1102666, at *33 (S.D.N.Y. Mar. 23, 2017) (Woods, J.) (holding that individual defendant had scienter where he had ultimate authority over statements). Additionally, even if the Court were to find that Plaintiff has not alleged knowledge or recklessness by each Individual Defendant, Plaintiff has done so for Acer, itself, since Acer's statements "would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Id.* at *31 (internal quotation marks omitted). [8]

The Court should also infer scienter from the Defendants' revision of their statement about what the "FDA agreed" to. Defendants waive this away by arguing that the statements were "substantively identical" (Mot. at 23), but that is obviously untrue. To say that the "FDA agreed" that something is "not needed" is a clear, solid agreement. (SAC ¶¶ 49-51.) To say that the "FDA

---

[7] Since *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358–361 (S.D.N.Y. 2011) and *City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 CIV. 2835 NRB, 2011 WL 4357368, at *18 (S.D.N.Y. Sept. 19, 2011) concerned enormous companies and complicated misstatement they have no applicability here.

[8] The SAC alleges that senior officers including Chief Medical Officer and Director of Regulatory Affairs would attend FDA meetings. (SAC ¶ 81.)

agreed" that something is "likely not needed" is not. The second statement does not even clearly indicate there was an agreement since it leaves open the possibility that something else would be needed. In fact, there is no doubt that if they had only made the revised statement, Defendants would be arguing that the statement was not misleading because sometimes it turns out that something that is "likely not needed" turns out to be needed. The difference between "additional clinical development" and an "additional clinical trial" is also significant because "clinical development" can be virtually any type of clinical work with the existing EDSIVO data, in additional to a clinical trial. Plaintiff can obviously not be entirely certain why Defendants revised that statement, but it is a reasonable inference based on their close editing of the statement that Defendants were keenly aware of its importance to investors and, *at minimum*, that the FDA had not "agreed" in the definitive way that the first statement portrayed it. Additionally, the timing of the statement and revision were very suspicious — Defendants made the first, definitive, statement right after they completed their reverse merger and needed to raise money through a secondary offering. They revised the statement after the offering was successful.

Defendants also acted with scienter because they certainly knew how important statements related to the FDA approval process are to investors. As *MannKind*, 835 F. Supp. 2d at 811-812, explained, "case law addressing misstatements relating to FDA approval lends support to Plaintiffs' use of these statements to demonstrate scienter" because "[a]s evidenced by the stock's precipitous drop following the 2011 CRL… FDA approval was the *sina qua non* for MannKind Corporation's success, and statements pertaining to the chances of such approval…were absolutely essential to the company's prospects." The court further held that "[a]ccordingly, Defendants' statements concerning an 'agreement' with the FDA…were extremely important to investors, and, therefore, extremely misleading" and "taken alone…are sufficient to demonstrate a strong

21

inference of scienter." *Id.* at 812. *See also Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) (holding that failure to disclose FDA's concerns about animal study was sufficient to plead scienter.)

Defendants knew that their statements about the FDA's view of EDSIVO were especially significant to investors because others expressed public skepticism about whether the Ong Trial was sufficient for FDA approval. The authors of the *Pharmaceutical Technology* article, in which experts predicted that EDSIVO would not be approved, contacted Acer for comment. (SAC ¶ 64.) In May 2018, attendees of the DEFY symposium on vEDS publicly questioned the Ong Trial in front of an Acer executive and, according to the Marfan Foundation, the consensus of that meeting was that "a large and well-controlled clinical trial of celiprolol in vEDS" was necessary. *(Id*. ¶¶ 67, 69.) The Marfan Foundation's Professional Advisory Board also informed Acer employees that they opposed approval of EDSIVO. (*Id.* ¶¶ 69-70.) Finally, Plaintiff's showing of scienter is buttressed by Defendants' misleading statements about the Ong Trial, including Defendant Schelling's statement that it was "robust" and that Acer continued to issue similar statements until they announced the CRL. (*Id.* ¶¶ 54, 101-103); *see MannKind*, 835 F. Supp. 2d at 811.

### B. Plaintiff Alleges Motive to Commit Fraud.

Although, only conscious misbehavior or recklessness is necessary to plead scienter, the SAC also pleads that Defendants had a motive to commit fraud. Numerous courts have held that a plaintiff can plead scienter by alleging that the Company was motived to make a misrepresentation because it was necessary for it to raise money to continue operating. *See Nguyen v. Radient Pharm. Corp.*, No. SA CV 11-0406 DOC, 2011 WL 5041959, at *2, 8-9 (C.D. Cal. Oct. 20, 2011) (holding that there was scienter where defendant pharmaceutical company falsely claimed it was conducting a clinical trial with Mayo Clinic and it admitted its ability to continue operating was dependent upon raising additional capital); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350

22

(E.D. Pa. 2014) (finding motive where pharmaceutical company was "sufficiently short on cash at the time of the alleged misrepresentations that it could not afford to finance an additional clinical trial as the FDA had recommended, heightening its need for a lucrative stock sale."); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 299 (D. Mass. 2006) (finding strong motive evidence where plaintiffs alleged that company "needed an immediate cash infusion to keep the business alive"). *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24 (2d Cir. 2013) is not inconsistent with these cases. It held that plaintiff's pleading was insufficient because it "did not allege that absent reporting the [misrepresentations defendant] would have been unable to complete the stock offering." *Id.* at 29.[9]

This case meets the specifications of *Tabak*. On November 13, 2017, the Company filed its 3Q2017 10-Q, admitting that "[t]here is substantial doubt about the Company's ability to continue as a going concern within one year." (SAC ¶ 119.) Less than a month later, Acer falsely stated in its December 2017 Offering Documents that "the FDA agreed that additional clinical development is not needed" for EDSIVO. (*Id.* ¶ 125.) The explicit purpose of the December 2017 Offering was to fund EDSIVO. (*Id.* ¶ 124.) In its 3Q2017 10-Q, issued on May 14, 2018, Acer again admitted there was substantial doubt about its ability to continue as a going concern. (*Id.* ¶ 130.) The Company then stated in the documents for its August 2018 Offering, which again had the explicit purpose to raise money for EDSIVO, that "the FDA agreed that an additional clinical trial is likely not needed." (*Id.* ¶¶ 131,133.)

