**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
Brian B. Alexander
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
balexander@rosenlegal.com

*Counsel for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICHOLAS SKIADAS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ACER THERAPEUTICS INC., CHRIS SCHELLING, and HARRY PALMIN, <br><br> Defendants. | No.: 1:19-cv-06137-GHW |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT AND TO MODIFY THE <u>SCHEDULING ORDER</u>

**Table of Contents**

INTRODUCTION ........................................................................................................................... 1

RELEVANT BACKGROUND ...................................................................................................... 3

    A.    Defendants' Motion to Dismiss the Second Amended Complaint. ............................. 3

    B.    The Scheduling Order and Defendants' Mediation Production. .................................. 6

    C.    The Documents Defendants Produced Show that the FDA Told Defendants that Approval Based on a Single Study was Rare When Defendants asked if the Ong Trial Was Sufficient for Approval of EDSIVO and Repeatedly Warned Defendants that the Ong Trial was Flawed for Years Prior to its Rejection of EDSIVO's NDA. ................................................................................... 7

    D.    Plaintiff's Proposed Third Amended Complaint. ....................................................... 15

    E.    Plaintiff Sent a Proposed Third Amended Complaint to Defendants and Informed the Court of his Intention to Move to Amend Less Than Two Months After Receiving Defendants' 36,000 Page Document Production. ............................ 17

ARGUMENT ............................................................................................................................... 18

    I.    THE COURT SHOULD MODIFY THE SCHEDULING ORDER TO ALLOW PLAINTIFF TO AMEND THE COMPLAINT .......................................................... 18

    A.    Plaintiff Has Acted Diligently ................................................................................... 19

    B.    Granting Plaintiff Leave to Amend Will Not Prejudice Defendants and Justice Requires it. ................................................................................................................. 20

CONCLUSION ............................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*City of Almaty, Kazakhstan v. Ablyazov*,
No. 115CV05345AJNKHP, 2019 WL 2324587 (S.D.N.Y. May 29, 2019) ............................ 19

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*,
304 F.R.D. 170 (S.D.N.Y. 2014) ...................................................................................... 21

*Holmes v. Grubman*,
568 F.3d 329 (2d Cir. 2009) .............................................................................................. 18

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................................................ 5

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
No. 1:15-CV-2457-GHW, 2019 WL 1245013 (S.D.N.Y. Mar. 18, 2019) ..................... 18, 20

*Kassner v. 2nd Ave. Delicatessen Inc.*,
496 F.3d 229 (2d Cir. 2007) ......................................................................................... 18, 20

*Olaf Soot Design, LLC v. Daktronics, Inc.*,
299 F. Supp. 3d 395 (S.D.N.Y. 2017) ........................................................................... 19, 21

*State Teachers Ret. Bd. v. Fluor Corp.*,
654 F.2d 843 (2d Cir. 1981) .............................................................................................. 21

**Statutes**

15 U.S.C. § 78u-4(b)(3)(B) ................................................................................................. 21

**Rules**

Federal Rule of Civil Procedure 15 …………………………………………………………18

Federal Rule of Civil Procedure 16 …………………………………………………………18

**<u>INTRODUCTION</u>**

On September 14, 2020, Plaintiff received a 36,000 page pre-mediation document production from Defendants that contained the official FDA prepared minutes of Defendant Acer Therapeutics' ("Acer" or the "Company") meetings with the FDA concerning EDSIVO along with other related documents. The FDA's minutes for its September 30, 2015 meeting with Acer show that Defendants specifically asked the FDA if the "Ong Trial" — the only clinical trial Acer relied on to show efficacy —  was sufficient for approval of its New Drug Application ("NDA") for EDSIVO: "***Does the Agency agree*** that the published literature provides sufficient efficacy support for celiprolol in the treatment of vEDS, and ***that no additional clinical studies will be needed for NDA approval?***" (emphasis added). The minutes show that the FDA ***did not agree.*** Instead, the minutes state that the FDA responded that approval based on a single study, such as the Ong Trial, was "***rare.***" (emphasis added.) The official minutes for Acer's June 28, 2018 meeting with the FDA show that Defendants again asked the FDA if it "agree[d]" that the Ong Trial supported the "efficacy of celiprolol." The FDA again did not agree and stated that it had not yet determined whether the Ong Trial was sufficient to support the ***efficacy*** of **EDSIVO** *or the filing of its NDA*.

The FDA meeting minutes and related documents also show that the FDA warned Defendants for years that the Ong Trial had serious flaws: (1) that it had a randomization imbalance between the celiprolol and control groups, and (2) its results were not properly adjusted for the multiple interim analyses of efficacy conducted during the Trial and that the Trial was stopped early based on those improperly conducted interim analyses. Based on those flaws, the FDA concluded that the Ong Trial was not sufficient to show that EDSIVO was effective against vEDS and its results were not statistically significant.

These documents provide definitive proof that Defendants statements that "the FDA agreed

that additional clinical development is not needed" and "the FDA agreed that an additional clinical trial is not likely needed" for EDSIVO were false and misleading (which the Court already held were well pled in the Second Amended Complaint) because Acer did not have any such agreement. They also show that those statements are false and misleading for the additional reasons that they concealed (i) that the FDA told Acer that approval based on one study was rare, and (ii) the FDA's criticisms of the Ong Trial. Based on this new evidence, it is also clear that numerous statements by Defendants to investors that Ong Trial was statistically significant, showed the efficacy of EDSIVO, and the important phenotype characteristics were equally balanced between celiprolol and control groups in the Trial were misleading because the FDA was telling Defendants the opposite. Defendants also misleadingly told investors that Acer's product candidates had a "de-risked profile" and that the FDA had only given them guidance on how to present the Ong Trial data, omitting that the FDA had warned them of serious flaws in the conduct and efficacy analyses in the original trial.

