Proposed Third Amended Complaint

# Exhibit 5

[REDACTED]

 **DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

IND 127365

**MEETING MINUTES**

Acer Therapeutics Inc.
Attention: Pamela M. Williamson, RAC, FRAPS
Williamson BioPharma Consulting, LLC
P.O. Box 247, 1 Metcalf Lane
Medway, MA 02053

Dear Ms. Williamson:

Please refer to your Investigational New Drug Application (IND) submitted under section 505(i) of the Federal Food, Drug, and Cosmetic Act for ACER-002 (celiprolol).

We also refer to the meeting between representatives of your firm and the FDA on June 14, 2018.  The purpose of the meeting was to:

- Review and discuss the results of the BBEST study published in The Lancet by Ong, et al 2010
- Address three topics identified in The Lancet publication as defined below:
  - Randomization imbalance and method of randomization
  - Interim analyses
  - Adjudication
- Review the key study results from the newly created Acer BBEST database
- Discuss any further questions that the Agency may have regarding the presented data and information.

A copy of the official minutes of the meeting is enclosed for your information.  Please notify us of any significant differences in understanding regarding the meeting outcomes.

Reference ID: 4290137

CONFIDENTIAL                    ACER_0002552

IND 127365
Page 2

If you have any questions, please call Maryam Changi, Regulatory Project Manager at (240) 402-2725.

Sincerely,

*{See appended electronic signature page}*

Ellis Unger, MD
Director
Office of Drug Evaluation I
Center for Drug Evaluation and Research

Enclosure:
Meeting Minutes

Reference ID: 4290137

CONFIDENTIAL

ACER_0002553



**FOOD AND DRUG ADMINISTRATION**
CENTER FOR DRUG EVALUATION AND RESEARCH

## MEMORANDUM OF MEETING MINUTES

| | |
|---|---|
| **Meeting Type:** | C |
| **Meeting Category:** | Guidance |

| | |
|---|---|
| **Meeting Date and Time:** | June 14, 2018, 09:00 am to 10:00 am, EDT |
| **Meeting Location:** | 10903 New Hampshire Avenue |
| | White Oak Building 22, Room 1415 |
| | Silver Spring, MD 20903 |

| | |
|---|---|
| **Application Number:** | 127365 |
| **Product Name:** | ACER-002 (celiprolol) |

| | |
|---|---|
| **Indication:** | For the treatment of vascular Ehlers-Danlos Syndrome (vEDS) in patients with a confirmed *COL3A1* mutation |
| **Sponsor Name:** | Acer Therapeutics Inc. |

| | |
|---|---|
| **Meeting Chair:** | Ellis Unger, MD |
| **Meeting Recorder:** | Maryam Changi, PharmD |


**FDA ATTENDEES**
*Office of Drug Development I:*
Ellis Unger, MD, Director

*Division of Cardiovascular and Renal Products:*
Norman Stockbridge, MD, PhD, Director
Michael Monteleone, MS, RAC, Associate Director for Labeling
Martin Rose, MD, Clinical Team Leader
Fortunato Senatore, MD, PhD, Clinical Reviewer
Edward Fromm, RPh, RAC, Chief, Project Management Staff
Maryam Changi, PharmD, Regulatory Project Manager

*Office of Biostatistics, Division of Biometrics I:*
Hsien Ming (Jim) Hung, PhD, Director
Andrew Potter, PhD, Statistician

**SPONSOR ATTENDEES**
William T. Andrews, MD, FACP, Chief Medical Officer

IND 127365
Page 2


Chris Schelling, Chief Executive Officer & Founder
Pamela M. Williamson, RAC, FRAPS,Acting Head, Regulatory Affairs, Williamson BioPharma Consulting, LLC
Pierre Boutouyrie, MD, Professor (PU-PH), Pharmacologie-Toxicologie Unite de Pharmacologie Clinique
John P. Balser, PhD, President, Veristat
Rodney Sleith, MS, Principal Statistician, Veristat
Dipali C. MacAllister, PharmD, Senior Consultant, Regulatory Affairs, SciLucent, LLC


## 1.0    BACKGROUND

According to the European Summary of Product Characteristics, celiprolol is a beta-1 adrenoceptor antagonist and partial beta-2 agonist. It was originally approved in Austria in 1984 for the treatment of hypertension and for the prevention and treatment of angina and continues to be marketed in the EU. Celiprolol is not approved for marketing in the US.

