**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NICHOLAS SKIADAS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br>    V. <br><br> ACER THERAPEUTICS INC., CHRIS SCHELLING, and HARRY PALMIN, <br><br> Defendants. | Case No. 1:19-cv-06137-GHW <br><br> CLASS ACTION |

**DECLARATION OF LAURENCE ROSEN IN SUPPORT OF THE MOTIONS FOR: (I) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND AWARD TO LEAD PLAINTIFF**

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---------|-------|
| 1 | Declaration of Jed Melnick |
| 2 | Declaration of Josephine Bravata Concerning: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections |
| 3 | Declaration of Lead Plaintiff Nicholas Skiadas |
| 4 | Declaration of Laurence Rosen on Behalf of The Rosen Law Firm, P.A. Concerning Attorneys' Fees and Expenses |
| 5 | Excerpts from Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements: 2020 Review and Analysis* (Cornerstone Research 2021) |
| 6 | Excerpts from Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Economic Consulting 2021) |
| 7 | Table of Law Firm Billing Rates |
| 8 | *Patron v. Dotts, et al.,* Case No. 1:19-cv-05362-PGG (S.D.N.Y. May 20, 2021) (Dkt. No. 66) |
| 9 | *Rupp, et al.,  v. Momo Inc., et al.,* Case No. 1:19-cv-04433-GBD) (S.D.N.Y. Aug. 4, 2021) (Dkt. No. 80) |

I, Laurence Rosen, declare under penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1.    I am the Managing Partner at The Rosen Law Firm, P.A. ("Rosen Law"), Court-appointed Lead Counsel for Lead Plaintiff Nicholas Skiadas ("Lead Plaintiff" or "Skiadas"). I oversaw or conducted the day-to-day activities in the Action.[1] I am familiar with the proceedings in this litigation, and I have personal knowledge of the matters set forth herein based upon supervising and participating in all aspects the Action.

2.    I respectfully submit this declaration, together with the attached exhibits, in support of Lead Plaintiff's Motions for: (I) Final Approval of Class Action Settlement and Plan of Allocation; and (II) an Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Lead Plaintiff. As set forth in the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation ("Final Approval Memorandum"), Lead Plaintiff seeks final approval of the $8,350,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.[2]

3.    As set forth in the Memorandum of Law in Support of the Motion for an Award of

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement (the "Stipulation") dated July 21, 2021 (Dkt. No. 123) or the Third Amended Complaint (Dkt. No. 101).  .

[2] The Settlement Class is defined as "all persons and entities who purchased or otherwise acquired any publicly-traded Acer common stock during the Settlement Class Period and suffered compensable damages thereby. Excluded from the Settlement Class are: Defendants and their immediate families; the officers and directors of Acer at all relevant times; their legal representatives, heirs, successors or assigns; any entity in which Defendants have or had a controlling interest; and any entity affiliated with, controlling, controlled by, or under common control with TVM Capital Life Science. Also excluded from the Settlement Class are those persons who file valid and timely requests for exclusion in accordance with the Preliminary Approval Order." Stipulation ¶1.33.

1

Attorneys' Fees, Reimbursement of Litigation Expenses, and Award to Lead Plaintiff ("Fee Memorandum"), Lead Counsel seek an award of attorneys' fees in the amount of one-third of the Settlement Fund (which, by definition, includes interest accrued thereon), reimbursement of litigation expenses of $160,016.52, and an Award to Lead Plaintiff of $10,000, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), for his costs, including lost wages, incurred in connection with his representation of the Settlement Class.

4.      The Court preliminarily approved the proposed Settlement by Order dated August 11, 2021 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class.  (Dkt. No. 125).  Pursuant to the Preliminary Approval Order, Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program under Lead Counsel's direction, whereby notice was given to potential Settlement Class Members by mail and/or email and by publication.

5.      In total, SCS notified 7,349 potential Settlement Class Members about the Settlement either by mailed Long Notice and Claim Form or emailed links to the Long Notice and Claim Form. To date, no requests for exclusion and no objections have been received.

## I.      INTRODUCTION

6.      The Action asserts claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, against Acer Therapeutics Inc. ("Acer" or the "Company"), Chris Schelling, and Harry Palmin (collectively, "Defendants").

7.      The proposed Settlement provides for the resolution of all claims against Defendants in exchange for a non-reversionary, cash payment of $8,350,000 (the "Settlement Amount"). As detailed herein, Lead Plaintiff and Lead Counsel submit that the proposed

Settlement represents an excellent result for the Settlement Class considering the risks of continued litigation, and very real risk that Defendants will be unable to pay any judgment.

8.      The $8,350,000 Settlement Amount is a highly favorable result. Lead Plaintiff's damages expert estimates that if Lead Plaintiff had fully prevailed on his claims at summary judgment and after a jury trial, if the Court certified the Settlement Class, and if the Court and jury accepted Lead Plaintiff's damages theory—*i.e.*, Lead Plaintiff's best case scenario—the total maximum damages would be approximately $69.2 million. Thus, the $8,350,000 Settlement Amount represents approximately 12% of the estimated total maximum damages potentially recoverable for the Settlement Class.