Defendants argue that because they disclosed that their business model was risky, they warned investors that they might be motivated to commit fraud. Plaintiff understood he was investing in a risky venture, but expected that Defendants would portray the risks honestly, not falsely claim that the FDA had agreed to things it had not. Defendants further state they "only

---

[9] None of the other cases that Defendants cite concern a company's admitted need to raise money to continue as a going concern. (Mot. at 17-18.)

would make money if EDSIVO were successfully brought to market." (Mot. at 17.) That is precisely why they were motived to make misrepresentations. If Defendants had not been able to raise money, there was no possibility of bringing EDSIVO to market and there would have been no more possibility of making money. Additionally, Defendants' employment would have ended.

Defendants also argue that finding a motive here would harm innovation and that they were simply hoping to bring a life-saving drug to market. To start with, it is a dubious argument that drug companies should be excused from accurately disclosing their interactions with the FDA to investors. Additionally, the unusual facts concerning EDSIVO's development are worth the Court's consideration. The story of EDSIVO is not the development of a new life-saving drug. Instead, it is the story of a company trying to bring an existing drug to market without conducting any additional clinical trials and intending to price it exorbitantly based on a questionable use of Orphan Drug Exclusivity. (SAC ¶¶ 40-47.) Advocates for vEDS patients, the Marfan Foundation and Ehlers-Danlos Society, *opposed* approval of EDSIVO given its likely high cost to patients and the scant evidence that it was superior to other available low-cost drugs. (*Id.* ¶¶ 41-42, 65-71.)

## C. It Does not Matter if Defendants Believed EDSIVO Would be Approved.

Defendants argue repeatedly in the scienter section that Plaintiff's theory is incorrect because Defendants "believed" the FDA would approve EDSIVO. (Mot. 19-20, 23.) To the contrary, Plaintiff has no doubt that Defendants believed it was possible, or at least hoped, that the FDA would approve EDSIVO, but that is irrelevant to this case. *See Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1130 (C.D. Cal. 2005) (holding that defendants' position that plaintiffs had to show that defendants knew the FDA would take adverse action was  an "attempt to raise the standard for scienter far beyond what is required by the PSLRA"). Instead, Plaintiff's theory is that, contrary to Defendants' public pronouncements, FDA never affirmatively "agreed" that additional clinical development was not needed for EDSIVO. (*See* SAC ¶ 11 (based on the CRL

24

"it is clear that the FDA never agreed that no clinical development for EDSIVO was needed in addition to the Ong Trial"); *id.* ¶ 89 ("[T]hese problems with the Ong Trial would be known to the FDA, so the FDA would not have 'agreed' that additional clinical development was not needed for EDSIVO.").) The SAC further alleges that the FDA would have given Defendants feedback about the Ong Trial, but  "[e]ven in the face of FDA criticism…, Defendants would have been highly motivated to avoid conducting a new prospective trial for EDSIVO because conducting such a trial would be incredibly expensive and time consuming." (*Id.* ¶¶ 90, 93.) The SAC does not, however, allege that Defendants knew, or the FDA explicitly told them, that the FDA would reject EDSIVO or that an additional clinical trial was required, prior to the FDA's actual review of EDSIVO's NDA.  (*See id.* ¶ 75 ("[A]n 'in-depth substantive review' of an NDA does not take place until after an NDA is accepted for filing.").

Defendants were entitled to believe the FDA would approve EDSIVO and if they had told investors only that, this case would not exist. Instead, they knowingly or recklessly misled investors by telling them the "FDA agreed" to something it had not. *See In re Amylin Pharm., Inc. Sec. Litig.*, No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *5 (S.D. Cal. May 1, 2003) ("There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable.").[10]

### CONCLUSION

For the reasons above, Defendants' Motion should be denied in its entirety. If the Court dismisses the Complaint, Plaintiff respectfully requests that it should be without prejudice.

---

[10] *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 590 (S.D.N.Y. 2016), *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014), and *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 622 (4th Cir. 2008) concerned optimist predictions that put defendants' beliefs at issue, not historical statements about what the FDA said.

Dated: May 22, 2020                    Respectfully submitted,

                                       **THE ROSEN LAW FIRM, P.A.**
                                       By: /s/*Laurence Rosen*

                                       Laurence Rosen
                                       Phillip Kim
                                       Brian B. Alexander
                                       275 Madison Avenue, 40th Floor
                                       New York, NY 10016
                                       Telephone: (212) 686-1060
                                       Fax: (212) 202-3827
                                       Email: lrosen@rosenlegal.com
                                               pkim@rosenlegal.com
                                               balexaner@rosenlegal.com

                                       *Counsel for Plaintiff and the Class*