This motion easily meets the requirements to move to amend and modify the scheduling order under Federal Rules of Civil Procedure 15 and 16(b). Plaintiff has acted diligently to amend, the proposed amendment does not prejudice Defendants, and justice requires the granting of leave to amend. Plaintiff could not have moved to amend prior to the September 16, 2020 scheduling order deadline to amend since the information Plaintiff is relying on to amend was contained in a 36,000 page document production that Plaintiff received only two days before that deadline. Furthermore, from the moment Plaintiff received the production, he diligently worked to identify important documents, analyze those documents with the assistance of an expert, and then to re-review all of Defendants' public statements to see if the new information rendered them false and misleading. Plaintiff sent Defendants a proposed Third Amended Complaint and informed the

2

Court of his intention to move to amend less than two months after receiving Defendant's 36,000 page production — a timeframe well within the standards for diligence set by other courts in this District. Defendants also cannot show that an amendment at this point in the case will prejudice them — Defendants have not produced any documents other than their September 14, 2020 production and Plaintiff's proposed amendment will not change the discovery necessary for this case. Finally, it is clearly in the interests of justice to allow Plaintiff to amend since when Defendants moved to dismiss the Second Amended Complaint, they represented to the Court that the suggestion that Acer would have moved forward with its NDA for EDSIVO even after the FDA criticized the Ong Trial as "implausible to the point of absurdity." This new evidence shows that is exactly what happened.

## **RELEVANT BACKGROUND**[1]

### A. **Defendants' Motion to Dismiss the Second Amended Complaint.**

Acer based its NDA for EDSIVO on a single old study — the "Ong Trial" — from which it licensed the data. (The Second Amended Complaint, ECF No. 43 ("SAC") ¶¶ 44-46.) The Second Amended Complaint alleged that Defendants' statements that at a September 2015 meeting with Acer, "the FDA agreed that additional clinical development is not needed" and "the FDA agreed that an additional clinical trial is not likely needed" for approval were false and misleading because the FDA had never made any such agreement. (*Id.* ¶¶ 106, 108, 112.) Defendants moved to dismiss Plaintiff's Second Amended Complaint for failure to plead actionable misrepresentations and scienter on May 1, 2020. (ECF Nos. 49, 50.) Plaintiff argued that the Second Amended Complaint sufficiently alleged that the FDA never "agreed" with Acer for two

---

[1] This section assumes knowledge of the general background of the case, as previously briefed by the Parties. (*See* ECF Nos. 50, 52-53.)

principal reasons: (1) Acer admitted in a June 25, 2019 press release that the FDA had issued a Complete Response Letter ("CRL") rejecting its application for EDSIVO that stated it was necessary for Acer to conduct an "adequate and well controlled trial" and (2) that the Ong Trial had serious flaws that would have concerned the FDA and the FDA would have communicated those concerns to Defendants prior to its rejection of EDSIVO's NDA. (Pls.' Mem. of law in Op. to Defs.' Mot. to Dismiss the SAC, ECF. No. 52, at 13-17.)

In their memorandum in support of their motion to dismiss, Defendants represented to the Court that Plaintiff's theory that the FDA communicated negative views of the Ong Trial data to Defendants that the Company failed to disclose to investors was "untenable":

> Had the FDA indeed shared Plaintiff's negative views of the Ong Trial data and communicated to Defendants that it viewed the data as insufficient, as Plaintiff and his expert theorize, the FDA could have issued an [Refuse to File]. But it did not. The very fact that the FDA, after allegedly "discuss[ing] [with Defendants] all the portions of EDSIVO's NDA . . . prior to the Company's submission of the NDA" ([SAC] ¶ 92), chose to accept the NDA for filing and substantive review, renders Plaintiff's theory of falsity untenable.

(ECF No. 50 at 16.) Defendants further stated in their memorandum that Plaintiff's theory was "implausible to the point of absurdity":

> At bottom, the "scheme" to defraud investors that Plaintiff alleges is implausible to the point of absurdity. Plaintiff alleges, via his expert, that "statements by the FDA prior to filing an NDA would have focused on whether the NDA would be approved, not on whether the sponsor of a drug could submit the NDA." (SAC ¶ 90.) By this Plaintiff suggests that the FDA would have told Defendants that it would not approve the NDA for EDSIVO without further clinical study.

(*Id.* at 19.) Defendants further argued that "Plaintiff [does] not identify any omitted communications [with the FDA]." (*Id.* at 12 n.8.)

On June 16, 2020, the Court issued an opinion mostly denying Defendants' motion. (Memorandum Opinion and Order, ECF No. 54 ("MTD Order") at 2.) The Defendants argued that their statements about the September 2015 meeting concerned only whether "additional clinical

4

development" or an "additional clinical trial" was  "not needed" or "not likely needed" to *submit* EDSIVO's NDA, not whether it was needed for *approval* of the NDA. (*Id.* at 15.) The Court held, however, that it was ambiguous whether a reasonable investor would have interpreted the statements to concern approval or submission and, therefore, could not dismiss Plaintiff's claims as a matter of law. (*Id.* at 17.) The Court further held that "the FDA's statement in the CRL makes plausible the allegation that the FDA never agreed that no further clinical development was necessary before it would approve EDSIVO" and, therefore, Defendants' statements about what the FDA agreed to were actionable misstatements. (*Id.*)

Plaintiff also alleged in the Second Amended Complaint that Defendants' statements that the "FDA provided us with additional guidance on the expected presentation of the existing clinical data for EDSIVO™ to support the NDA filing" at a May 2017 meeting were false or misleading. (*Id.*) The Court held that these statements were not false or misleading because "[t]hat the FDA ultimately rejected the Acer's NDA for EDSIVO Skiadas does not suggest that the FDA did not provide Acer with guidance about how to present existing data." (*Id.* at 18.)