Celiprolol was granted Orphan Drug Designation (#14-4567) on January 5, 2015 for the treatment of Elhers-Danlos Syndrome. Acer is proposing the 505(b)(2) regulatory pathway for the NDA.

Acer Therapeutics Inc. met with the Division on May 18, 2017 where the Division advised Acer to request two separate meetings, one to discuss the results of the published study upon which approval would be based and a pre-NDA meeting to discuss how the data will be presented in the NDA. The Sponsor requested this meeting to:

1. Review and discuss the results of the BBEST study published in The Lancet by Ong et al. (2010)
2. Address three topics identified in *The Lancet* publication defined below (per the Agency's request during the May 18, 2017 Type C meeting):
   - Randomization imbalance and method of randomization
   - Interim analyses
   - Adjudication
3. Review the key study results from the newly created Acer BBEST database
4. Discuss any further questions that the Agency may have regarding the presented data and information.

FDA sent Preliminary Comments to Acer Therapeutics Inc. on June 8, 2018. The Sponsor used the appended slides to lead the discussion.


## 2.0    DISCUSSION
### *Question 1: Randomization Imbalance and Method of Randomization*
*Does the Agency agree that the covariate analysis adjusting for the presence or absence of the three major diagnostic criteria would appropriately address the Agency's question regarding potential bias or effect on the primary efficacy outcomes?*


Reference ID: 4290137

CONFIDENTIAL    ACER_0002555

IND 127365
Page 3

### FDA Response to Question 1:

We need more information before we can provide agreement on your covariate adjustment. To facilitate agreement on the baseline covariates, we recommend using a panel of outside experts in the treatment of vascular Ehlers-Danlos Syndrome to select a set of prognostic covariates to include in your adjusted Cox proportional hazards model. In addition, you must submit your statistical analysis plan for review. Plan to include a stratified permutation test of time to primary efficacy outcome because of the small sample size in BBEST.

### Discussion:

The Sponsor referred to slide 5 and explained that they performed the covariate analysis adjusting for the presence or absence of the three-major diagnostic criteria and the results of their analysis will be included in the NDA.

The Sponsor then stated that none of the potential prognostic factors (e.g., demographic criteria such as sex, age, blood pressure) were identified in the BBEST study. The Sponsor stated that potential prognostic factors were evaluated in BBEST, but none were identified. The Division noted that bruising was a major Villefranche criteria for vEDS and that there was an imbalance for this criterion between the two groups (72% celiprolol vs 89% control). The Division asked whether an adjustment was made for bruising or the genetic criteria. The Sponsor explained that they consider bruising to be a very common finding and not predictive of future arterial rupture. Also, patients may not report bruising.

The Sponsor agreed to perform a stratified premutation test and will include the results in their planned NDA.

### Question 2: Interim Analyses

*Does the Agency agree that adjustment for Type I error in the final outcome analysis was not required in the original BBEST study given that the study was not stopped due to efficacy as evidenced by crossing of a priori defined boundaries?*

### FDA Response to Question 2:

No, we do not agree. It is our understanding that BBEST was stopped early "because significant differences were recorded between the two groups in the whole population after 64 months" (Ong 2010 article in *The Lancet*). In this situation, Whitehead 2004 states that p-values obtained from a conventional analysis are invalid and recommends that an adjusted p-value be reported. Regardless of the reason for study termination of BBEST, the unblinded looks at the data may have increased the type I error rate.