9.      According to Cornerstone Research, in 2020 the average recovery in settlements where damages ranged between $25 million and $74 million was 5.3% of estimated damages, and it was 7.6% of estimated damages between 2011 and 2019. Ex. 5 (Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements: 2020 Review and Analysis* (Cornerstone Research 2021) at p. 6 (Fig. 5)). Moreover, NERA Economic Consulting found that for 2020, the median recovery in securities class actions was approximately 1.7% of estimated damages. Ex. 6 (Excerpts from Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Economic Consulting 2021). Accordingly, the 12% recovery here is well above the median recovery in cases of similar size. Consequently, the Settlement Amount, when balanced against the significant risks of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay, weighs strongly in favor of final approval.

10.     The Settlement was negotiated by experienced counsel, who were well aware of the strengths and weaknesses of the case, including the ability to pay issues.

11.     Lead Counsel's efforts in the litigation included, among other things:

- drafted a motion for appointment of lead plaintiff and lead counsel;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) U.S. Securities and Exchange Commission ("SEC") filings, (ii) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles, and (iii) other publicly available material; (b) retaining and working with a private investigator; and (c) retaining and consulting with an FDA regulatory and biostatistics expert;

- researched, drafted and filed several complaints including the Second Amended Complaint, which survived Defendants' motion to dismiss, and the operative Third Amended Complaint which included facts uncovered during discovery;

- drafted pre-motion letters as well as oppositions to Defendants' motion to dismiss the Second Amended Complaint and for reconsideration of the order granting in part and denying in part the motion to dismiss the Second Amended Complaint;

- requested and reviewed more than 36,000 pages of documents Defendants produced in a pre-mediation production, which included minutes of Acer's meetings with the FDA;

- consulted extensively with an FDA regulatory and biostatistics expert on understanding complex factual and scientific issues to determine bases of liability and draft allegations for the amended complaints and in responding to motions to dismiss;

- Drafted a memorandum of law and reply in support of Plaintiff's Motion for Leave to File the Third Amended Complaint that the Court granted;

- consulted extensively with experts on damages and loss causation issues in connection with preparing for settlement negotiations;

- engaged in an extensive mediation and settlement process facilitated by Mr. Melnick of JAMS, which included: the submission of detailed mediation statements; and two full-day mediation sessions and weeks of continued discussions via telephone and email with Mr. Melnick's assistance;

- drafted and negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants;

- worked with a damages expert to craft a plan of allocation that treats Lead Plaintiff and all other members of the proposed Settlement Class fairly;

- drafted the preliminary approval motion;

- oversaw the implementation of the notice process to Settlement Class Members; and

- drafted the motion for final approval.

4

12.     Lead Plaintiff entered into the proposed Settlement only after performing all of the above work, and engaging in two separate mediations, that informed him and Lead Counsel as to the strengths and weaknesses of the case.  The Settlement is, therefore, the result of arm's length negotiations between and among well-informed, highly experienced counsel.

13.     Based on the foregoing efforts, Lead Plaintiff and Lead Counsel believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

14.     In addition, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiff's damages consultant. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts, and similar plans have been repeatedly approved by the courts.

15.     Finally, Lead Plaintiff seeks approval of Lead Counsel's request for attorneys' fees, reimbursement of litigation expenses, and Award to Lead Plaintiff.  As discussed in detail in the accompanying Fee Memorandum, the requested one-third fee is well within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested out-of-pocket litigation costs of $160,016.52 and the requested

PSLRA award of $10,000 to each Lead Plaintiff are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Factual Background

16.    Lead Plaintiff alleges that Defendants violated the federal securities laws by making misrepresentations or omissions of material fact regarding the likelihood that the FDA would approve the New Drug Application of the Company's drug candidate, EDSIVO. Lead Plaintiff further alleges that the misstatements or omissions artificially inflated the price of Acer common stock, and that the Company's stock price dropped in response to certain subsequent disclosures.

### B.    Procedural Background

17.    This litigation was commenced on July 1, 2019 styled as *Sell v. Acer Therapeutics Inc., et. al.,* Case No. 1:19-cv-06137-GHW, alleging violations of the Exchange Act against the Defendants (Dkt. No. 1). After filing a motion seeking appointment as lead plaintiff and approval of lead counsel, on September 25, 2019, the Court appointed Skiadas as Lead Plaintiff and Rosen Law as Lead Counsel (Dkt. No. 24).

18.    On December 3, 2019, Lead Plaintiff filed the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Amended Complaint") asserting claims under Section 10(b) and 20(a) of the Exchange Act (Dkt. No. 28). On January 15, 2020, Defendants filed a pre-motion letter requesting leave to move to dismiss the Amended Complaint (Dkt. No. 31), which Lead Plaintiff opposed (Dkt. No. 35). On February 7, 2020, Defendants filed a motion to

dismiss (Dkt No. 38).

19.     In response to Defendants' motion to dismiss, on February 28, 2020, Lead Plaintiff filed the Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("Second Amended Complaint") (Dkt. No. 43). On May 1, 2020, Defendants filed a motion to dismiss the Second Amended Complaint, which was fully briefed on May 29, 2020. On June 16, 2020, the Court granted in part and denied in part Defendants' motion to dismiss the Second Amended Complaint ("Motion to Dismiss Order") (Dkt. No. 54).

20.     On July 1, 2020, Defendants filed a motion for reconsideration of the Motion to Dismiss Order, which was fully briefed on July 17, 2020. On July 21, 2020, the Court denied Defendants' motion for reconsideration (Dkt. No. 63). Accordingly, on August 7, 2020, Defendants filed their answer to the Second Amended Complaint (Dkt. No. 64).