The Court further held that Plaintiff adequately alleged scienter for four different reasons. *First*, the Court held that given the importance of FDA approval to the success of pharmaceutical companies, "'case law addressing misstatements relating to FDA approval lends support to Plaintiffs' use of these statements to demonstrate scienter" and that Acer's statements "'necessarily implied that there would be no serious impediments to timely FDA approval.'" (*Id.* at 19-20 (quoting *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011).) *Second*, the Court held that Defendants' revision of their statement about the September 2015 meeting demonstrated Scienter. (*Id.* at 20.) *Third*, the Court held that "[t]he inference of scienter is also bolstered by the fact that Defendants admitted in their SEC filings that they needed to raise funds

for Acer to remain viable." (*Id.* at 21.) *Fourth*, the Court held Plaintiff's allegation that "Defendants had access to information that contradicted the challenged statements" supported scienter. (*Id.* at 22.) The Court also rejected Defendants' argument that Plaintiff's allegations were "fundamentally illogical" because "investors would uncover the scheme when the FDA ultimately rejected Acer's NDA for EDSIVO." (*Id.*) The Court explained that "Skiadas' allegations support the inference that Defendants rationally (though recklessly) gambled that the FDA would ultimately approve EDSIVO, even though the FDA had never 'agreed' that it would approve EDSIVO without additional clinical development." (*Id.*)

The Court denied Defendants' Motion for Reconsideration on July 21, 2020. (ECF No. 63.)

**B. The Scheduling Order and Defendants' Mediation Production.**

On August 17, 2020, the Court held the initial pretrial conference for this case and entered a scheduling order (the "Scheduling Order"). (ECF No. 67.) The Court's model scheduling order states that the deadline for a motion to amend should be "[a]bsent exceptional circumstances, a date not more than 30 days following the initial pretrial conference." (*Id.*) As directed by the Court's model order, the Scheduling Order set a deadline of 30 days after the entry of the order, September 16, 2020, to file a motion to amend. (*Id.*) As part of agreement between the Parties, Defendants agreed to produce certain documents prior to an early private mediation that occurred on October 7, 2020. (Alexander Decl. ¶ 2.)[2] Plaintiff received Defendant's 36,000 page document production on September 14, 2020. (*Id.* ¶ 3.)[3] After receiving Defendants' voluminous production, Plaintiff immediately began to work to identify the important documents and consulted with an

---

[2] The Declaration of Brian B. Alexander, dated December 3, 2020, was filed concurrently with this motion ("Alexander Decl.")

[3] Defendants purportedly emailed their production to Plaintiff on the evening of Friday, September 11, 2020. Plaintiff, however, did not receive it until technical problems were worked out between the parties on Monday, September 14, 2020. (*Id.*)

expert, Dr. Phillip Lavin, to analyze them since they were highly technical. (*Id.* ¶ 4.) Following Plaintiff's review of the documents and consultation with Dr. Lavin, Plaintiff re-reviewed all of Defendants' statements to see if the new evidence rendered them false and misleading. (*Id.* ¶ 5.) Although Plaintiff served his First Set of Requests for Production of Documents on August 17, 2020, Plaintiff agreed to Defendants' request to delay serving their responses and objections until after the scheduled mediation. (*Id.* ¶ 7.) Accordingly, Defendants did not serve their responses and objections, which were originally due on September 16, 2020, until October 23, 2020. (*Id.*) Defendants have refused Plaintiff's requests to meet and confer about their responses and objections and have not produced any documents in response to Plaintiff's First Set of Requests for Production. (*Id.*)

### C. The Documents Defendants Produced Show that the FDA Told Defendants that Approval Based on a Single Study was Rare When Defendants asked if the Ong Trial Was Sufficient for Approval of EDSIVO and Repeatedly Warned Defendants that the Ong Trial was Flawed for Years Prior to its Rejection of EDSIVO's NDA.

Defendant's mediation production contained, *inter alia*, the FDA's official meeting minutes from its meetings with Acer concerning EDSIVO. After a sponsor of a drug meets with the FDA, the FDA prepares minutes of the meeting so that the sponsor has an official record of the FDA's position. (Proposed Third Amended Complaint, attached as Exhibit A to Alexander Decl. ("TAC") ¶ 65.) Since sponsors send written questions to the FDA and the FDA responds to the questions in writing prior to the meeting, the FDA's official meeting minutes contain the sponsor's questions, the FDA's written answers, and a summary of the meeting. (*Id.* ¶ 64.) The minutes of Acer's FDA meetings show that, contrary to Defendants contention that their discussion with the FDA would have been focused on submission of EDSIVO's NDA, Defendants specifically asked the FDA in both 2015 and 2018 if it agreed that the Ong Trial was sufficient for the approval of ESIVO. ***Both times the FDA told Acer that it did not agree***. In the 2015 meeting,

the FDA instead told Defendants that it *was rare* for the FDA to approve a drug based on a single study.

In contrast to Defendants' representation to the Court that such a scenario was "absurd" and "implausible," the documents show that the FDA repeatedly warned Acer about serious flaws in the Ong Trial for more than two years prior to the FDA's rejection of EDSIVO's NDA. The FDA warned Defendants numerous times that: (1) the Ong Trial had a randomization imbalance between the celiprolol and control groups, and (2) the Ong Trial's efficacy results were not properly adjusted for the multiple interim analyses of efficacy conducted during the Trial and the Trial was stopped early based on those improperly conducted interim analyses. Based on those flaws, the FDA concluded that the Ong Trial was not sufficient to show that EDSIVO was effective and its results were not statistically significant. The minutes also show that Defendant Schelling attended every meeting that Acer had with the FDA about EDSIVO. (*Id.* ¶¶ 69, 74, 96, 106, 120, 135.)