In addition, you must submit all details of the BBEST study design including:
- The original triangular region used for the triangular test
- All of the log-rank test statistics (Z) and Fisher's information values (V) for each interim analysis
- Plot of the trajectory of the Z's against the V's
- All original meeting minutes of the independent safety monitoring board

Reference ID: 4290137

CONFIDENTIAL                                                                                          ACER_0002556

IND 127365
Page 4

You should propose an appropriate method to adjust the final p-value for the interim looks. In addition, plan to conduct an analysis estimating the hazard ratio for celiprolol treatment to no celiprolol treatment after each event.

### *Discussion:*
The Sponsor referred to slide 7 and explained to the Division that because the differences between the treatment groups were large in BBEST study, and after consulting with DMC, it was decided to terminate the study early. The Sponsor agreed to provide an appropriate method to adjust the p-value. The Sponsor also explained that they do not have the documentation of the previous interim analyses, but the DMC meeting minutes are available. Because the final data are available, the interim analyses and the final analysis will be recalculated. The Division asked the Sponsor to provide the minutes from the meeting with DMC at the time of NDA submission and to calculate the nominal alpha for each interim analysis based on the DMC meeting minutes that capture when the interim analyses were performed. The Sponsor stated that they will provide a plot of the hazard ratio after each event in the NDA submission. The Division asked the sponsor to submit the original SAP and the revised SAPs to the Division as soon as possible and at the time of NDA submission.

### *Question 3: Adjudication*
*Does the Agency agree that the evaluation performed by the Sponsor addresses the Agency's request and that it is appropriate to analyze and present the outcomes of this evaluation in the NDA?*

### *FDA Response to Question 3:*
Your evaluation addressed our specific query about an adjudicated event in addition to making corrections based on additional discoveries. Your NDA should include a detailed description of the adjudication process and all related manuals, charters, and definitions. Please refer to our response to Question 4 for additional guidance regarding the contents of your NDA.

### *Discussion:*
No further discussion.

### *Question 4: Acer BBEST Study Results*
*Does the Agency have any additional questions or requests regarding the information provided by the Sponsor regarding the efficacy and safety results which are planned for inclusion in the submission of a NDA?*

### *FDA Response to Question 4:*
- Please submit the adjudication packages for all 50 events submitted to the CEC at the time of the trial. We also ask that you submit the re-adjudication packages for all events you re-evaluated.
- We ask that you compile a listing of all adverse events to determine if any could have been adjudicated as a primary or secondary endpoint and compare them to a list of adverse events that were adjudicated to be primary and secondary endpoints.

CONFIDENTIAL

IND 127365
Page 5

- Please submit the CEC Charter, other governance charters, and operational manuals for our review. Also, please submit minutes to CEC and other governance committee meetings.
- Please submit a table of protocol amendments, interim analyses, data migration to the CEC, and enrollment and accrual of endpoints at these various points in time.
- Please submit all versions of the protocol and provide a table explaining all amendments.
- Please submit your statistical analysis plan (SAP) for the planned re-analysis of BBEST to FDA for review.

### *Discussion:*
No further discussion.

### *Question 5: Long-term Cohort Study of celiprolol treatment in vEDS Patients*
*Does the Agency agree that the data as described from the Long-term Cohort Study of celiprolol treatment in vEDS patients are likely to be informative, and if published in a respected, peer-reviewed journal, would likely be considered supportive of an NDA submission using the 505(b)(2) pathway for use of celiprolol in vEDS patients with a confirmed COL3A1 mutation?*

### *FDA Response to Question 5:*
Data from the Long-Term Cohort Study referenced above may be informative.  Because we have not yet seen the data, we cannot determine that such data "…would likely be supportive of an NDA submission using the 505(b)(2) pathway for use of celiprolol in vEDS patients with a confirmed COL3A1 mutation."