21.     On August 8, 2020, in advance of the Initial Pretrial Conference, the Parties jointly submitted a letter advising the Court about the status of the case (Dkt. No. 65). The Court held the Initial Pretrial Conference on August 17, 2020 and entered the Amended Civil Case Management Plan and Scheduling Order (Dkt. No. 67).

22.     On November 10, 2020, Lead Plaintiff filed a letter indicating his intention to file a proposed Third Amended Complaint for Violation of the Federal Securities Laws ("Third Amended Complaint") (Dkt. No. 72). Defendants submitted a letter in response objecting to Lead Plaintiff's intention to move to file an amended complaint (Dkt. No. 74). At a November 25, 2020 pre-motion conference, the Court directed the Parties to focus their briefs concerning Lead Plaintiff's motion for leave to amend on issues relating to Rule 16 of the Federal Rules of Civil Procedure only. The Court further instructed Defendants to raise any arguments relating to the legal sufficiency of the proposed Third Amended Complaint in a motion to dismiss.

23.    On December 3, 2020, Lead Plaintiff filed a motion for leave to file a Third Amended Complaint, which was fully briefed on December 18, 2020. After a telephonic hearing held on January 18, 2021, the Court granted Lead Plaintiff's motion (Dkt. No. 93). The Court also stayed discovery pending resolution of Defendants' anticipated motion to dismiss the Third Amended Complaint.  On February 4, 2021, Lead Plaintiff filed the operative Third Amended Complaint (Dkt. No. 97). An unredacted version of the Third Amended Complaint was filed on February 16, 2021 (Dkt. No. 101). The Third Amended Complaint expanded the Class Period, added twenty additional alleged misstatements, and attached eleven documents that Defendants produced to Lead Plaintiff.

24.    On February 18, 2021, Defendants filed a pre-motion letter requesting leave to move to dismiss part of the Third Amended Complaint (Dkt. No. 104). Lead Plaintiff responded on February 23, 2021 (Dkt. No. 106). After a telephonic conference on Defendants' pre-motion letter, the Court granted Defendants' request for leave to file a motion to dismiss  (Dkt. No. 108).

25.    On May 6, 2021, the Parties jointly requested that the Court stay the Action in light of the Parties reaching a settlement in principle to allow the Parties to negotiate and finalize the settlement papers (Dkt. No. 112). The Court stayed the Action on May 6, 2021 (Dkt. No. 113).

**C.    Settlement Negotiations and the Settlement's Preliminary Approval**

26.     The Parties began settlement negotiations in the fall of 2020. On October 7, 2020, Lead Plaintiff and Defendants engaged in a mediation via videoconference before Jed Melnick of JAMS.

27.    Prior to the mediation, Defendants produced more than 36,000 pages of documents, which Lead Plaintiff reviewed. The Parties also exchanged detailed mediation statements with numerous exhibits that were submitted to Mr. Melnick.

28.     A settlement was not reached at the mediation, but extensive negotiations continued after the mediation with Mr. Melnick's assistance. The Parties attended a second mediation with Mr. Melnick on March 30, 2021. A settlement was not reached at the second mediation, but negotiations continued after the second mediation with Mr. Melnick's assistance.

29.     On May 3, 2021, Mr. Melnick made a mediator's proposal for a resolution of the Action. On May 4, 2021, Mr. Melnick informed the Parties that both sides accepted the mediator's proposal.

30.     Following additional negotiations, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation and Lead Plaintiff filed Unopposed Motion for Entry of Order Preliminarily Approving Settlement and Establishing Notice Procedures (Dkt. No. 117).

31.     At all times the settlement negotiations were arm's-length and hard fought. According to Mr. Melnick, "..the parties carried out extensive, detailed, and hard-fought discussions    regarding    the    strengths    and    weaknesses    of    the    case"    and "the negotiations between counsel for the parties were conducted at arm's length and were not collusive." Ex. 1, Melnick Decl., at ¶15.  Additionally, Mr. Melnick concluded  "that all sides litigated the action in a vigorous, professional, and thorough manner. It was also clear to me that both sides were well-prepared and fully capable of proceeding to a judicial resolution if a settlement could not be achieved." *Id.*

32.     On August 11, 2021, the Court entered the Preliminary Approval Order.  (Dkt. No. 125).

III.    **THE RISKS OF CONTINUED LITIGATION**

33.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $8,350,000.  As explained more fully below,

9

there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.  Prior to trial and appeal, Lead Plaintiff faced significant litigation risks.  In addition, there were concerns related to Defendants' ability to pay. Thus, there was no guarantee that Lead Plaintiff and the Settlement Class would later achieve any recovery, let alone one greater than the Settlement Amount.

### A.    Risks Posed By Continued Litigation

34.    Although at the time the Settlement was reached Lead Plaintiff's Second Amended Complaint had partially survived a motion to dismiss, there is no guarantee that the additional misstatements pled in the Third Amended Complaint would have survived a motion to dismiss. Moreover, even though some of the alleged misstatements survived a motion to dismiss,  Lead Plaintiff would still need to prove each element of his case at trial.