*September 30, 2015 Meeting.* The minutes of Acer's September 30, 2015 meeting with the FDA showed that Acer specifically asked the FDA if the Ong Trial was *sufficient for approval* of EDSIVO: "Does the Agency agree that the published literature provides sufficient efficacy support for celiprolol in the treatment of vEDS, and that no additional clinical studies will be *needed for NDA approval*?" (*Id.* ¶ 70, Ex. 1 at ACER_0002207 (emphasis added).) The FDA responded that approval based on a single study, such as the Ong Trial, was "*rare*": "The literature *may* support filing an NDA. *We should note that approval based solely on the published report of a single study is rare.*" (*Id.*(emphasis added).) This is definitive proof that the FDA did not agree "additional clinical development is not needed" for approval of EDSIVO. Furthermore, it shows that Defendants specifically asked the FDA about *approval*, not just *submission*, prior to the

8

submission of their NDA, which contradicts Defendants' position.

*May 18, 2017 Meeting.* Acer met again with the FDA about EDSIVO at a Type C Guidance meeting on May 18, 2017. The meeting minutes show that the FDA independently brought up concerns it had about the Ong Trial at the meeting. (*Id.* ¶ 76, Ex. 2 at ACER_0002339-ACER_0002340.) First, the FDA stated that the Ong Trial's results were potentially biased in favor of celiprolol based on the makeup of the groups that received celiprolol and the control group:

> 1) ***Randomization imbalance***: It appears to us that there was an imbalance at baseline between the celiprolol subjects and the placebo subjects in the frequency of major diagnostic criteria, which reflect the risk for arterial rupture that favored celiprolol over placebo. ***If true, the results of the study were potentially biased in favor of celiprolol…***.

(*Id.* (emphasis added).) Second, the FDA warned Acer that their statistical analyses were unreliable and based on improper interim analyses:

> 2) Interim analyses: Multiple interim analyses were conducted throughout the course of the trial. ***We are concerned that alpha was not properly adjusted to account for these multiple analyses***.[4]

(*Id.* at ACER_0002340 (emphasis added).)

When discussing the "randomization imbalance" in the Ong Trial, the FDA was referring to multiple differences between the celiprolol and control groups that biased the results of the Ong Trial. The researchers discovered during the Trial that 20 of the 53 participants did not have the COL3Al gene mutation that causes vEDS and there was a severe imbalance between the study's celiprolol and control groups regarding the mutation. (*Id.* ¶ 77.) Only 52% of the 25 patients in the celiprolol arm were confirmed to have the mutation, versus 71% of the 28 patients in the control group. (*Id.*) The celiprolol and control groups were also imbalanced due to a higher percentage of people in the control group who had a family history of vEDS; a personal and 1st degree relative

---

[4] "Alpha" is the targeted level corresponding to statistical significance.

with a history of arterial rupture or dissection and uterine or intestinal rupture; and a phenotypic presentation that indicated they were sicker, including a higher incidence of acrogeria, hypermobility of joints, tendon rupture, lower limb varicosity, and bruising. (*Id.*)   The randomization imbalance potentially biased the results in favor of celiprolol, making them unreliable.

In its statement concerning "[i]nterim analyses," the FDA was expressing concern that the Ong Trial did not adjust the p-value (or level of significance) necessary to achieve statistical significance to compensate for the multiple interim analyses that researchers conducted prior to the time that the original trial plan called for the Trial to conclude. (*Id.* ¶ 79.)  Conducting multiple interim analyses introduces additional error into the results of a clinical trial because repeatedly looking at the data increases the chance that an indication of efficacy could be the result of random chance. (*Id.*) This was an especially serious problem because the Ong Trial was terminated early based on those improperly conducted interim analyses, which was compounded because the results were not statistically significant when the study was terminated nor at any of the preceding interim analyses. (*Id.*) The Ong Trial was terminated after only enrolling 53 patients, even though researchers had intended to enroll 100 patients and many of the enrolled patients were not monitored for the full 5-year duration that the original trial plan called for.  (*Id.*)

*June 14, 2018 and June 28, 2018 Meetings.* Acer had another Type C guidance meeting with the FDA on June 14, 2018 and a Type-B pre-NDA meeting with the FDA on June 28, 2018. (*Id.* ¶ 91.) Acer submitted briefing packages to the FDA prior to each meeting that were dated May 3, 2018 and May 29, 2018, respectively. (*Id.* ¶ 92; Exs. 3-4.) Both briefing packages contained sections entitled "Brief History of Development," that described Acer's September 2015 meeting with the FDA. Contrary to Acer's public filings, the descriptions of the September 2015 meeting

that Acer submitted to the FDA *did not mention any agreement between Acer and the FDA*. (*Id.* ¶ 93, Ex. 3 at ACER_0002408-ACER_0002409, Ex. 4 at ACER_0002443.)