### *Discussion:*
The Sponsor referred to slides 9, 10, 11, 12, and 13 and clarified that the question was to inform the Division about the possibility of including upcoming data from the long-term cohort study in the NDA submission.

## 3.0    OTHER IMPORTANT MEETING LANGUAGE:

### PREA REQUIREMENTS
Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Because this drug product for this indication has an orphan drug designation, you are exempt from these requirements.  Please include a statement that confirms this finding, along with a reference to this communication, as part of the pediatric section (1.9 for eCTD submissions) of

Reference ID: 4290137

CONFIDENTIAL

ACER_0002558

IND 127365
Page 6

your application.  If there are any changes to your development plans that would cause your application to trigger PREA, your exempt status would change.

## DATA STANDARDS FOR STUDIES

Under section 745A(a) of the FD&C Act, electronic submissions "shall be submitted in such electronic format as specified by [FDA]."  FDA has determined that study data contained in electronic submissions (i.e., NDAs, BLAs, ANDAs and INDs) must be in a format that the Agency can process, review, and archive.  Currently, the Agency can process, review, and archive electronic submissions of clinical and nonclinical study data that use the standards specified in the Data Standards Catalog (Catalog) (See http://www.fda.gov/forindustry/datastandards/studydatastandards/default.htm).

On December 17, 2014, FDA issued final guidance, *Providing Electronic Submissions in Electronic Format--- Standardized Study Data* (http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM292334.pdf).  This guidance describes the submission types, the standardized study data requirements, and when standardized study data will be required.  Further, it describes the availability of implementation support in the form of a technical specifications document,  Study Data Technical Conformance Guide (Conformance Guide) (See http://www.fda.gov/downloads/ForIndustry/DataStandards/StudyDataStandards/UCM384744.pdf), as well as email access to the eData Team (cder-edata@fda.hhs.gov) for specific questions related to study data standards.  Standardized study data will be required in marketing application submissions for clinical and nonclinical studies that start on or after December 17, 2016.  Standardized study data will be required in commercial IND application submissions for clinical and nonclinical studies that start on or after December 17, 2017.  CDER has produced a *Study Data Standards Resources* web page that provides specifications for sponsors regarding implementation and submission of clinical and nonclinical study data in a standardized format.  This web page will be updated regularly to reflect CDER's growing experience in order to meet the needs of its reviewers.

Although the submission of study data in conformance to the standards listed in the FDA Data Standards Catalog will not be required in studies that start before December 17, 2016, CDER strongly encourages IND sponsors to use the FDA supported data standards for the submission of IND applications and marketing applications.  The implementation of data standards should occur as early as possible in the product development lifecycle, so that data standards are accounted for in the design, conduct, and analysis of clinical and nonclinical studies.  For clinical and nonclinical studies, IND sponsors should include a plan (e.g., in the IND) describing the submission of standardized study data to FDA.  This study data standardization plan (see the Conformance Guide) will assist FDA in identifying potential data standardization issues early in the development program.

Additional information can be found at http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm248635.htm.

For general toxicology, supporting nonclinical toxicokinetic, and carcinogenicity studies,

Reference ID: 4290137

CONFIDENTIAL                                                                        ACER_0002559

IND 127365
Page 7

CDER encourages sponsors to use Standards for the Exchange of Nonclinical Data (SEND) and submit sample or test data sets before implementation becomes required.  CDER will provide feedback to sponsors on the suitability of these test data sets.  Information about submitting a test submission can be found here: http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm174459.htm

## LABORATORY TEST UNITS FOR CLINICAL TRIALS

CDER strongly encourages IND sponsors to identify the laboratory test units that will be reported in clinical trials that support applications for investigational new drugs and product registration.  Although Système International (SI) units may be the standard reporting mechanism globally, dual reporting of a reasonable subset of laboratory tests in U.S. conventional units and SI units might be necessary to minimize conversion needs during review.  Identification of units to be used for laboratory tests in clinical trials and solicitation of input from the review divisions should occur as early as possible in the development process.  For more information, please see the FDA website entitled, Study Data Standards Resources and the CDER/CBER Position on Use of SI Units for Lab Tests website found at https://www.fda.gov/downloads/ForIndustry/DataStandards/StudyDataStandards/UCM587505.pdf.