35.    If litigation were to continue, Defendants would have opposed class certification. While Lead Counsel believe that Rule 23's requirements would have been satisfied and a class would be certified, Lead Plaintiff bears the burden of proof on class certification and Defendants would have undoubtedly raised arguments challenging the propriety of class certification. Moreover, even if Lead Plaintiff successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Class certification was, by no means, a forgone conclusion.

36.    Additionally, a recent ruling by the United States Supreme Court has made obtaining class certification for plaintiffs more difficult and could potentially provide additional challenges should the litigation against Defendants proceed. In *Goldman Sachs Grp. v. AR Teacher*

10

*Ret.*,  141 S. Ct. 1951 (2021), the Supreme Court held, in part, that when defendants are seeking

to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988),

as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may

consider the generic nature of an alleged misrepresentation as evidence of lack of price impact.

Accordingly, courts are now permitted to assess materiality of an alleged misstatement and

consider "all evidence relevant to price impact" at the class certification stage.  On the plus side

for Lead Plaintiff, the Supreme Court did clarify that defendants bear the burden of persuasion of

showing a lack of price impact by a preponderance of the evidence.

### B.        Risks to Proving Liability and Damages

37.        In addition to the hurdle of obtaining class action status, Lead Plaintiff and Lead

Counsel faced numerous additional risks to establishing certain Defendants' liability. Although

the Second Amended Complaint partially survived a motion to dismiss, Lead Plaintiff would have

to prove his claims if litigation continued. Defendants intended to contend in their anticipated

motion to dismiss the Third Amended Complaint that the additional misstatements added to that

complaint by Lead Plaintiff were not actionable. For example, Defendants contend that the alleged

misstatements regarding the Ong Trial were not false or misleading because its data and results

were publicly available and there was no requirement for Acer to disclose interim feedback from

the FDA during the review process. Additionally, Defendants continue to assert that the alleged

misstatements regarding the September 2015 FDA meeting were not false or misleading because

they related to the submission of the New Drug Application, rather than approval, despite the fact

those alleged misstatements survived Defendants' motion to dismiss. Further, Defendants have

asserted that even if those statements were false or misleading, scienter could not be established

11

as they did not have intent to mislead investors, did not make the statements with deliberate recklessness, and there was no motive or other evidence of intent to commit fraud

38.    Although Lead Plaintiff believes he had strong arguments in response to this argument and others, Defendants' contentions nevertheless posed a risk to establishing liability had the litigation continued.  Indeed, despite believing that the Action is meritorious, Lead Plaintiff and Lead Counsel were well aware of the high hurdles they would have to surmount in order to successfully prove that Defendants actually violated the securities laws.

39.    Even assuming Lead Plaintiff overcame the above risks and established liability, Lead Plaintiff would have confronted considerable challenges in establishing class-wide damages. Defendants have already asserted, and will continue to assert, that Lead Plaintiff would be unable to recover the full stock drop as damages.

40.    Moreover, if damages were ultimately contested, both sides would have used experts to support their respective positions. The inevitable "battle of the experts" at class certification, summary judgment, and trial creates substantial litigation risk because there can be no assurance as to which party's expert a jury will find more persuasive.

**C.    Other Risks, Including Trial and Appeals, and Ability to Collect a Judgment**

41.    Complex litigation, like this Action, is uncertain and success is never guaranteed. Lead Plaintiff would have had to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one.  Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

42.    Even if Lead Plaintiff succeeded in proving all elements of his case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only

would have renewed all the risks Lead Plaintiff faced—as Defendants would have reasserted all their arguments summarized above—but also would have resulted in significant additional delay. Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe that the Settlement represents a highly favorable result for the Settlement Class.

43. Additionally, the Settlement was funded by Defendants' D&O policy. According to Acer's Form 10-Q, as of March 31, 2021, Acer's market capitalization was around $34 million and the Company had only about $15.9 million in cash and cash equivalents. *See* Form 10-Q for the quarter ending March 31, 2021, at 6-7, Available at:https://www.sec.gov/Archives/edgar/data/0001069308/000156459021028403/acer-10q_20210331.htm.

44. Accordingly, if the case was litigated and if Lead Plaintiff prevailed, it is likely that the Settlement Class would have received less money than provided for in the Settlement. If a settlement had not been reached, Defendants would have continued to use the D&O policy funds to mount their defense and this would have eroded the amount of funds available for investors.

**D.     The Settlement is Reasonable in Light of the Maximum Potential Recovery**

45. As discussed above, Lead Plaintiff's damages expert estimates that if Lead Plaintiff had fully prevailed on all his claims at summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Lead Plaintiff's damages theory—*i.e.*, Lead Plaintiff's best case scenario—the estimated total maximum damages would be approximately $69.2 million. Thus, the Settlement Amount represents approximately 12% of the total maximum damages potentially available in the Action.

46. A recovery of 12% of maximum recoverable damages is above comparable settlements and is a positive result. According to Cornerstone Research, for settlements where

13

damages were between $25 million and $74 million, the average settlement recovery was 5.3% of estimated damages in 2020 and between 2011 and 2019, the average settlement recovery was 7.6% estimated damages. Ex 5. And NERA Economic consulting found that the median recovery for securities class action settlements was 1.7% of estimated damages. Ex. 6. This weighs strongly in favor of final approval.

47.    Having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and considering the very real risks presented by continued litigation, it is our informed judgment, based on all of the proceedings to date and our extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the Settlement Class's best interest.