The minutes for the June 14, 2018 meeting show that even though it had been more than a year since the May 18, 2017 meeting,  Acer had not made any progress alleviating the FDA's concerns about how the Ong Trial had been conducted and the unreliability of its results. Regarding the randomization imbalance issue, Acer asked the FDA if conducting an analysis adjusting for the presence or absence of three major diagnostic criteria would address the FDA's concerns ("the BBEST study" is the name the FDA used for the Ong Trial):

> ***Question 1: Randomization Imbalance and Method of Randomization***
> *Does the Agency agree that the covariate analysis adjusting for the presence or absence of the three major diagnostic criteria would appropriately address the Agency's question regarding potential bias or effect on the primary efficacy outcomes?*

(*Id.* ¶ 99, Ex. 5 at ACER_0002555 (emphasis in original).) The FDA responded: "We need more information before we can provide agreement on your covariate adjustment" and stated that Acer needed to submit its statistical analysis plan for review and that it should also "include a stratified permutation test of time to primary efficacy outcome because of *the small sample size in BBEST*." (*Id.* ¶ 100, Ex. 5 at ACER_0002556 (emphasis added.).) At the June 14, 2018 meeting, the FDA also told Defendants that there was an imbalance in patients that presented with bruising between the celiprolol and control groups in the Ong Trial and asked if an adjustment had been made for that imbalance or the imbalance in COL3A1 gene mutations. (*Id.* ¶ 101, Ex. 5 at ACER_0002556.)

Regarding the interim analyses of the Ong Trial, the June 14, 2018 meeting minutes showed that Defendants asked the FDA if it "agree[d]" that Acer did not have to adjust the "final outcome analysis" of the Ong Trial based on the fact it was terminated early:

> ***Question 2: Interim Analyses***
> *Does the Agency agree that adjustment for Type I error in the final outcome*

11

> *analysis was not required in the original BBEST study given that the study was not stopped due to efficacy as evidenced by crossing of a priori defined boundaries?*

(*Id.* ¶ 102, Ex. 5 at ACER_0002556 (emphasis in original).) Unsurprisingly, given that the FDA had previously told Acer more than a year ago, at the May 18, 2017 meeting, that an adjustment was needed, ***the FDA again did not agree***, and stated that Acer needed to use the Whitehead Test to evaluate the results of the Trial:

> ***No, we do not agree.*** It is our understanding that BBEST was stopped early "because significant differences were recorded between the two groups in the whole population after 64 months" (Ong 2010 article in The Lancet). In this situation, ***Whitehead 2004 states that p-values obtained from a conventional analysis are invalid and recommends that an adjusted p-value be reported. Regardless of the reason for study termination of BBEST, the unblinded looks at the data may have increased the type I error rate.***

(*Id.* ¶ 103, Ex. 5 at ACER_0002556 (emphasis added).) The June 14, 2018 meeting minutes further stated that Defendants admitted to the FDA that they did not even have the "documentation of the previous interim analyses" and would have to recalculate them. (*Id.* ¶ 104, Ex. 6 at ACER_0002557.)

The minutes of Acer's June 28, 2018 meeting show that Acer, again, specifically asked the FDA if the Ong Trial was sufficient to ***support the efficiency of celiprolol*** in vEDS patients:

> **Question 13:** Does the Agency agree that the source-verified data from the BBEST study, which corroborates the results as reported in The Lancet (Ong et al. 2010)…support the…efficacy of celiprolol for treatment of vEDS patients with a confirmed COL3Al mutation?

(*Id.* ¶ 108, Ex. 6 at ACER_0002613.) The FDA ***again did not agree***, stating that it could only decide whether the data was sufficient to support ***filing or efficacy*** after its substantive review of EDSIVO's NDA: "We can only decide on the adequacy of the data to support filing, efficacy and safety after our review." (*Id.* ¶ 109, Ex. 6 at ACER_0002613.)

*FDA's December 21, 2018 Letter*. Acer submitted its NDA for EDSIVO on October 29, 2018. (*Id.* ¶ 114.) In a December 21, 2018 letter, the FDA informed Acer it had completed its

12

"filing review" of the NDA for EDSIVO and "determined that your application is sufficiently complete to permit a substantive review" and, therefore, the NDA was "considered filed." (*Id.* ¶ 115; Ex. 7 at ACER_0002644.) It set a target date of June 25, 2019, for a decision on the NDA. (*Id.*) The FDA further stated that, although Acer's application was complete, it continued to be concerned that the Ong Trial was not sufficient to show efficacy of EDSIVO because of the Trial's randomization imbalance, improperly conducted interim analyses, and premature termination:

> 1) Randomization Imbalance: Given the imbalance in the major diagnostic criteria and the COL3A1 genetic mutation in the treatment groups, it is unclear whether these treatment groups are comparable.
>
> 2) Interim Analyses: Multiple interim analyses were conducted without preplanned alpha spending.
>
> …
>
> 4) Premature termination: The study was terminated when approximately 50% of the planned enrollment was complete. The decision to terminate the trial appears to have been made shortly after 2 events were reported in the control arm.

(*Id.* ¶ 116; Ex.7 at ACER_0002645.)

*February 11, 2019 Meeting.* The minutes for Acer's February 11, 2019 meeting with the FDA show that the FDA brought up the same concerns about the Ong Trial to Acer again, and that further analysis by the FDA had only deepened those concerns. The FDA informed Defendants that it had conducted the Whitehead triangulation test on the Ong Trial data, as it previously told Defendants it would do. Based on that test, the FDA told Defendants that the interim analyses of the Ong Trial and the Trial's early termination led to "***Inconclusive efficacy***":

> ***Inconclusive efficacy.*** The Whitehead triangulation test was used to ascertain efficacy during the performance of multiple pre-planned interim analyses. The original stopping boundaries are unknown. ***Stopping boundaries that we estimated were never crossed during 4 interim analyses, although the trial was terminated at 50% of the planned enrollment by parties unblinded to endpoint distribution between the arms of BBEST at the time of termination, thus introducing potential bias.***

(*Id.* ¶ 122, Ex. 8 at ACER_0002653 (emphasis added).) The FDA further stated that the imbalances

13

between the patients in the celiprolol and control groups in the Ong Trial caused "*a loss of statistical significance*":

> Baseline imbalances impacting statistical significance. ***There were numerous imbalances suggesting the no-beta-blocker arm was sicker at baseline than the celiprolol arm***: 1) family history of vEDS (16 vs 11); 2) personal and 1st degree relative with a history of arterial rupture or dissection, uterine or intestinal rupture (6 vs 2); 3) phenotypic presentation: acrogeria (21 vs 15), hypermobility of joints (23 vs 17), tendon rupture (6 vs 2), lower limb varicosity (11 vs 6), bruising (25 vs 18); and 4) reported COL3Al genetic defect (20 vs 13). …[t]he p-value from the stratified log-rank test was 0.098, consistent with the permutation test p-value of 0.11, ***showing a loss of statistical significance by controlling for the effects of the diagnostic criteria.***

(*Id.* ¶ 125, Ex. 8 at ACER_0002653 (emphasis added).)