## SUBMISSION FORMAT REQUIREMENTS

The Electronic Common Technical Document (eCTD) is CDER and CBER's standard format for electronic regulatory submissions.  The following submission types: **NDA, ANDA, BLA, Master File** (except Type III) and **Commercial INDs** must be submitted in eCTD format.  Submissions that do not adhere to the requirements stated in the eCTD Guidance will be subject to rejection. For more information please visit: http://www.fda.gov/ectd.

The FDA Electronic Submissions Gateway (ESG) is the central transmission point for sending information electronically to the FDA and enables the secure submission of regulatory information for review.  Submissions less than 10 GB must be submitted via the ESG.  For submissions that are greater than 10 GB, refer to the FDA technical specification *Specification for Transmitting Electronic Submissions using eCTD Specifications*.  For additional information, see http://www.fda.gov/ForIndustry/ElectronicSubmissionsGateway.

## SECURE EMAIL COMMUNICATIONS

Secure email is required for all email communications from FDA when confidential information (e.g., trade secrets, manufacturing, or patient information) is included in the message.  To receive email communications from FDA that include confidential information (e.g., information requests, labeling revisions, courtesy copies of letters), you must establish secure email.  To establish secure email with FDA, send an email request to SecureEmail@fda.hhs.gov.  Please note that secure email may not be used for formal regulatory submissions to applications (except for 7-day safety reports for INDs not in eCTD format).

## 505(b)(2) REGULATORY PATHWAY

The Division recommends that sponsors considering the submission of an application through the 505(b)(2) pathway consult the Agency's regulations at 21 CFR 314.54, and the draft

Reference ID: 4290137

CONFIDENTIAL                                                                      ACER_0002560

IND 127365
Page 8

guidance for industry, *Applications Covered by Section 505(b)(2)* (October 1999), available at
http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.
In addition, FDA has explained the background and applicability of section 505(b)(2) in its
October 14, 2003, response to a number of citizen petitions that had challenged the Agency's
interpretation of this statutory provision (see Docket FDA-2003-P-0274-0015, available at
http://www.regulations.gov).

If you intend to submit a 505(b)(2) application that relies for approval on FDA's finding of
safety and/or effectiveness for one or more listed drugs, you must establish that such reliance is
scientifically appropriate, and must submit data necessary to support any aspects of the proposed
drug product that represent modifications to the listed drug(s). You should establish a "bridge"
(e.g., via comparative bioavailability data) between your proposed drug product and each listed
drug upon which you propose to rely to demonstrate that such reliance is scientifically justified.

If you intend to rely on literature or other studies for which you have no right of reference but
that are necessary for approval, you also must establish that reliance on the studies described in
the literature or on the other studies is scientifically appropriate. You should include a copy of
such published literature in the 505(b)(2) application and identify any listed drug(s) described in
the published literature (e.g. by trade name(s)).

If you intend to rely on the Agency's finding of safety and/or effectiveness for a listed drug(s) or
published literature describing a listed drug(s) (which is considered to be reliance on FDA's
finding of safety and/or effectiveness for the listed drug(s)), you should identify the listed drug(s)
in accordance with the Agency's regulations at 21 CFR 314.54. It should be noted that 21 CFR
314.54 requires identification of the "listed drug for which FDA has made a finding of safety and
effectiveness," and thus an applicant may only rely upon a listed drug that was approved in an
NDA under section 505(c) of the FD&C Act. The regulatory requirements for a 505(b)(2)
application (including, but not limited to, an appropriate patent certification or statement) apply
to each listed drug upon which a sponsor relies.