## IV.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

48.    The Preliminary Approval Order directed that SCS, under Lead Counsel's direction, to: (i) email the Summary Notice, with links to the Long Notice and Claim Form on SCS's website, to Settlement Class Members that SCS was able to obtain email addresses; and (ii) mail the Long Notice and Claim Form via first-class mail to Settlement Class Members if no email address could be obtained identified with reasonable effort. Preliminary Approval Order, at ¶13.

49.    The Court also set a deadline of December 17, 2021 (21 calendar days prior to the Settlement Hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum or to request exclusion from the Settlement Class, and scheduled the Settlement Hearing for January 7, 2022 at 12:00 p.m.

50.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to mail copies of the Long Notice and Claim Form, email the Summary Notice, and publish the Summary Notice. Contemporaneously with the

14

dissemination with the Notice, Lead Counsel instructed SCS to post downloadable copies of the Long Notice and Claim Form online at https://www.strategicclaims.net/acer (the "Settlement Website"). The Notice directed Settlement Class Members to the Settlement Website in order to obtain additional information on the Settlement, including how to file a claim, request exclusion or object to the Settlement, and access the Long Notice and Claim Form.

51. The Court-approved Long Notice disclosed, among other things, the following information to Settlement Class Members: (a) a summary of the Settlement, including the $8,350,000 Settlement Amount; (b) the proposed Plan of Allocation; (c) that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Amount (*i.e.*, $2,783,333.33, plus interest), reimbursement of litigation expenses in an amount not to exceed $200,000, and an Award to Lead Plaintiff not to exceed $10,000; (d) that any Settlement Class Member could object to the requested attorneys' fees, reimbursement of the litigation expenses and Award to Lead Plaintiff; (e) an explanation of the reasons for the Settlement; (f) that requests for exclusion from the Settlement must be submitted to the Claims Administrator no later than December 17, 2021; (g) that objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum must be filed with the Court and served on counsel no later than December 17, 2021; and (h) that the deadline for submitting a Claim Form is December 8, 2021.

52. To disseminate notice, on August 25, 2021, SCS mailed a copy of the Long Notice and Claim Form to 64 individuals and organizations identified in the transfer agent records provided to Lead Counsel by Acer counsel. *See* Declaration of Josephine Bravata Concerning: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; And (C) Report on Requests for Exclusion and Objections ("Bravata Decl."), attached hereto as Exhibit 2 at ¶4.

15

53.     In addition, SCS maintains a proprietary database with names and addresses of the largest banks, brokerage firms, institutions and other third-party nominees.  On August 25, 2021, SCS caused a letter to be mailed or emailed to the 1,299 nominees contained in the SCS master mailing list.  Bravata Decl., at ¶3; 2-B (copy of the letter sent to nominees).  The letter directed nominees to: (a) mail the Long Notice and Claim Form to their customers who may be beneficial purchasers/owners; (b) email a direct link to the Long Notice and Claim Form supplied by SCS to their beneficial purchasers/owners; or (c) provide SCS with a list of the names, mailing addresses, and email addresses, if available, of such beneficial purchasers/owners so SCS could promptly mail the Postcard Notice or email links to the Long Notice and Claim Form directly to them.  Bravata Decl., at ¶3.

54.     As of December 10, 2021, SCS mailed 5,545 copies of the Long Notice and Claim Form to potential Settlement Class Members.  Bravata Decl., at ¶5.  SCS was also provided four email addresses from nominees to whom SCS emailed the Summary Notice with links to the Long Notice and Claim Form and was also informed that one nominee emailed 1,736 of their customers to notify them of this settlement and provide direct links to the Notice and Claim Form on the settlement website.  *Id*. at ¶6.

55.     On September 6, 2021, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published once in *Investor's Business Daily* and to be transmitted over *GlobeNewswire*.  *See id.* at ¶10; Ex. 2-C (confirmations of publications).

56.     Lead Counsel also caused SCS to establish the dedicated Settlement Website, which became operational on August 25, 2021, to provide potential Settlement Class Members with information concerning the Settlement, including exclusion, objection, and claim-filing deadlines for the case; the online claim filing link; the date and time of the Settlement Hearing;

16

and downloadable versions of the Long Notice and Claim Form, as well as copies of the Stipulation and Preliminary Approval Order.  Bravata Decl., ¶12.

57.    SCS maintains a toll-free telephone number for potential Settlement Class Members to call and obtain information about the Settlement and/or request a Long Notice and Claim Form.  SCS promptly responds to each telephone inquiry and will continue to address potential Settlement Class Members' inquiries.  *Id.* at ¶11.

58.    As set forth above, the Long Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation and/or the Fee Memorandum, or to request exclusion from the Settlement Class, is December 17, 2021.  To date, no requests for exclusion have been received.  *Id.* at ¶¶13-14.  SCS will file a supplemental affidavit after the December 17, 2021 deadline addressing whether any requests for exclusion have been received.

59.    In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum have been entered on this Court's docket or have otherwise been received by Lead Counsel.  Lead Counsel will file reply papers by December 29, 2021 that will address any objections that may be received.

## V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

60.    Pursuant to the Preliminary Approval Order, and as set forth in the Long Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $8,350,000 Settlement Amount, plus any and all interest earned thereon, less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any litigation expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information either online or postmarked no later than December 8, 2021. The Net

17

Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to Court approval. *See* Ex. 2-A(Long Notice), at pp. 6-8; Stipulation, ¶7.3. As set forth in the Long Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the Plan of Allocation approved by the Court.