*April 9, 2019 Meeting.* On March 29, 2019, the FDA sent Acer a background package for Acer's "Late Cycle Meeting" with the FDA, which was scheduled for April 9, 2019. (*Id.* ¶ 128, Ex. 9.) In the Late Cycle Meeting background package, the FDA again stated that the Ong Trial had "**Inconclusive efficacy results**" because of the interim analyses and early termination of the Trial (*Id.* ¶ 130, Ex. 9 at ACER_0002659 (emphasis in original).) The FDA also reiterated in the Late Cycle Meeting background package that there were numerous baseline imbalances between the celiprolol and control groups in the Ong Trial and stated that Acer's own analysis "adjusting for three protocol-defined major diagnostic criteria—personal/family history of arterial rupture, history of hollow organ rupture, or COL3A1 gene mutation—***render[ed] the treatment effect non-significant*…**." (*Id.* ¶ 131, Ex. 9 at ACER_0002659- ACER_0002660 (emphasis added).)

The minutes for Acer's April 9, 2019 meeting with the FDA reiterated the statements that the FDA made about interim analyses and baseline imbalances from the Late Cycle Meeting background package. (*Id.* ¶ 135, Ex. 10 at ACER_0002666-ACER_0002667.) Furthermore, the minutes state that Acer admitted during the meeting that the Ong Trial was terminated prematurely, before it showed the efficacy of celiprolol: "***The Applicant agreed*** with the Division's conclusions

14

that the stopping boundaries were not crossed and the trial was terminated prematurely." (*Id.* ¶ 136, Ex. 10 at ACER_0002666 (emphasis added).)

*The CRL.* Defendants also produced a copy of the CRL that the FDA issued when it rejected EDSIVO's NDA. It was dated June 24, 2019, and Defendants have not made it public. (*Id.* ¶¶ 142, 144.) In the CRL, the FDA stated that the Ong Trial had not provided substantial evidence of the effectiveness of celiprolol for the same reasons — concerns about the interim analysis and the premature termination of the Trial and imbalances in the celiprolol and control groups in the Trial — that it had continuously warned Acer about for more than two years:

> We have concluded that ***the Beta-Blocker in Ehlers-Danlos Syndrome Treatment (BBEST) trial does not provide substantial evidence of effectiveness for celiprolol for the reduction of cardiac or arterial events (rupture or dissection) in patients with vascular Ehlers-Danlos Syndrome (vEDS) who have a confirmed type III collagen (COL3Al) mutation.*** Our conclusion is based on the following considerations: 1) ***the statistical boundary conditions that were established to adjust for multiple interim analyses*** (Whitehead's Triangular Monitoring Design) were not satisfied when ***the study was terminated prematurely when only 50% of the planned subjects had been enrolled***; 2) ***the p-value for the primary endpoint was not adjusted for multiple interim analyses***; 3) there were ***important baseline imbalances*** for which adjustment would increase the p-value to 0.09 (using the stratified log-rank test) and to 0.11 (using the stratified permutation test).

(*Id.* ¶ 142, Ex. 11 at ACER_0002670 (emphasis added).) The CRL further stated: "To address these issues, it will be necessary to conduct an adequate and well-controlled trial to determine whether celiprolol reduces the risk of clinical events in patients with vEDS" and that "[f]or a future study, we recommend you attempt to confirm the [COL3Al mutation] in study participants." (*Id.* ¶ 143, Ex. 11 at ACER_0002670, ACER_0002672.)

## D. Plaintiff's Proposed Third Amended Complaint.

Plaintiff's Proposed Third Amended Complaint adds allegation from the FDA's meeting minutes and related documents that Defendants produced in their September 14, 2020 production. These new allegations show definitively that Defendants' statements about what the "FDA agreed"

15

to, which the Court previously sustained, were false. (TAC ¶¶ 159, 164, 177.) The Third Amended Complaint also pleads that those statements were false and misleading for the additional reason that Defendants failed to disclose that the FDA told Acer that approval based on a single trial was "rare" and that the FDA was concerned about flaws in the Ong Trial. (*Id.* ¶¶ 160, 165, 178.)

The Proposed Third Amended Complaint also repleads that Defendants' statements that the "FDA provided us with additional guidance on the expected presentation of the existing clinical data for EDSIVO™ to support the NDA filing" at a May 2017 meeting were false or misleading. (*Id.* ¶¶ 166, 179.) They were misleading because the FDA's criticisms were not limited to "guidance on the expected presentation," but instead concerned flaws about how the Trial was originally conducted that Acer could not remedy after the fact. (*Id.* ¶¶ 167, 180.)