If FDA has approved one or more pharmaceutically equivalent products in one or more NDA(s)
before the date of submission of the original 505(b)(2) application, you must identify one such
pharmaceutically equivalent product as a listed drug (or an additional listed drug) relied upon
(see 21 CFR 314.50(i)(1)(i)(C), 314.54, and 314.125(b)(19); see also 21 CFR 314.101(d)(9)). If
you identify a listed drug solely to comply with this regulatory requirement, you must provide an
appropriate patent certification or statement for any patents that are listed in the Orange Book for
the pharmaceutically equivalent product, but you are not required to establish a "bridge" to
justify the scientific appropriateness of reliance on the pharmaceutically equivalent product if it
is scientifically unnecessary to support approval.

If you propose to rely on FDA's finding of safety and/or effectiveness for a listed drug that has
been discontinued from marketing, the acceptability of this approach will be contingent on
FDA's consideration of whether the drug was discontinued for reasons of safety or effectiveness.

We encourage you to identify each section of your proposed 505(b)(2) application that is
supported by reliance on FDA's finding of safety and/or effectiveness for a listed drug(s) or on

Reference ID: 4290137

CONFIDENTIAL                                                                                    ACER_0002561

IND 127365
Page 9

published literature (see table below).  In your 505(b)(2) application, we encourage you to clearly identify (for each section of the application, including the labeling):  (1) the information for the proposed drug product that is provided by reliance on FDA's finding of safety and/or effectiveness for the listed drug or by reliance on published literature; (2) the "bridge" that supports the scientific appropriateness of such reliance; and (3) the specific name (e.g., proprietary name) of each listed drug named in any published literature on which your marketing application relies for approval.  If you are proposing to rely on published literature, include copies of the article(s) in your submission.

In addition to identifying the source of supporting information in your annotated labeling, we encourage you to include in your marketing application a summary of the information that supports the application in a table similar to the one below.

| List the information essential to the approval of the proposed drug that is provided by reliance on the FDA's previous finding of safety and effectiveness for a listed drug or by reliance on published literature ||
| --- | --- |
| **Source of information (e.g., published literature, name of listed drug)** | **Information Provided (e.g., specific sections of the 505(b)(2) application or labeling)** |
| *1.  Example: Published literature* | *Nonclinical toxicology* |
| *2.  Example: NDA XXXXX "TRADENAME"* | *Previous finding of effectiveness for indication A* |
| *3.  Example: NDA YYYYYY "TRADENAME"* | *Previous finding of safety for Carcinogenicity, labeling section B* |
| *4.* | |

Please be advised that circumstances could change that would render a 505(b)(2) application for this product no longer appropriate.  For example, if a pharmaceutically equivalent product were approved before your application is submitted, such that your proposed product would be a "duplicate" of a listed drug and eligible for approval under section 505(j) of the FD&C Act, then it is FDA's policy to refuse to file your application as a 505(b)(2) application (21 CFR 314.101(d)(9)).  In such a case, the appropriate submission would be an Abbreviated New Drug Application (ANDA) that cites the duplicate product as the reference listed drug.

## NEW PROTOCOLS AND CHANGES TO PROTOCOLS

To ensure that the Division is aware of your continued drug development plans and to facilitate successful interactions with the Division, including provision of advice and timely responses to your questions, we request that the cover letter for all new phase 2 or phase 3 protocol submissions to your IND or changes to these protocols include the following information:

1.  Study phase

CONFIDENTIAL                                                                                    ACER_0002562

IND 127365
Page 10

2.  Statement of whether the study is intended to support marketing and/or labeling changes
3.  Study objectives (e.g., dose finding)
4.  Population
5.  A brief description of the study design (e.g., placebo or active controlled)
6.  Specific concerns for which you anticipate the Division will have comments
7.  For changes to protocols only, also include the following information:
    -   A brief summary of the substantive change(s) to the protocol (e.g., changes to endpoint measures, dose, and/or population)
    -   Other significant changes
    -   Proposed implementation date

We recommend you consider requesting a meeting to facilitate discussion of multiple and/or complex issues.