61.      The proposed Plan of Allocation is detailed in the Long Notice. *See* Ex. 2-A (Long Notice) pp. 6-8. A downloadable version of the Long Notice is posted online on the Settlement Website. If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants. The Plan of Allocation's objective is to distribute the Net Settlement Fund equitably to those Settlement Class Members who suffered economic losses as a result of the alleged fraud as opposed to losses caused by market- or industry-wide factors or Company-specific factors unrelated to the alleged fraud. *See id.*

62.      The Plan of Allocation, developed by Lead Plaintiff's damages expert working in conjunction with Lead Counsel, is based on a theory of damages consistent with the securities claims alleged, and reflects an assessment of the damages that Lead Plaintiff contends could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiff's corrective disclosure event allegations and analysis.

63.      Under the Plan of Allocation, the Claims Administrator will calculate a Recognized Claim Amount for each Settlement Class Member's purchases of Acer common stock between September 25, 2017 and June 24, 2019, both dates inclusive.

64.      Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement — his, her, or its Recognized Claim Amount divided by the total of Recognized Claim Amounts of all Authorized Claimants, multiplied by the total

18

amount in the Net Settlement Fund and in accordance with each type of claim's allocation. Ex. 2-A (Long Notice) at pp. 6-8.

65.    An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including how many shares of Acer the Claimant purchased, acquired, or sold during the relevant period, when that Claimant bought, acquired, or sold the shares, and the number of valid claims filed by other Claimants.

66.    The Plan of Allocation is based on the premise that the decreases in the price of Acer's common stock may be used to measure the alleged artificial inflation in the price of Acer's common stock prior to the alleged corrective disclosure and stock price decline. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Acer common stock during the relevant period, or if the Claimant purchased shares during the relevant period, but did not hold such shares long enough, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged wrongdoing. *Id.*

67.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. Ex. 2- A (Long Notice) at p. 6; Stipulation ¶7.7. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. *Id.* In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost-prohibitive.

68.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Acer securities that were attributable to the wrongful conduct alleged in the Third Amended Complaint. Lead Counsel believes that the proposed Plan of Allocation will result in a

19

fair and equitable distribution of the Net Settlement Fund among Settlement Class Members similar to the result if Lead Plaintiff prevailed at trial.

69.    To date, no objections to the proposed Plan of Allocation have been received by Lead Counsel, the Claims Administrator, or filed on the Court's docket.  *See* Bravata Decl. at ¶14.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

70.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of one-third of the Class Action Settlement Amount (*i.e.*, $2,783,333.33, plus interest). Lead Counsel also request reimbursement of litigation expenses from the Settlement Fund in the amount of $160,016.52 and an Award to Lead Plaintiff of $10,000 for his reasonable costs (including lost wages) directly incurred in connection with his representation of the Settlement Class.  The requested litigation expenses are well below the maximum expense amount of $200,000 set forth in the Long Notice and Summary Notice. The legal authorities supporting a one-third fee award are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.    The Fee Application

71.    Lead Counsel is applying for a percentage-of-the-common-fund fee as compensation for the services they rendered on behalf of the Settlement Class.  As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery.  The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances.  This paradigm minimizes unnecessary drain on the Court's resources.  Notably, the percentage-of-the-

fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.  Furthermore, as set forth below, though not required in the Second Circuit, Lead Counsel also respectfully submits that the requested fee is fully supported by a "lodestar multiplier cross-check."

72.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is fair and reasonable and should be approved.  As discussed in the Fee Memorandum, a one-third fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

### 1.    The Favorable Outcome Achieved is the Result of the Significant Time and Labor That Lead Counsel Devoted to the Action

73.    Lead Counsel spent considerable time prosecuting the Action on behalf of the Settlement Class. Among other things, Lead Counsel:

a.   drafted a motion for appointment of lead plaintiff and lead counsel;

b.   conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) U.S. Securities and Exchange Commission ("SEC") filings, (ii) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles, and (iii) other publicly available material; (b) retaining and working with a private investigator; and (c) retaining and consulting with an FDA regulatory and biostatistics expert;

c.   researched, drafted and filed several complaints including the Second Amended Complaint, which survived Defendants' motion to dismiss, and the operative Third Amended Complaint which included facts uncovered during discovery;

d.   drafted pre-motion letters as well as oppositions to Defendants' motion to dismiss the Second Amended Complaint and for reconsideration of the order granting in part and denying in part the motion to dismiss the Second Amended Complaint;

21

e.  requested and reviewed more than 36,000 pages of documents Defendants produced in a pre-mediation production, which included minutes of Acer's meetings with the FDA;

f.  drafted a memorandum of law and reply in support of Plaintiff's Motion for Leave to File the Third Amended Complaint that the Court granted.

g.  consulted extensively with experts on damages and loss causation issues in connection with preparing for settlement negotiations;

h.  engaged in an extensive mediation and settlement process facilitated by Mr. Melnick of JAMS, which included: the submission of detailed mediation statements; and two full-day mediation sessions and weeks of continued discussions via telephone and email with Mr. Melnick's assistance;

i.  drafted and negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants;

j.  consulted extensively with an FDA regulatory and biostatistics expert on understanding complex factual and scientific issues to determine bases of liability and draft allegations for the amended complaints and in responding to motions to dismiss;

k.  worked with a damages expert to craft a plan of allocation that treats Lead Plaintiff and all other members of the proposed Settlement Class fairly;

l.  drafted the preliminary approval motion;

m.  oversaw the implementation of the notice process to Settlement Class Members; and

n.  drafted the motion for final approval.