Additionally, the Proposed Third Amended Complaint adds misleading statements by Defendants that: (i) the Ong Trial had statistically significant results and showed efficacy (*id.* ¶¶ 152, 155, 157, 169, 171, 172, 183, 184, 193, 194, 196), and (ii) the important phenotype characteristics were equally balanced between the celiprolol and control groups of the Trial (*id.* ¶¶ 156, 162, 170, 175 189.)  Defendants made those statements at the same time that the FDA was specifically warning Acer that that the results of the Ong trial were not statistically significant and that the Trial had a randomization imbalance between the celiprolol and control groups. Lastly, the Proposed Third Amendment Complaint also adds Defendants' misstatements that Acer's product candidates had a "de-risked profile" (*id.* ¶¶ 182, 187, 192.) Defendants made those statements in 2019 even though the FDA had told them that the Ong Trial showed "[i]nconclusive efficacy." (*Id.* 185, 188, 195.) These new misstatements expand the class period by a little less than three months to September 25, 2017 through June 24, 2019.[5]

_____

[5] The Third Amended Complaint also reorganizes some of the other allegations from the Second Amended Complaint as part of integrating the new allegations and contains some edits for clarity. Due to this reorganization, the comparison

**E. Plaintiff Sent a Proposed Third Amended Complaint to Defendants and Informed the Court of his Intention to Move to Amend Less Than Two Months After Receiving Defendants' 36,000 Page Document Production.**

Plaintiff emailed Defendants a draft of the Proposed Third Amended Complaint on Friday, November 6, 2020 and requested that Defendants give Plaintiff their position on (1) Plaintiff's anticipated motion for leave to amend the complaint and (2) per Section 4.A.ii. of the Court's Individual Rules of Practice, whether documents that Defendants produced and Plaintiff attached to and quoted in the Proposed Third Amended Complaint should be filed under seal, since Defendants had designated those documents as "Confidential" under the protective order entered in this case. (Alexander Decl. ¶ 8.) Plaintiff informed the Court by letter on November 10, 2020 that Plaintiff intended to move to amend the Second Amended Complaint. (ECF Nos. 71, 72.) Plaintiff sent Defendants a copy of that letter on November 9, 2020 and agreed to Defendants' request not to file the letter until November 10, so that Defendants could determine if portions of the letter should be filed under seal. (Alexander Decl. ¶ 9.)

Defendants did not notify Plaintiff of their position on the motion to amend until Defendants filed a letter with the Court on November 16, 2020 (the "November 16 Letter") that stated they opposed Plaintiff's anticipated motion to amend. (ECF No.74; Alexander Decl. ¶ 10.) Defendants, however, did not inform Plaintiff of their position on what portions of the documents attached to the proposed Third Amended Complaint should be filed under seal. (Alexander Decl. ¶ 10.)[6] On November 18, 2020, Plaintiff informed Defendants that Plaintiff intended to file his motion to amend on November 24, 2020 and, therefore, requested that Defendants provide their

---

of the Proposed Third Amended Complaint against the Second Amended Complaint, which is attached as Exhibit B to the Alexander Declaration for the Court's convenience, is difficult to read in places.

[6] On November 16, 2020, Defendants contacted Plaintiff and asked if he would agree not to file the exhibits of the Third Amended Complaint. Plaintiff promptly informed Defendants on November 17, 2020 that he still intended to file the exhibits, but that he would only file excerpts of Exhibits 3 and 4. (*Id*.)

17

position on sealing by November 23, 2020. (*Id.* ¶ 11.) Defendants told Plaintiff on November 19, 2020 that they could not give Defendants their position on sealing and proposed redactions until November 24, 2020 (*Id.* ¶ 12.) Accordingly, Plaintiff told Defendants he would wait to file his motion for leave to amend until November 25, 2020. (*Id.*) On November 23, 2020, the Court ordered a November 25, 2020 teleconference regarding Plaintiff's anticipated motion to amend. (ECF No. 78.) Defendants did not provide Plaintiff with their position on sealing on November 24, 2020. (Alexander Decl. ¶ 13.) At the November 25, 2020 conference, Defendants told the Court they needed until November 30, 2020 to provide Plaintiff with their position on sealing, more than three weeks after Plaintiff sent Defendant the Proposed Third Amended Complaint. The Court directed Plaintiff to meet and confer with Defendants about sealing and to file his motion to amend on December 3, 2020. (ECF No. 80.)

## ARGUMENT

### I. THE COURT SHOULD MODIFY THE SCHEDULING ORDER TO ALLOW PLAINTIFF TO AMEND THE COMPLAINT

"Rule 15…directs the Court to freely give leave [to amend] when justice so requires." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 1:15-CV-2457-GHW, 2019 WL 1245013, at *3 (S.D.N.Y. Mar. 18, 2019) (Woods, J.) (internal quotations marks omitted). Where, as here, "'a scheduling order governs amendments to the complaint, the lenient standard under Rule 15(a) ... must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause.'" *Id.* (quoting *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009).) When determining whether good cause exists, courts consider the diligence of the moving party and whether the Court's deadline could have been reasonably met. *Id.* "The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at

this stage of the litigation will prejudice defendants." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007). "No one factor is dispositive, and a district court has discretion to grant a motion to amend even where the moving party has not shown diligence in complying with a deadline for amendments in a Rule 16 scheduling order." *Olaf Soot Design, LLC v. Daktronics, Inc.*, 299 F. Supp. 3d 395, 397 (S.D.N.Y. 2017) (internal quotation marks omitted).

### A. Plaintiff Has Acted Diligently

There is no conceivable way that Plaintiff could have met the Scheduling Order's September 16, 2020 deadline to move to amend. (Alexander Decl. ¶¶ 3-6.) The documents prompting Plaintiff's decision to amend were contained in 36,000 pages of documents that Plaintiff received on September 14, 2020, only two days before the deadline. (*Id.* ¶¶ 3, 6.) After receiving Defendants' production, Plaintiff diligently worked to identify the important documents and consulted with an expert to analyze them. (*Id.* ¶ 4.) Plaintiff re-reviewed all of Defendants' public statements to determine if the new information rendered those statements false or misleading. (*Id.* ¶ 5.)