## 4.0    ATTACHMENTS AND HANDOUTS
Sponsor's slides are attached.

Reference ID: 4290137

CONFIDENTIAL                                                                    ACER_0002563



# Type C Meeting
# Sponsor Topics for Discussion
# June 14, 2018

## *Confidential*

Reference ID: 4290137

CONFIDENTIAL

ACER_0002564

# List of Sponsor Attendees

| Name | Title |
|------|-------|
| William T. Andrews, MD, FACP | Chief Medical Officer |
| Chris Schelling | Chief Executive Officer & Founder |
| Pamela M. Williamson, RAC, FRAPS | Acting Head, Regulatory Affairs |
| Pierre Boutouyrie, MD | Professor (PU-PH), Pharmacologie-Toxicologie Unite de Pharmacologie Clinique |
| John P. Balser, PhD | President |
| Rodney Sleith, MS | Principal Statistician |
| Dipali C. MacAllister, PharmD | Senior Consultant, Regulatory Affairs |



Acer Therapeutics

Reference ID: 4290137
Confidential
CONFIDENTIAL

2

ACER_0002565

# Acer Questions for Discussion

Based on the Agency's Preliminary Meeting Responses, the questions that require further discussion and/or clarification are the following:

- **Question 1.** Does the Agency agree that the covariate analysis adjusting for the presence or absence of the three major diagnostic criteria would appropriately address the Agency's question regarding potential bias or effect on the primary efficacy outcomes?

- **Question 2:** Does the Agency agree that adjustment for Type I error in the final outcome analysis was not required in the BBEST study given that the study was not stopped due to efficacy as evidenced by crossing of a priori defined boundaries?

- **Question 5:** Does the Agency agree that the data as described from the Long-term Cohort Study of celiprolol treatment in vEDS patients are likely to be informative, and if published in a respected, peer reviewed journal, would likely be considered supportive of an NDA submission using the 505(b)(2) pathway for use of celiprolol in vEDS patients with a confirmed *COL3A1* mutation?



Acer
Therapeutics

Reference ID: 4290137
**Confidential**
CONFIDENTIAL

3

ACER_0002566

# Question 1

*__Question 1:__ Does the Agency agree that the covariate analysis adjusting for the presence or absence of the three major diagnostic criteria would appropriately address the Agency's question regarding potential bias or effect on the primary efficacy outcomes?*

## FDA Preliminary Response to Question 1:

We need more information before we can provide agreement on your covariate adjustment. To facilitate agreement on the baseline covariates, we recommend using a panel of outside experts in the treatment of vascular Ehlers-Danlos Syndrome to select a set of prognostic covariates to include in your adjusted Cox proportional hazards model. In addition, you must submit your statistical analysis plan for review. Plan to include a stratified permutation test of time to primary efficacy outcome because of the small sample size in BBEST.



Acer
Therapeutics

Reference ID: 4290137
**Confidential**
CONFIDENTIAL

ACER_0002567

# Acer Response to Question 1

## Randomization Imbalance and Method of Randomization

Potential imbalance at baseline:

- The covariate analysis adjusting for the presence or absence of the three major <u>diagnostic</u> criteria has been performed to address the Agency's question regarding potential bias or effect on the primary efficacy outcome.  Results from this analysis will be included in the planned NDA.

- An objective of the BBEST trial was to identify potential <u>prognostic</u> factors and none were identified in the BBEST study.

- The SAP for the Acer BBEST analyses will be submitted in the planned NDA.*

- A stratified permutation test will be performed and included in the planned NDA.