74.  Attached hereto as Exhibit 4 is the Declaration of Laurence Rosen on Behalf of The Rosen Law Firm, P.A. Concerning Attorneys' fees and Expenses ("Rosen Fee Declaration"). The Rosen Fee Declaration includes a chart containing each Rosen Law attorney's time on the Action.

75.  The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District. Additionally, the rates billed by Lead Counsel attorneys (ranging from $425-$750 per hour for non-partners and $800-$995 per hour for partners) are comparable to peer plaintiff and defense

firms litigating matters of similar magnitude. *See* Ex. 7 attached hereto (table of peer law firm billing rates).

76.     Rosen Law expended 2,120.18 hours in the investigation and prosecution of the Action, the resulting in a lodestar of $1,636,294.50.  The requested fee amount of one-third of the Settlement Fund currently equals $2,783,333.33 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a lodestar multiplier of approximately 1.70.

77.     Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member's claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process.  No additional compensation will be sought for this work.

78.     As detailed above, throughout this litigation, Lead Counsel devoted substantial time to the prosecution of the Action. Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this cases.  Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

79.     Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, we respectfully submit that the requested fee is reasonable and should be approved.

### 2.     The Magnitude and Complexity of the Action

80.     As detailed in the Fee Memorandum, securities class action cases are known for their notorious complexity.  This case was no different.  To build and settle the case, Lead Counsel,

among other things, needed to: (i) conduct an extensive factual investigation, including retention of a private investigator, consultation with loss causation and damages experts, consultation with an expert in biostatistics and the FDA drug approval process, and a broad review of all publicly available information; (ii) prepare multiple complaints, including the Second Amended Complaint – which partially survived a motion to dismiss – and the operative Third Amended Complaint, knowing it needed to contain sufficient detail to overcome the PSLRA's heightened pleading standard; (iii) oppose Defendants' motion to dismiss the Second Amended Complaint and the motion for reconsideration; (iv) review 36,000 documents Defendants produced in anticipation of mediation; (v) consult extensively with an FDA and biostatistics expert on complex factual issues related to plaintiffs' theories of liability; (vi) submit a written mediation statement; and (vii) engage in two days of mediation and weeks of follow up negotiations with Defendants.

81.     The Parties zealously advocated their positions throughout the litigation and mediation process and it took several months before the Parties reached complete agreement and executed the Stipulation.

### 3.     The Significant Risks Borne By Lead Counsel

82.     This prosecution was undertaken by Lead Counsel on an entirely contingent-fee basis.  From the outset, there was no guarantee that Lead Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a litigation like this one were covered. Upon Rosen Law's involvement in the Action, it was unknown how long litigation would last. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-

fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during the course of the Action, and incurred $160,016.52 in out-of-pocket litigation-related expenses.

83.    Additionally, Lead Plaintiff alleged his claims without information gained through subpoena power, as Defendants would likely have argued that any attempt to do so would have been precluded by the PSLRA's automatic stay of discovery.

84.    Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this litigation presented multiple risks and uncertainties that could have prevented any recovery whatsoever.

85.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured.  Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. *See supra*, ¶¶33-47. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

### 4.    The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Leal Counsel, and the Standing and Caliber of Defendants' Counsel

86.     As demonstrated by Rosen Law's firm resume, attached as Exhibit  A to the Rosen Fee Decl., Lead Counsel is a highly experienced and skilled law firm that focuses its practice on securities class action litigation. Indeed, Lead Counsel has substantial experience in litigating securities fraud class actions and has negotiated scores of other class settlements, which have been approved by courts within the Second Circuit and throughout the country. Lead Counsel enjoys a reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters and Lead Counsel's experience added valuable leverage

in the settlement negotiations. *See e.g., Yedlowski v. Roka Bioscience, Inc.,* No. 14- CV-8020-FLW-TJB, 2016 WL 6661336 at *21 (D.N.J. Nov. 10, 2016) ("[Rosen Law] is highly experienced in the complex field of securities fraud class action litigation"); *In re Tupperware Brands Corp. Sec. Litig.*, No. 620CV357ORL31GJK, 2020 WL 3259749, at *2-3 (M.D. Fla. May 27, 2020), report and recommendation adopted, No. 620CV357ORL31GJK, 2020 WL 3259086 (M.D. Fla. June 16, 2020) (recognizing that Rosen Law is "well-credentialed" with "significant securities litigation experience"); *Knox v. Yingli Green Energy Holding Co. Ltd.,* 136 F. Supp. 3d 1159, 1165 (C.D. Cal. 2015) ("The Rosen Law Firm is "highly qualified [and] experienced" in securities class actions"); *Vinh Nguyen v. Radient Pharm. Corp.*, 2014 WL 1802293, at *9 (C.D. Cal. May 6, 2014) (The Rosen Law Firm "took on significant risk in this case, working thoroughly and enthusiastically through extensive litigation").