Plaintiff sent Defendants a draft Third Amended Complaint on November 6, 2020 and informed the Court of his intent to amend on November 10, 2020 — less than two months after receiving Defendants' 36,000 page production. (*Id.* ¶¶ 3, 8-9; ECF No. 71-72.) Courts in this district have held that seeking leave to amend less than three months after receiving new information, evidences the necessary diligence for a showing of good cause. *See, e.g. City of Almaty, Kazakhstan v. Ablyazov*, No. 115CV05345AJNKHP, 2019 WL 2324587, at *2 (S.D.N.Y. May 29, 2019) ("[C]ourts in this District have found that a time period of less than three months [after receiving new information] satisfies the diligence standard under Rule 16"); *Olaf Soot Design,* 299 F. Supp. 3d at 399 (holding that moving to amend "within a few months after receiving and reviewing" relevant documents was sufficiently diligent). Furthermore, even though

19

Defendants significantly delayed the filing of Plaintiff's motion to amend by taking more than three weeks to provide their position on what portion of the exhibits to the Proposed Third Amended Complaint they believed Plaintiff should file under seal, Plaintiff is still filing this motion less than three months after receiving the new information that the proposed amendment is based on.[7]

**B. Granting Plaintiff Leave to Amend Will Not Prejudice Defendants and Justice Requires it.**

Defendants cannot show that they will be prejudiced by the Court granting Plaintiff leave to amend. Since discovery was stayed while Defendants moved to dismiss the Second Amended Complaint, the only documents Defendants have produced in this case is their September 14, 2020 limited pre-mediation production (Alexander Decl. ¶ 7.) Defendants significantly delayed further discover by requesting an extension to respond and object to Plaintiff's First Set of Requests for Production until after the Parties' mediation. (*Id.*) Plaintiff agreed to Defendants request and Defendants did not serve their responses and objections until October 23, 2020. (*Id.*) Since serving those responses and objections, Defendants have refused Plaintiff's requests to meet and confer on the basis that discovery is now stayed. (*Id.*) Furthermore, Plaintiff does not believe that his amendment will alter the discovery necessary in this case, given that the new allegations are closely related to the allegations in the Second Amended Complaint — both are based on the FDA's communications with Acer about the Ong Trial and EDSIVO's NDA.

Notably, even if discovery were further along and Plaintiff's amendment did alter the scope of discovery, that would still be insufficient to show prejudice since "allegations that an

---

[7] The cases that Defendants cited in their November 16 Letter are easily distinguishable. *See Kassner*, 496 F.3d at 243; (no indication that motion to amend was based on new information); *Int'l Techs. Mktg.*, 2019 WL 1245013, at *1-*2 (plaintiff moved to amend over a year after close of discovery based on information that had been publicly available when plaintiff filed earlier complaints).

amendment will require the expenditure of additional time, effort, or money do not themselves constitute undue prejudice." *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 174 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 845, 856 (2d Cir. 1981) (reversing denial of motion to amend filed three years after initial complaint even though amendment required delay and potentially some additional discovery because no trial date had been set and no summary judgment motion had been filed); *Olaf Soot Design,* 299 F. Supp. 3d at 397, 399 (granting leave to amend even though amendment required additional discovery and the court had already decided summary judgment motion because no trial date had been set and new claim was interrelated with old claim).

Any argument by Defendants that they will be prejudiced by delay caused by application of the PSLRA's discovery stay, *see* 15 U.S.C. § 78u-4(b)(3)(B), is meritless. If the Court agrees that Defendants can invoke the PSLRA's stay provision even though the Proposed Third Amendment Complaint does not change the scope of discovery, Defendants will be responsible for delaying the case, not Plaintiff. Furthermore, a decision by the Court that held both that the PSLRA stay applies to Defendants' anticipated motion to dismiss the Proposed Third Amended Complaint and the delay caused by the PSLRA stay was prejudicial would be holding that any amendment to a securities class action after it had survived a motion to dismiss is prejudicial to defendants.

Finally, in addition to the fact that Defendants are unable to show prejudice, justice requires that the Court grant Plaintiff's leave to amend. This motion is only necessary because the documents Defendants produced show that they made numerous additional misleading statements and that the statements that the Court already sustained are misleading for additional reasons. The new information contained in the FDA meeting minutes and related documents — that the FDA

21

warned Defendants for years that the Ong Trial was flawed and that there was a significant risk it would not approve EDSIVO, but Defendants moved forward with their NDA anyway — is something that Defendants represented to the Court in their motion to dismiss the Second Amended Complaint was "untenable" and  "implausible to the point of absurdity." (ECF No. 50 at 16, 19.)  Defendants went as far as to say that Plaintiff's allegations that Defendants would move forward with their NDA under those conditions completely undermined Plaintiff's theory of the case. Given that the meeting minutes and other documents show that what the Defendants represented to the Court as "implausible" is exactly what happened, Plaintiff have good cause to amend and it is clearly in the interests of justice.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court modify the scheduling order and grant Plaintiff leave to file a Third Amended Complaint.


Dated: December 3, 2020                    Respectfully submitted,


                                           **THE ROSEN LAW FIRM, P.A.**
                                           By: /s/*Laurence Rosen*

                                           Laurence Rosen
                                           Phillip Kim
                                           Brian B. Alexander
                                           275 Madison Avenue, 40th Floor
                                           New York, NY 10016
                                           Telephone: (212) 686-1060
                                           Fax: (212) 202-3827
                                           Email: lrosen@rosenlegal.com
                                                   pkim@rosenlegal.com
                                                   balexander@rosenlegal.com

                                           *Counsel for Plaintiff and the Class*


22