* Clarify submission request of SAP for Questions 1 & 4

5

Reference ID: 4290137
**Confidential**
CONFIDENTIAL

ACER_0002568

# Question 2

**Question 2:** *Does the Agency agree that adjustment for Type I error in the final outcome analysis was not required in the BBEST study given that the study was not stopped due to efficacy as evidenced by crossing of a priori defined boundaries?*

## FDA Preliminary Response to Question 2:

No, we do not agree. It is our understanding that BBEST was stopped early "because significant differences were recorded between the two groups in the whole population after 64 months" (Ong 2010 article in *The Lancet*). In this situation, Whitehead 2004 states that p-values obtained from a conventional analysis are invalid and recommends that an adjusted p-value be reported. Regardless of the reason for study termination of BBEST, the unblinded looks at the data may have increased the type I error rate.

In addition, you must submit all details of the BBEST study design including:

- The original triangular region used for the triangular test
- All of the log-rank test statistics (Z) and Fisher's information values (V) for each interim analysis
- Plot of the trajectory of the Z's against the V's
- All original meeting minutes of the independent safety monitoring board

You should propose an appropriate method to adjust the final p-value for the interim looks.  In addition, plan to conduct an analysis estimating the hazard ratio for celiprolol treatment to no celiprolol treatment after each event.



Acer
Therapeutics

Reference ID: 4290137
**Confidential**
CONFIDENTIAL

ACER_0002569

# Acer Response to Question 2

- Consensus decision to stop the BBEST study.

- Whitehead triangular test method provides control over alpha for all interim and final analyses.

- We understand the Agency's response and we will provide an appropriate method to adjust the final p-value for the interim looks based on standard statistical methodology.

  - No interim analyses performed on the *COL3A1* subpopulation.

- We will conduct an analysis estimating the hazard ratio for celiprolol treatment to no celiprolol treatment after each event.



Reference ID: 4290137
**Confidential**
CONFIDENTIAL

ACER_0002570

# Question 5

***Question 5:***  *Does the Agency agree that the data as described from the Long-term Cohort Study of celiprolol treatment in vEDS patients are likely to be informative, and if published in a respected, peer reviewed journal, would likely be considered supportive of an NDA submission using the 505(b)(2) pathway for use of celiprolol in vEDS patients with a confirmed COL3A1 mutation?*

## FDA Preliminary Response to Question 5:

*Data from the Long-Term Cohort Study referenced above may be informative. Because we have not yet seen the data, we cannot determine that such data "...would likely be supportive of an NDA submission using the 505(b)(2) pathway for use of celiprolol in vEDS patients with a confirmed COL3A1 mutation."*



Reference ID: 4290137
**Confidential**
CONFIDENTIAL

ACER_0002571

# Acer Response to Question 5

## Long-term Observational Cohort Study

- PIs:  Pierre Boutouyrie, Michael Frank, Xavier Jeunemaitre

- Registry Initiated:  2011

- Study Period:  2000 to 2017

- Median Duration of Patient Follow-up:  5.35 years

- N = 144 patients

- Median Age at Diagnosis:  35

- 100% of patients have *COL3A1* gene mutation

- >80% of patients on celiprolol


Acer
Therapeutics

Reference ID: 4290137
**Confidential**
CONFIDENTIAL

ACER_0002572

# Acer Response to Question 5 – cont'd



Reference ID: 4290137
**Confidential**
CONFIDENTIAL

10

# Acer Response to Question 5 – cont'd

CONFIDENTIAL

ACER_0002574

# Acer Response to Question 5 – cont'd

CONFIDENTIAL

ACER_0002575

# Acer Response to Question 5 – cont'd



**Confidential**
CONFIDENTIAL

ACER_0002576

# Acer Response to Question 5 – cont'd

CONFIDENTIAL

ACER_0002577

--------------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**
--------------------------------------------------------------------------------

/s/
----------------------------------------------------------------


ELLIS F UNGER
07/12/2018

Reference ID: 4290137

CONFIDENTIAL

ACER_0002578