87.    Lead Counsel also obtained an excellent result for the Settlement Class, as described in Paragraphs 7-8.

88.    Additionally, the quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Defendants were represented by Morrison & Foerster, a well-known law firm that vigorously represented the interests of its clients throughout the Action. Indeed, from past experience, Lead Counsel know firsthand that Morrison & Foerster will zealously and persistently litigate for their clients through class certification, summary judgment, trial, and appeals. In the face of this experienced and formidable opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

89.    Mr. Melnick took note of the quality of the work counsel performed during the mediation process and found that they were well prepared and knowledgeable. Ex. 1, Melnick

Decl. ¶¶14-15. Moreover, while the Court will make its own determination of an appropriate attorneys' fee award, Mr. Melnick believes that the request of one-third "is fair and reasonable in light of the substantial benefit conferred upon the class and the risks of continued litigation." *Id.,* at ¶16.

### 5.    The Requested Fee In Relation to the Settlement

90.    The amount of the fee requested (one-third) in relation to the Settlement Amount ($8.35 million) is fair and reasonable. Courts routinely award fees of one-third in securities class action settlements. *See* Fee Memorandum at pp. 6-8.

### 6.    Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases

91.    Courts have consistently recognized that it is in the public interest to have vigorous private enforcement of the federal securities laws,  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

### 7.    The Reaction of the Class Supports Lead Counsel's Fee Request

92.    As noted above, as of December 10, 2021, 7,349 potential Settlement Class Members about the Settlement either by mailed Long Notice and Claim Form or emailed links to the Long Notice and Claim Form. Bravata Decl. at ¶7. To date, no requests for exclusion and no objections have been received. *Id*. at ¶¶13-14. In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over *GlobeNewswire*. Bravata Decl. at ¶10; Ex. 2-C (confirmation of Summary Notice publications).  To date, no objections to

27

the maximum potential attorneys' fees request set forth in the Long Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers, set to be filed by December 29, 2021.

### 8.    Lead Plaintiff Supports Lead Counsel's Fee Request

93.    As set forth in the declarations submitted by Lead Plaintiff, Lead Plaintiff has concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 3, Skiadas Decl., at ¶9.  Lead Plaintiff has been intimately involved in this case, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

94.    In sum, Lead Counsel accepted the Action on a fully contingent basis, committed significant resources, and prosecuted the Action without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the litigation risks, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of one-third of the Settlement Fund, resulting in a multiplier of 1.70, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.    Reimbursement of the Requested Litigation Expenses is Fair and Reasonable

95.    Lead Counsel seeks $160,016.52 in litigation expenses to be paid from the Settlement Fund.

96.    The Long Notice and the Summary Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of litigation expenses in an amount not to exceed $200,000.  The amount requested by Lead Counsel is well below the $200,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised

28

as to the maximum amount of expenses set forth in both the Long Notice and Summary Notice.  If any objection to the request for reimbursement of litigation expenses is made after the date of this filing, Lead Plaintiff will address it in his reply papers.

97.    From the beginning of the case, Lead Counsel were aware that they might not recover their out-of-pocket expenses.  Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute the Action. Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

98.    In my opinion, the expenses paid were necessary and appropriate for the prosecution and resolution of the Action. The largest component of expenses was expended on the retention of experts including a financial expert focusing on damages and loss causation as well as a FDA regulatory and biostatistics expert.  These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the complaints, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

99.    Other large components of expenses include investigator fees and mediation fees – both necessary for the litigation and ultimate resolution of the Action.

100.    The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things, court filing fees, service of process costs, postage and delivery expenses, cost for private investigators, and the cost of on-line legal research.

**C.    The Award to Lead Plaintiff**

101.    Lead Plaintiff seeks reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of his reasonable costs (including lost wages) directly incurred in connection with his representation of the Settlement Class, in the amount of $10,000.  Ex., 3, Skiadas Decl., ¶12. Lead Plaintiff lost a significant amount of money on his investments in Acer common stock and was highly motived to, and did, work closely with Lead Counsel throughout the pendency of the Action to secure the highest possible recovery for himself and the Settlement Class.

102.    Lead Plaintiff is a cardiologist and a sophisticated investor who has been investing for over 20 years. *Id*. at ¶¶3-4. Given his medical background, Lead Plaintiff invests in biotechnology companies. *Id*. at ¶4. Lead Plaintiff utilized it his knowledge to assist Lead Counsel and the Settlement Class by conducting his own research and investigation. *Id*. at ¶7.

103.    Additionally, Lead Plaintiff: (i) regularly communicated with Lead Counsel regarding the posture and progress of the case, as well as strategy; (ii) produced documents to Lead Counsel attorneys; (ii) reviewed all significant pleadings and briefs filed in the Action; (iv) consulted with my attorneys regarding the settlement negotiations; and (v) evaluated and approved the proposed Settlement. *Id*. at ¶7.

## VII.    CONCLUSION

104.    In view of the significant recovery for the Settlement Class and the substantial risks related to the prosecution of the Action, as described herein and in the accompanying Final Approval Memorandum, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should be approved as fair and reasonable.  I further submit that the requested fee in the amount of one-third of the Settlement

Fund should be approved as fair and reasonable, reimbursement of litigation expenses, and Award to Lead Plaintiff, should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 10th day of December 2021, at New York, New York.

*/s/ Laurence Rosen*

LAURENCE ROSEN